☀ 87°   🚗                                          SUBSCRIBE   🔍
                                                   as low as 99¢

my                                                           👤 LOG IN

**BREAKING**   3 Miami Dolphins stay off the field during national anthem
**NEWS**

# State hired prison health firm despite record of horrific deaths

LOCAL    By Pat Beall - Palm Beach Post Staff Writer

      0

Posted: 3:00 p.m. Saturday, October 25, 2014

Long before Florida hired Corizon Inc. to handle prison health care, the Tennessee-based company racked up impressive revenues, securing a string of government contracts and dominating the inmate care industry.

But as Florida inked its $1.09 billion deal with the company in 2012, Corizon also quietly was signing off on lawsuit settlements linked to dangerously deficient care. It faced withering criticism in an Idaho class-action suit and was faulted in a federal report on an immigrant detainee's death. Maine auditors criticized Corizon care.

None of that made its way into Corizon's 2,300 page bid for the Florida contract, despite a requirement to disclose investigations and legal settlements.

In fact, none of the criticisms and incidents should have come as a surprise to state officials. High-profile deaths and lawsuits linked to Corizon and the two companies that merged in 2011 to create it — Prison Health Services and Correctional Medical Services — span more than a decade. Many were in Florida.

Booked into the Volusia County Jail on a misdemeanor charge, Tracy Veira died in 2009 from forced, and untreated, opiate withdrawal; she had been left alone in a cell for the last four days of her life. The same year, Collier County Jail inmate Joan Graeber lost her baby after staffers delayed treatment for a blood condition lethal to the fetus.

Between 2002-2004, when Corizon handled medical care at the Palm Beach County Jail, two inmates died when medicines were withheld, including one HIV-positive prisoner treated with Tums. Judges released two others so they could get medical care. The health department threatened legal action if a potentially deadly infection racing through the jail wasn't brought under control.

## *Related*

Death at the Palm Beach County Jail: A timeline

Dying for care: Documents

Two cancer-stricken Florida state prison inmates were treated with Tylenol and ibuprofen by Corizon staffers this year as their undiagnosed disease spread, The Palm Beach Post reported last month. One inmate died in June. A second is dying.

This, too, was not a first for Corizon: In 2010, Manatee County inmate Jovon Frazier's arm pain was treated with Tylenol and muscle exercises for four months before an MRI indicated he had bone cancer, a suit brought by his mother charges. His arm was amputated. However, cancer already had spread to his lungs. Frazier, serving less than a year for theft and drug charges, died.

**State: Corizon fully disclosed**

Corizon believes details of those and other cases did not have to be divulged, and that it stayed well within the terms of what the state wanted to know. "Corizon Health is confident that its bid was responsive," company spokeswoman Courtney Eller said.

Florida corrections officials agree. Even if information on lawsuit settlements, the Maine audit and federal investigation had been provided, the company's bid response met the definition of full disclosure, Florida Department of Corrections spokeswoman Jessica Cary said.

Late last month, after The Post identified a spike in inmate mortality rates, Corrections Secretary Michael Crews formally warned Corizon its contract could be pared back or payments withheld unless medical treatment improved.

The warning was based on "serious concerns" about inmate health care, Cary said, and Crews has directed the company to take "immediate, specific measures."

While not specifically addressing the written warning, Corizon's Eller said that "we have implemented a number of improvements over the past year. We look forward to continuing that progress in the future."

But attorney Randall Berg, who sued both DOC and Corizon on behalf of an amputee inmate who could not get a prosthetic leg, remains skeptical of both the company and DOC.

"When one has to sue DOC and Corizon to get inmates' hernia surgeries, prosthetic legs, artificial knees; finally the secretary does something," said Berg, executive director of Florida's Justice Institute, an inmate advocacy group.

"Corizon has been a disaster and in breach of contract since assuming the contract."

**Other states' criticisms**

Citing the need to slash costs, the Legislature voted to hand off state prisoners' medical, psychiatric and dental care to private companies in 2011. By late 2013, privatization was complete.

Today, Corizon and Wexford Health Sources share responsibility for roughly 100,000 Florida inmates under five-year contracts worth more than a combined $1.3 billion. Corizon snared $1.09 billion of that.

It's not surprising that Corizon and the two companies that merged in 2011 to form it — Prison Health Services and Correctional Medical Services — would come under fire. Prison care is difficult and prisoners are litigious. Inmates can, and do, fake illness. They don't necessarily need to fake, though: Prisoners frequently suffer complex and chronic diseases, as well as mental illness and serious dental problems. It's why even a 50-year-old Florida inmate is considered elderly.

Even so, bidders for the Florida contracts were required to disclose settled lawsuits and federal reports involving inmate care within the previous five years. Corizon provided a list of financial penalties assessed by governments for unspecified contract lapses and a paragraph confirming "certain oversight or regulatory agencies have on occasion reviewed issues at facilities contracted to Corizon."

However, nowhere in Corizon's bid documents are details of five five court settlements, a critical federal report on the death of an immigrant detainee, a Maine report detailing shortcomings in that state and in 2010, renewed federal oversight of an Idaho prison

where Corizon provided medical care. All occurred within the five-year time frame.

- Between 2007 and 2009, Corizon spent more than $6.6 million to settle suits brought by three pregnant women who lost their unborn babies and a fourth whose baby sustained permanent brain damage.

- In 2011, U.S. immigration officials commissioned a formal inquiry into the fatal heart attack of an immigrant detainee who was held in two jails, including a jail in Albany, N.Y. jail. The woman died in Albany, where Corizon provided treatment. The federal report found that the woman's previously prescribed heart medicines were given in the wrong dosages and at the wrong time.

- In 2010, a doctor hired by Corizon quit after six months at an Idaho prison. Unqualified staffers handled medical care and pharmacy operations ran afoul of state law, he said, a practice he reported to state medical boards. A federal judge subsequently appointed a monitor to report on medical care at the prison. The monitor's assessment was so scathing state lawyers sought to keep it sealed.
-

A 2011 Maine audit found that Corizon was slow to respond to inmates reporting illness, failed to conduct regular physicals and could not always prove medicine was administered at the right time or in the right amount. State prison officials challenged the review's findings, in part because of the small sample size.


**ER trip: Money for 'foolishness'**

In two other back-to-back legal settlements not found in Corizon's bid documents, the company's nurses faulted company practices.

In 2007, 25-year-old Brett Fields was serving time in the Lee County Jail on two misdemeanor charges when he came to the infirmary with a red, pull-filled lump on his arm. Corizon's medical staff prescribed antibiotics.

It didn't help. Fields' arm remained swollen. Back pain followed, then uncontrollable twitching in his legs. Four weeks into his confinement, Fields couldn't walk or uinate. He had no knee reflex. He was given Tylenol.

Crawling to a toilet, Fields' lower intestines fell out of his bowels. A nurse appeared, accused him of faking, had him placed on a sheet and dragged to a medical observation cell.

The same nurse later testified that Corizon supervisors "yelled a lot" about nurses sending inmates to hospitals. Staff was told to make sure doctors decided whether inmates needed an ambulance, she said, "because it cost … so much money every time we take somebody to the ER."

If a doctor makes the call, she said, "that way, there's not any unnecessary money spent for foolishness."

Reluctance to use emergency transport was repeated in Minnesota in 2010, a court case alleges, where inmate Xavius Scullark-Johnson's anti-seizure drug had been cut in half, triggering multiple convulsions. A nurse turned away an ambulance, the suit said.. Scullark-Johnson was left brain dead.

In Fields' case, the delayed call for emergency treatment came as an untreated, antibiotic-resistant infection spread to his spine. There, it created an abscess, damaging his spinal nerves. When finally sent to a hospital, he was rushed into surgery, but as doctors, a jury and an appeals court later agreed, help came too late to avert permanent damage. He remains partly paralyzed.

A jury awarded Fields $1.2 million in damages.

**Protocols not followed**

In the fall of 2013, as Corizon's billion-dollar state contract was being implemented, the company was settling another lawsuit brought by the family of a county jail inmate, one which also involved disturbing statemrnts by acompany nurse.

Tracy Veira told medical staff she was taking prescribed opiates when she was booked into the Volusia County jail on drug charges. Corizon staffers halted the medication without explanation.

Opiate withdrawal can be managed. Untreated, it can be deadly. Almost immediately, Veira no longer could eat or keep down liquids. In the space of a week, she dropped 20 pounds, according to court documents.

Confined to an isolation cell, Veira spent much of four days alone, throwing up volumes of noxious green fluid.

She died of dehydration. The cell was so fouled that even an hour after her death, workers had trouble remaining in it.

One of three nurses on duty the night before Veira died, Inga Jones, described seeing Veira lying across clinic chairs, pale, slurring her words and twitching while the supervisory nurse read a book.

Jones believed Veira needed to get to a hospital. So did another nurse. Neither was in charge, though.

Jones also believed Veira had not been seen by a doctor and was not checked after she was locked into her cell.

But that was the norm, Jones said in court papers. "Drug and alcohol withdrawal protocols were routinely not followed," wrote Jones. "Many times I recalled returning to duty and finding a patient in full-blown detox."

**Cruel and unusual**

Inmates are not legally entitled to excellent care. They are, however, legally entitled by the U.S. Constitution's ban on cruel and unusual punishment to adequate care.

"A prisoner who receives a sentence of 2-10 years, deserves to do 2-10 years," wrote a Michigan federal judge in 2006. "What he does not deserve is a de facto and unauthorized death penalty at the hands of a callous and dysfunctional health care system."

The judge was overseeing a Michigan class-action suit alleging substandard medical and psychiatric care. That care was being handled by Correctional Medical Services, or CMS, the Corizon predecessor.

Among the cases cited: A psychotic 21-year-old strapped to a concrete slab for four days when the heat index hovered at 100. He died of heat and thirst.

A doctor saw him once, according to court documents, but did not take his vital signs. On the fourth day, a nurse detected a "faint" pulse — but prison video shows he then left the cell. The inmate died an hour later.

After hearing details of the death, the judge ordered multiple changes, writing that, "The days of deadwood in the Department of Corrections are over, as are the days of CMS intentionally delaying referrals and care for craven profit motives."

**Killer forces change**

Florida has had its own taste of federal judges controlling prison care. In 1972, convicted Florida murderer Michael Costello's handwritten lawsuit alleging poor medical care by the state — not private companies — triggered a landmark class-action suit lasting two decades.

Because a federal judge in the Costello case was persuaded that overcrowding was linked to poor health care, state prisoners had to be released and expensive new prisons built. The state's bond rating was threatened by the ongoing litigation.

The court relinquished control only after Florida created the Correctional Medical Authority, a state-financed, independent panel that surveyed prison health care.

In 2011, the same year state lawmakers voted to put health care in the hands of for-profit companies, they eliminated money for CMA, effectively abolishing it.

Some money was restored in 2012. CMA began inspecting prisons again in 2013.

Several got good marks. For instance, treatment at Hernando Correctional prison was equivalent to community standards, the team wrote, and medical staff deserved to be commended. Inmates, they wrote, "were generally satisfied with health care."

Two months after the CMA review, Hernando inmate Donna Pickelsimer was taken to a state prison hospital to live out her last days. For months, medical records show, Pickelsimer's painful, spreading lung cancer was treated with Tylenol and warm compresses by Corizon staff, even as bulges appeared on her chest, back and arm.

When Pickelsimer complained of pain, she was placed in an isolation cell.

CMA's report did not reference any inmate with lung cancer. However, sandwiched between praise for the medical staff were observations that cancer treatment for two women wasn't carried out. Months after a cancer specialist prescribed a round of testing, one inmate was still waiting on the screenings.

The other woman's prescribed follow-up treatment related to ovarian cancer had been denied by Corizon. There was no record that the prison doctors offered any alternate plan of treatment.

**'It makes anybody cry'**

Despite the criticisms and high-profile cases, privatizing to manage burgeoning inmate medical care costs remains popular. In the past 12 months, Corizon has inked contracts valued at more than $1 billion with jails or prisons in California, Kansas, Georgia and Minnesota.

In Indiana, prison officials last year signed Corizon to a three-year contract, despite the highly publicized death of Rachel Wood the previous year.

Inmates said Wood, 26, was bleeding from her eyes and nose when prison medical staff directed an ambulance to take her, not to a hospital, but to a long term care facility.

Dead on arrival, Wood had more than 3,600 nanograms of the antidepressant Citalopram in her system, said her father, Claude Wood. The recommended dosage is no more than 120 nanograms. A medical examiner ruled her death was a result of "therapeutic misadventure" — medical error.

"Why did state officials blow this off?" asked Wood of Indiana's decision to hire Corizon. "It makes anybody cry, what they've done."

**What The Post found**

In a Sept. 28 story, reporter Pat Beall documented horrors and a downward spiral in care since private companies took over prison health care in Florida.

- Two inmates with fatal cancers were treated with Tylenol and ibuprofen as their disease spread. One died in June. The other is not expected to live beyond this year.

- The number of inmates being sent to outside hospitals is sharply down. At the current rate, admissions will drop by 47 percent compared with the last year state corrections officials oversaw medical care.
- In January, inmate deaths from causes other than murder or accidents hit 36, a 10-year high. Deaths for the first seven months of this year totaled 206, a 10-year high when compared with the first seven months of other years.

**More at mypalmbeachpost.com**

Death at the Palm Beach County Jail - An interactive timeline

As part of its continuing series on prison health care, The Post has published more than 3,200 pages of source documents, including lawsuits and the companies' response to them; court depositions and transcripts; bid proposals; contracts and audits.

They can be read at: mypalmbeachpost.com/dying-for-care-documents/

**Pleaded to murder**

**to avoid jail care**

Writhing in abdominal pain but given only antacids, Kevin Coleman sat for three weeks in the Palm Beach County Jail, awaiting his second trial in a murder. New evidence likely would exonerate him. But he pleaded no contest to the charge, leaving him a felony record but releasing him for time served, to make sure he didn't go back. **His story, XA**



___

# *About the Author*

PAT BEALL



___

 ADVERTISER CONTENT: The Palm Beach Post
**Your guide to the best places to eat, shop, and play in West Palm Beach**

___

# *Reader Comments*  0

___

# *Next Up in Local*

**JUST IN: Florida man accused of breaking 3-month-old girl's leg**

**Skeeters are back in bunches: County to spray western communities**





**86°**
Broken Clouds
**Port Royal SC**     **FULL FORECAST**

Search

# Corizon Health may have no future at jail

*Published: Monday, June 6th 2016, 1:25 pm PDT*
*Updated: Tuesday, June 7th 2016, 1:44 pm PDT*

**By David Klugh, Anchor**   CONNECT

CHATHAM CO., GA (WTOC) - This weekend, we learned Chatham County Sheriff John Wilcher may be moving forward with a plan to terminate the jail's contract with Corizon Health.

That company has been providing inmate healthcare for the last several years. It has also been the target of nearly a dozen civil lawsuits by jail employees and inmates who claim they suffered permanent injury or even death under Corizon's care. One thing Corizon's leave cannot do, is erase the past.

Accusations and lawsuits against Corizon Health have been coming out of the Chatham County Jail at rate that has had even county commissioners questioning the jail's choice of a heath care provider.

The election of Sheriff Wilcher may have been the beginning of the end of Corizon Health. This just weeks after another inmate died of heart failure after the family says Corizon waited days to get him the help he needed.  Monday, even before officially filing suit, the family of Jimmy Alexander came forward begging for the community to end its tolerance of this jail's health care culture.

"When life after life is lost and question after question abounds, that's violence," said Attorney Chad Mance. "And so, it is an unsafe practice as a matter of public safety for us to allow any more inmates to die in the Chatham County Detention Center."

Commission Chairman Al Scott confirmed Monday morning, the county has been looking at half a dozen alternative jail health providers for months now.  A source close to that process says the jail nurses were brought together last week and told a new vendor was on the way and that Corizon was out.

However, Sheriff Wilcher is not ready to talk about it until that new service provider has signed on and is approved.

Savannah attorney, Will Claiborne has filed half a dozen lawsuits against Corizon on behalf of injured deputies and the families of inmates who died in the Chatham County Jail, or suffered permanent injured while in the jail.

"They appear to be wanting to take a step in the right direction so that these things will hopefully stop happening in the future.  We'll find out," said Claiborne. "The quality of care needs to improve, and whether that's Corizon doing a better job, or more money being appropriated, or a different company coming in, at the end of the day, all of our clients are concerned that what has happened to them or happened to their families, doesn't happen again."

Perhaps the greatest challenge for the county, if a new healthcare vendor is being brought in here at the jail, is considering a different, more pro-patient business model. Under Corizon, the county provided a lump sum of money, just over $5 million, and whatever Corizon didn't need for inmate care, it took home as profit.  Some consider that model unethical at best, illegal at its worst.

"We would hope to see a change in the compensation model because," said Claiborne. "You're right, regardless of the size of the pot of money, if the profit and the costs are drawn from the same pot of money, you know which one is going to be sacrificed for the other."

And there appears to be a pool of Corizon Health patients in Chatham County just waiting for their chance to prove they too were at the wrong end of that alleged sacrifice.

The GBI is now investigating the Alexander case, with a family waiting anxiously for the results.

"We are going to be very aggressive about exacting the full depth and breathe of the laws, should any wrong doing be revealed," said Mance. "If any wrong doing is revealed, we are going to sue first and ask questions later."

WTOC tried several times over the weekend and Monday to reach out to Corizon Health for a comment. Corizon responded Tuesday with a statement:

> " *We are not aware of the selection of any vendor in Chatham County, and with our current contract expiring on July 31, based on the WARN Act, we are required to give 60-day notice to our employees. Should the County decide to go in a different direction, Corizon Health will work to ensure a smooth transition in patient care.* "

As for the county's contract with Corizon, commissioners have not yet received a proposal from their staff. That could happen as early as Tuesday and could be on the commission agenda as early as Friday.

We are also told the new vendor hoping to provide healthcare in the future at the jail, is touring the facilities this week. We'll keep you up to date.

I am also told Sheriff Wilcher is not comfortable speaking publicly about his plans for inmate healthcare until a new vendor is in place. And the County Commission has not received any kind of proposal to put on their agenda as of Tuesday afternoon.

We'll let you know if that changes.

*Copyright 2016 WTOC. All rights reserved.*

## RECOMMENDED STORIES

*Recommended by*

   

**Portland, Oregon: This Brilliant Company Is Disrupting a $200 Billion Industry**
*Sponsored | EverQuote*

**The All-New 2018 Cadillac CTS Will Make Your Heart Race**
*Sponsored | Yahoo! Search*

**Glasses-Lovers Are Going Crazy Over This Website**
*Sponsored | GlassesUSA*

**How To Fix Your Fatigue (Do This Every Day)**
*Sponsored | Health Headlines*

   

**Nadia Comaneci Is Completely Unrecognizable Today**
*Sponsored | Kiwi Report*

**Teen spots "demonic" man stalking a girl at Target, then says "excuse me sir, do you know her?"**
*Sponsored | Scribol*

**Best & Worst Refinance Mortgage Companies of 2017**
*Sponsored | Comparisons.org*

**Husband Found Wife's Secret Identity In A Locked Box Years After She Dies [Gallery]**
*Sponsored | True Activist*

## SPONSORED CONTENT

**25 Most Desirable SUVs** *Edmunds*

**Lottery Winner Leaves His Wife A Note: We're Broke [Gallery Story]** *Worldation*

**Portland, Oregon: What is the $200 Billion Industry Being Disrupted By EverQuote?** *EverQuote*

**What Americans With No Tickets In Three Years Might Not Know** *EverQuote*

**Shop Soft Shoes!** *Sofft Shoes*

## WE RECOMMEND

**Susan Smith has spent more than half her life behind bars**

**In Vegas, Pence praises US resolve to find hope after horror**

**Shrimp: 10 Things You Didn't Know**

**NC high court reviews death penalty of man who beheaded wife**

**A Lesson In Soft-Shell Crabs**

*Recommended by*

Can't Find Something?    SEARCH FOR IT HERE    SEARCH



P.O. Box 8086
Savannah GA 31412
(912) 234-1111

**FCC Public File**
publicfile@wtoc.com
(912) 234-1111
**EEO Report**
Closed Captioning

**NEWS    WEATHER    SPORTS    VIDEO    TRAFFIC    TV    LOWCOUNTRY    COMMUNITY    CONTESTS    ABOUT US**

**GEORGIA NEWS NOW    SOUTH CAROLINA NEWS NOW**

All content © Copyright 2000 - 2017 Raycom Media. All Rights Reserved. For more information on this site, please read our Privacy Policy, and Terms of Service, and Ad Choices

The New York Times

---

**N.Y. / REGION**  |  HARSH MEDICINE

# As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence

By PAUL VON ZIELBAUER    FEB. 27, 2005

Brian Tetrault was 44 when he was led into a dim county jail cell in upstate New York in 2001, charged with taking some skis and other items from his ex-wife's home. A former nuclear scientist who had struggled with Parkinson's disease, he began to die almost immediately, and state investigators would later discover why: The jail's medical director had cut off all but a few of the 32 pills he needed each day to quell his tremors.

Over the next 10 days, Mr. Tetrault slid into a stupor, soaked in his own sweat and urine. But he never saw the jail doctor again, and the nurses dismissed him as a faker. After his heart finally stopped, investigators said, correction officers at the Schenectady jail doctored records to make it appear he had been released before he died.

Two months later, Victoria Williams Smith, the mother of a teenage boy, was booked into another upstate jail, in Dutchess County, charged with smuggling drugs to her husband in prison. She, too, had only 10 days to live after she began complaining of chest pains. She phoned friends in desperation: The medical director would not prescribe anything more potent than Bengay or the arthritis medicine she had brought with her, investigators said. A nurse scorned her pleas to be hospitalized

Coletti Decl., Ex. J
Page 9 of 64

9/8/2017
Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 10 of 64
As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence - The New York Times

as a ploy to get drugs. When at last an ambulance was called, Ms. Smith was on the floor of her cell, shaking from a heart attack that would kill her within the hour. She was 35.

In these two harrowing deaths, state investigators concluded, the culprit was a for-profit corporation, Prison Health Services, that had moved aggressively into New York State in the last decade, winning jail contracts worth hundreds of millions of dollars with an enticing sales pitch: Take the messy and expensive job of providing medical care from overmatched government officials, and give it to an experienced nationwide outfit that could recruit doctors, battle lawsuits and keep costs down.

A yearlong examination of Prison Health by The New York Times reveals repeated instances of medical care that has been flawed and sometimes lethal. The company's performance around the nation has provoked criticism from judges and sheriffs, lawsuits from inmates' families and whistle-blowers, and condemnations by federal, state and local authorities. The company has paid millions of dollars in fines and settlements.

In the two deaths, and eight others across upstate New York, state investigators say they kept discovering the same failings: medical staffs trimmed to the bone, doctors underqualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished.

Not surprisingly, Prison Health, which is based outside Nashville, is no longer working in most of those upstate jails. But it is hardly out of work. Despite a tarnished record, Prison Health has sold its promise of lower costs and better care, and become the biggest for-profit company providing medical care in jails and prisons. It has amassed 86 contracts in 28 states, and now cares for 237,000 inmates, or about one in every 10 people behind bars.

Prison Health Services says that any lapses that have occurred are far outnumbered by its successes, and that many cities and states have been pleased with its work. Company executives dispute the state's findings in the upstate deaths, saying their policy is never to deny necessary medical care.

And they say that many complaints -- from litigious inmates, disgruntled employees and overzealous investigators -- simply come with the hugely challenging work they have taken on.

"What we do," said Michael Catalano, the company chairman, "is provide a public health service that many others are unable or unwilling to do."

The examination of Prison Health also reveals a company that is very much a creature of a growing phenomenon: the privatization of jail and prison health care. As governments try to shed the burden of soaring medical costs -- driven by the exploding problems of AIDS and mental illness among inmates -- this field has become a $2 billion-a-year industry.

It is an intensely competitive world populated by a handful of companies, each striving to find enough doctors and nurses for a demanding and sometimes dangerous job. The companies, overseen by local governments with limited choices and money, regularly move from jail to jail, and scandal to scandal -- often disliked but always needed.

Perhaps the most striking example of Prison Health's ability to prosper amid its set of troubles unfolded in New York State. Despite disappointed customers and official investigations in Florida and Pennsylvania, the company still managed to win its largest contract ever in 2000, when New York City agreed to pay it $254 million over three years to provide care at the correctional labyrinth on Rikers Island.

The city, in fact, just renewed that deal in January for another three years -- despite the deaths upstate, and a chorus of criticism over Prison Health's work at Rikers, where employees and government monitors have complained of staff shortages and delays in drugs and treatments for H.I.V. and mental illnesses. A rash of suicides in 2003 prompted a scramble by officials to fill serious gaps in care and oversight.

Along the way, though, Prison Health has acquired at least one tenacious adversary. The State Commission of Correction, appointed by the governor to investigate every death in jail, has moved over the last several years from polite

recommendations to bitter denunciations, frustrated by what it says is the company's refusal to admit and address deadly mistakes.

The commission has faulted company policies, or mistakes and misconduct by its employees, in 23 deaths of inmates in the city and six upstate counties. Fifteen times in the last four years, it has recommended that the state discipline Prison Health doctors and nurses.

And since 2001, the commission, along with the State Education Department, which regulates the practice of medicine, has urged Attorney General Eliot Spitzer to halt the company's operations in New York, saying that Prison Health lacks any legal authority to practice medicine because business executives are in charge. New York, like many other states, requires that for-profit corporations providing medical services be owned and controlled by doctors, to keep business calculations from driving medical decisions.

Prison Health says its work in New York is legal because it has set up two corporations headed by doctors to run medical care. But state investigators have called those corporations shams.

Elsewhere, Prison Health did not go that far, until questioned by The Times. Now it says it is creating doctor-run corporations in 11 other states with similar laws, including New Jersey and California.

"Had we realized this would be a question, we would have addressed it earlier," said Mr. Catalano, the company's chairman. "We have nothing to hide here."

But in one report after another, the state commission has exposed what it says is the dangerous way Prison Health has operated.

One investigation found that the doctor overseeing care in several upstate jails in 2001 -- continually overruling the doctors there, and refusing drugs and treatments -- was not even licensed to practice in New York State. He did the job, the commission found, by telephone -- from Washington.

The commission's gravest findings have involved deaths on the company's watch, mostly of people who had not been convicted of anything.

Coletti Decl., Ex. J
Page 12 of 64          4/24

Candy Brown, a 46-year-old Rochester woman jailed in 2000 on a parole violation, died when her withdrawal from heroin went untreated for two days as she lay in her own vomit and excrement in the Monroe County Jail, moaning and crying for help. But nurses did not call a doctor or even clean her off, investigators said. Her fellow inmates took pity and washed her face; some guards took it on themselves to ease her into a shower and a final change of clothes.

Scott Mayo Jr. was only a few minutes old in 2001 when guards fished him out of a toilet in the maternity unit of Albany County Jail. It was the guards, investigators said, who found a faint pulse in the premature baby and worked fiercely to keep his heart beating as a nurse stood by, offering little help.

"We're a jail," the nurse told state officials after the infant died. "There's no equipment for a fetus. Or a newborn."

In at least one death report, the commission took the opportunity to voice a broad indictment of the company. Frederick C. Lamy, chairman of the commission's medical review board, denounced Prison Health, or P.H.S as it widely known, as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."

"The lack of credentials, lack of training, shocking incompetence and outright misconduct" of the doctors and nurses in the case was "emblematic of P.H.S. Inc.'s conduct as a business corporation, holding itself out as a medical care provider while seemingly bereft of any quality control."

In its review of Prison Health's work, The Times interviewed government regulators, law enforcement officials and legal and medical specialists, including current and former company employees. The review included thousands of pages of public and internal company documents, state and city records, and every New York State report on deaths under the company's care.

The examination shows that in many parts of the country, including counties in New Jersey and Florida, Prison Health has become a mainstay, satisfying officials by paring expenses and marshaling medical staffs without the rules and union issues that constrain government efforts.

But elsewhere, it has hopscotched from place to place, largely unscathed by accusations that in cutting costs, it has cut corners.

Georgia, which hired Prison Health in 1995, replaced the company two years later, complaining that it had understaffed prison clinics. Similar complaints led Maine to end its contract in 2003. In Alabama, one prison has only two doctors for more than 2,200 prisoners; one AIDS specialist, before she left this month, called staffing "skeletal" and said she sometimes lacked even soap to wash her hands between treating patients.

In Philadelphia's jails, state and federal court monitors in the late 1990's told of potentially dangerous delays and gaps in treatment and medication for inmates under Prison Health, which nonetheless went on in 2000 to win a contract not far away in the Baltimore City Detention Center. There, two years later, the federal Department of Justice reported that better care might have prevented four inmate deaths. One guard, it said, complained that she had to fight nurses to get sick inmates examined.

Such stories can be heard around the country. In Las Vegas, after an H.I.V.-positive inmate died in 2002, nurses and public defenders said the county jail's medical director had refused medications for AIDS and mental illness, calling inmates junkies.

In Indiana, Barbara Logan, a former Prison Health administrator who filed a whistleblower suit last year, said in an interview that the pharmacy at her state prison was so poorly stocked that nurses often had to run out to CVS to refill routine prescriptions for diabetes and high blood pressure.

Before Prison Health even started in Georgia, there had been several inmate deaths in neighboring Florida that cost the company three county contracts, millions of dollars in settlements -- and an apology for its part in the 1994 death of 46-year-old Diane Nelson. Jailed in Pinellas County on charges that she had slapped her teenage daughter, Ms. Nelson suffered a heart attack after nurses failed for two days to order the heart medication her private doctor had prescribed. As she collapsed, a nurse told her, "Stop the theatrics."

The same nurse, in a deposition, also admitted that she had joked to the jail staff, "We save money because we skip the ambulance and bring them right to the morgue."

A Tough Business Taking On Headaches, And Creating Some, Too

Few jobs are harder to get right than tending to the health of inmates, who are sicker and more dependent on alcohol and drugs than people outside. AIDS and hepatitis have torn through cellblocks, and mental illness is a mushrooming problem. In the last decade, state and local government spending for inmate health care has tripled nationwide, to roughly $5 billion a year.

Qualified doctors and nurses are difficult to find, as jails are hardly the most prestigious or best-paying places to work. The potential costs of failure, though, are high -- because most inmates will eventually be let out, along with any disease or mental illness that went untreated.

For decades the task fell to state and local governments that typically lacked resources or expertise, acting in sometimes conflicting roles as punisher and medical protector. Often, the results were tragic.

Three skeletons dug up at an Arkansas penal farm in 1968 led to the uncovering of a monstrous system in which a prison hospital served as torture chamber and a doctor as chief tormentor. The 1971 uprising at Attica state prison in upstate New York, which was sparked in part by complaints about health care, left 43 inmates and guards dead. The debacle unleashed a flood of prisoner lawsuits that culminated in a 1976 United States Supreme Court decision declaring that governments must provide adequate medical care in jails and prisons.

But where governments saw a burden, others spotted an opportunity. Two years after the ruling, a Delaware nurse named Doyle Moore founded Prison Health, pioneering a for-profit medical-care industry that offered local officials a grand solution: hand off the headache.

About 40 percent of all inmate medical care in America is now contracted to for-profit companies, led by Prison Health, its closest rival, Correctional Medical

As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence - The New York Times

Services, and four or five others. Though the remaining 60 percent of inmate care is still supplied by governments, most often by their Health Departments, that number has been shrinking as medical expenses soar.

A few big-city hospitals and other nonprofit enterprises have stepped into the fray, and while not perfect themselves, have performed the best by many accounts, bringing a sense of mission to the work. But that care usually costs more than governments want to spend, and most hospitals are neither equipped nor motivated to enter a jail or prison, where profit margins linger in the single digits.

In this world, where governments are limited in their choices, a half-dozen for-profit companies jockey to underbid each other and promise the biggest savings.

"It's almost like a game of attrition, where the companies will take bids for amounts that you just can't do it," said Dr. Michael Puisis, a national expert and editor of "Clinical Practice in Correctional Medicine," an anthology of articles by doctors. "They figure out how to make money after they get the contract."

Businesses with the most dubious track records can survive, and thrive. When cost-trimming cuts into the quality of care, harming inmates and prompting lawsuits and investigations, governments often see no alternatives but to keep the company, or hire another, then another when that one fails -- a revolving-door process that sometimes ends with governments rehiring the company they fired years earlier.

Prison Health has mastered the game. When its mistakes have become public, the company has quietly settled lawsuits and nimbly brokered its exits by quickly resigning, thus preserving its marketable claim that it has never been let go for cause.

Even dissatisfied government clients can be reluctant to discuss their complaints openly, or share them with other counties or states. Some fear being exposed to lawsuits and criticism; others worry that the company dropped this year may return next year as the only bidder for the job. Or, as some former Prison Health customers discovered to their dismay, the new company they hire may be bought by the company they fired.

Coletti Decl., Ex. J
Page 16 of 64

8/24

9/8/2017
Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 17 of 64
As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence - The New York Times

"You've got the professionals dealing with amateurs," said Dr. Ronald Shansky, a former medical director for the Illinois prison system. He said most sheriffs and jailers were not sophisticated enough about medicine to know what to demand for their money until things go wrong. Local laws requiring that contracts be regularly put out for bid -- and go to the lowest bidder -- can force officials to switch providers constantly, disrupting care and demoralizing staffs.

Yet once they turn jail medicine over to an outside enterprise, governments rarely go back to providing it themselves. "It's like an article of faith that private is better," Dr. Shansky said, even though a 1997 study comparing government and for-profit prison care, commissioned by the Michigan Department of Corrections, found little difference in cost or quality.

On this playing field, Prison Health has prevailed by thinking big, buying up competitors and creating a nationwide pharmacy to supply its operations. Its revenues have risen in the last decade to an estimated $690 million last year from $110 million in 1994, and its stock has leapt to $27.46 a share -- its closing price on Friday -- from a split-adjusted price of $3.33.

But day by day, Prison Health -- like all of its competitors -- faces the most basic challenge: finding people to do the job. For openings in Philadelphia last year, it advertised on a Web page called the Job Resource. "Psychiatrists -- Feel shackled to an unsatisfying job? Discover correctional medicine!" said one ad. A Las Vegas posting urged, "Come do some time with us!"

Those who Prison Health hires wind up responsible for the legion of people locked up every day. When the doors shut behind them, the care those prisoners get is shuttered from public view. Deaths behind bars provoke scant outcry.

But if the public has little information about inmates, and not much inclination to care, it may have even less sympathy for the notion that they should die for want of medical attention.

Cutting a Lifeline For Parkinson's Patient, A Countdown to Death

Case 3:16-cv-02235-AA   Document 42-10   Filed 10/20/17   Page 18 of 64
9/8/2017
As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence - The New York Times

Four days into his stay at the Schenectady County Jail, it all began to come apart for Brian Richard Tetrault. He could no longer walk the four steps from his bunk to the door of Cell 22, in A-block, where a nurse was waiting with his small ration of pills.

Since his arrest, the state commission said, he had been denied most of the medication he had used for a decade to control his Parkinson's disease and psychological problems. The medical staff knew about his ailments from the day he arrived, soft-spoken and clutching a plastic pill organizer; they even phoned his doctor for his charts.

But the jail's medical director took him off all but two of his seven medications, and nurses concluded that the new inmate was more uncooperative than ill, state investigators said. Mr. Tetrault, a former nuclear scientist at the nearby Knolls Atomic Power Laboratory, had only seven days left before an agonizing death that investigators would label "physician induced."

He had grown up in the Albany suburbs, a hunter and amateur mechanic with a gift for mathematics. He joined the Navy, and spent a year on classified missions in a nuclear submarine. By 1990, he had a wife and two sons, a house on a lake and his pick of good-paying jobs in nuclear engineering.

But try as he did to ignore its slow trespass, Parkinson's ruined everything. His sister Barbara first noticed how his hand shook during a game of pinochle. By 1995, Mr. Tetrault was popping prescription Sinemet tablets every two hours to counter the loss of dopamine, a brain chemical vital to muscle function. Every day became a battle with dyskinesia, the drug-induced tremors common to Parkinson's patients.

"He'd call it 'disky,' " said Larry Broderick, a high school friend. "He'd say, 'I'm getting disky.' "

By 2001, the disease had destroyed Mr. Tetrault's marriage and estranged his two teenage sons. His ex-wife, Eileen, had obtained an order of protection as he grew increasingly depressed and angry. That Nov. 10, he stormed into her home while she was away and snatched some items -- skis and a push broom -- before the police arrived and charged him with burglary and harassment.

His mistreatment began that day, according to the state commission. Without seeing Mr. Tetrault, the jail's medical director, Dr. W.J. Duke Dufresne, prescribed Sinemet and an anti-ulcer drug, but none of the other five medications for his Parkinson's, pain and psychiatric troubles.

On his second day in jail, Mr. Tetrault saw Dr. Dufresne, the only physician for the jail's 300 or so inmates. In a brief visit, the commission said, the doctor reduced even the Sinemet. As for the mental health drugs, Dr. Dufresne later told investigators that only a psychiatrist should prescribe them.

But no one ever arranged for Mr. Tetrault to see the jail psychiatrist, the commission said. And never again did he see Dr. Dufresne, who told investigators he had believed that Mr. Tetrault was merely feeling the typical ups and downs of Parkinson's; he had planned to check on him in three months.

Mr. Tetrault had only days. On his fourth day in jail, medical records show, he grew increasingly "disky" and belligerent, as his body withdrew from the medications that had sustained him for years. On the sixth day, he lay in his bunk, steeped in his own urine and unable to move. "Continues to be manipulative," a nurse wrote.

On the seventh day, the commission said, nurses continued to look in on him, chronicle his deterioration and do little about it. "Inmate remains very stiff," one wrote. "Head arched back, sweating profusely," another noted. A third nurse forced him to walk to the jail clinic, though he could barely move.

On the eighth day, alerted by a nurse's phone call, Dr. Dufresne ordered Mr. Tetrault hospitalized. At Ellis Hospital in Schenectady, emergency-room doctors diagnosed the ravages of his untreated Parkinson's. "I suspect, in the prison setting, he was not getting his full dose of medication as needed," wrote Dr. Richard B. Brooks.

There was not much the hospital could do. On the 10th day, Mr. Tetrault went into septic shock. On the 11th, he died.

The state commission ultimately referred Dr. Dufresne to the State Board for Professional Medical Conduct for what it alleged was "grossly inadequate" care, urged Prison Health to fire him and asked the county to fire Prison Health.

The commission found that Dr. Dufresne had never given Mr. Tetrault a physical examination; and nurses had transcribed the doctor's orders incorrectly, reducing even the Sinemet.

The medical conduct board has taken no action against Dr. Dufresne. The company, in its lawyer's response to the commission, disputed virtually all of the commission's findings, saying that Mr. Tetrault sometimes resisted taking his medication, and that he was well able to move when he wanted. The company's internal one-page review of Mr. Tetrault's care passed no judgment on the doctor or the nurses. But it did recommend six minor changes, like keeping medical records in chronological order. Dr. Dufresne, who is now the company's regional medical director for upstate jails, did not return calls seeking comment.

Richard D. Wright, the president and chief executive of Prison Health, would not discuss details of the case, citing a lawsuit by Mr. Tetrault's son Zachary. He said that over all, Schenectady County "was extremely pleased with the work of the company."

But the county moved to fire Prison Health the day after the commission's report was made public last June. "We were going to terminate them for cause," said Chris Gardner, the county attorney. "But they approached us and we mutually agreed to terminate the relationship."

The humiliation of Mr. Tetrault did not end with his passing, or with Prison Health, the commission said. On the day he died, Nov. 20, 2001, sheriff's officials altered records to change the time of his release from custody, in the early evening, to 2:45 p.m. -- 10 minutes before he was pronounced dead, the commission said. The Sheriff's Department denied the charge, and said it had done nothing untoward in trying to formally release Mr. Tetrault.

But the commission said the time change allowed the department to avoid an investigation, at least for a while. Commissioners learned of Mr. Tetrault's death by

reading a newspaper article about Zachary's lawsuit, 20 months later.

The Revolving Door After Trouble in Florida, Moving On, and Up

If Schenectady County was learning hard lessons about Prison Health, it was old news in South Florida, where several counties had tangled, and re-tangled, with the company years earlier.

By the time Pinellas County hired Prison Health in 1992, the company was hitting its stride. Fourteen years after its founding, it had established a wide beachhead in the state, and had just begun a nationwide push that by the end of the decade would put it in the three biggest cities of the Northeast and the prison systems of entire states. A year earlier, the company began selling stock under the name of a holding company, America Service Group.

But for Pinellas, halfway down Florida's Gulf Coast, things were headed downhill.

Everett S. Rice, who was sheriff then, said that Prison Health understaffed the county jail in Clearwater. The company seemed reluctant, he said, to send seriously ill inmates to hospitals, which could cost it thousands of dollars a day. Inmates were regularly showing up in court incompetent to stand trial, said Bob Dillinger, the county public defender, because they were not getting their psychiatric medicines.

The sheriff's office learned that even the most basic care had to be spelled out in the contract. When one inmate died after a delay in calling for help, Mr. Rice said, the agreement was rewritten to require that Prison Health call 911 at a specific time after the start of a medical emergency.

Then, in March 1994, came the death of Diane Nelson, who collapsed of a heart attack in front of the nurse whose words would echo in news reports: "We save money because we skip the ambulance."

Saving money was the reason the county had hired Prison Health. Pinellas was actually on its second round with the company, having first enlisted it in 1986 because of worries about the ballooning costs of the county's own jail health care. When the contract went back out for bid three years later, Pinellas switched to a

cheaper competitor; three years after that, Prison Health bid the lowest and retook the job.

But Mr. Rice said the bidding process never turned up a whisper of criticism about Prison Health, or any of its competitors. "Every time we'd be up for renewal, we'd talk to the other counties and institutions, and surprisingly, most of them had glowing reports," he said.

In the end, the deal with Prison Health "probably saved a little money," Mr. Rice said, but the human and political costs were too high. "I thought if I'm going to get the blame for this, I'm going to bring it back inside," he said.

The county did that in April 1995, going back into the business of jail medical care. Three months later, an hour's drive to the east, rural Polk County -- which had hired Prison Health the same year as Pinellas -- broke off with the company after three inmate deaths that cost Polk taxpayers thousands of dollars in settlements.

"There were instances where we would actually send somebody to the hospital by ambulance because P.H.S. wouldn't do so," said David Bergdoll, counsel to the Polk County Sheriff's office.

Since 1992, at least 15 inmates have died in 11 Florida jails in cases where Prison Health appears to have provided inadequate care, according to documents and interviews with state and county officials.

As it grew, Prison Health proved adept at ingratiating itself with local politicians, hiring lobbyists and contributing to campaigns for sheriff. Under a promise of immunity from prosecution, the nurse who founded the company, Mr. Moore, testified at a 1993 Florida corruption trial that he had paid the Broward County Republican chairman $5,000 a month -- "basically extortion," he said -- to keep the contract there and in neighboring Palm Beach County.

Some counties say Prison Health has done good work and saved taxpayers money. In Tampa, the medical bill at the Hillsborough County Jail fell to $1.2 million, from $1.8 million in 1982, the year Prison Health replaced the county's medical operation, said Col. David M. Parrish, who runs the jail.

There have been other costs. Last year, the company dismissed a nurse and reprimanded two others after an inmate's baby died; the mother, Kimberly Grey, said in a federal lawsuit that although she had been leaking amniotic fluid for five days, nurses refused to examine her until she gave birth over a cell toilet.

But Colonel Parrish said that mistakes, and second-guessing, were part of the job, no matter who does it. "Anybody who is in the health care business for inmates is going to get blasted because inmates have nothing better to do than complain and sue and find somebody who is going to make a big stink about nothing," he said.

Certainly, a litany of complaints followed as Prison Health expanded across the nation. In Philadelphia, a 1999 federal court monitor's report warned that the company's failure to segregate inmates who were suffering from tuberculosis posed "a public health emergency." Pregnant inmates, it said, were not routinely tested or counseled for H.I.V., endangering their babies.

Dr. Robert Cohen, a state court monitor, said in an interview that Philadelphia doctors "actually encouraged women to refuse pelvic examinations."

Prison Health still works in Philadelphia, where officials have persistently prodded it to improve care. Like many governments, the city has moved from a fixed-cost contract in which the company's profit comes out of whatever it does not spend to one that covers most medical costs and pays Prison Health a management fee.

When other governments have shown less patience, Prison Health has survived, and even grown, by buying rivals like Correctional Health Services, of Verona, N.J. In 1999, its biggest purchase, EMSA Government Services, brought with it contracts with dozens of prisons and jails.

Back in Florida, the purchase brought some unwelcome déjà vu to Polk County, which thought it was through with Prison Health when it hired EMSA. When Prison Health bought EMSA, Polk officials soon replaced it yet again.

"P.H.S. was the lowest bidder, but we didn't accept their bid," said Mr. Bergdoll, the sheriff's counsel. "That should tell you something." Since then, he said, the

Coletti Decl., Ex. J
Page 23 of 64

number of lawsuits has fallen so sharply that the county's insurer lowered its premiums.

The EMSA purchase also brought Prison Health back to Broward County, Fla., which had dropped it years earlier because it had been unhappy with the medical care. Two years after its return, three state judges noticed the phenomenon that had played out in Pinellas -- a parade of inmates showing up in court incoherent -- and ordered the company to stop withholding psychiatric drugs.

"My impression was that it was money," Judge Susan Lebow said in an interview. "The doctors were under corporate direction to not continue the medications."

Prison Health denies it gave any such order. The Broward sheriff would not comment on the company, which the county replaced again in 2001.

But the revolving door of for-profit health care spins on. Last December, Broward hired Armor Correctional Health Services, a company formed just a few weeks earlier by a familiar figure: Doyle Moore, the nurse who founded Prison Health.

A Jailhouse Birth Chaos on a Cell Floor As a Baby Is Discovered

It could not have been much worse. A newborn baby lay in a pool of blood on the floor of the Albany County Jail. At least four adults were there: the mother, a registered nurse and two correction officers who struggled to save the tiny boy. But the nurse looked on passively, tending to the dazed mother, convinced that little could be done, state records show.

The baby, who was named Scott Mayo Jr., died two days later.

The mistreatment and missed chances to help the young mother, Aja Venny, began soon after her arrival 11 days earlier, investigators said. A 22-year-old secretary and community-college student from the Bronx, she knew she had done something stupid: taken a ride with a drug dealer she knew from her neighborhood. When a state trooper pulled them over, she stuffed his small bags of drugs into her bra.

She was booked into jail on Aug. 30, 2001, nearly six months pregnant.

The medical staff made an appointment with an obstetrician it paid to visit every two weeks, but Ms. Venny never saw him, state investigators said; nurses ordered her files from a Bronx women's clinic, but never received them. The one concession to her condition, it seems, was her assignment to the maternity unit, a six-bunk cell with a toilet cordoned off by a white curtain.

On Sept. 9, Ms. Venny awoke before dawn with excruciating cramps. Another inmate told the guard that Ms. Venny was about to give birth. After two calls to the nursing supervisor, Donna Hunt, a jail sergeant sent an officer to fetch her immediately.

When she arrived at 7:15 a.m., Ms. Hunt found Ms. Venny sitting on the toilet crying and "blood everywhere," she told investigators. She cleaned off and consoled the inmate, and told the officers to call an ambulance. She said later that she assumed that Ms. Venny had miscarried and saw no reason to check the toilet.

But ambulance technicians, on the phone with the sergeant, asked if there was a baby. Guards looked in the toilet and discovered the infant, still in his placental sac. Officer Dave Verrelli scooped him out using a red biohazard waste bag and laid him on a towel on the cell floor as Nurse Hunt watched.

"I knew that there was probably nothing we could do for this fetus," she told investigators.

Officer Verrelli detected a slight pulse. "What should I do now?" he frantically asked the nurse, who told him to cut open the sac. Officer Verrelli cut it, removed the baby and uncoiled the umbilical cord from its neck. Ms. Hunt confirmed that there was a faint heartbeat, investigators said, but did nothing to get the baby breathing in the quarter-hour before ambulance workers arrived and administered oxygen.

At the hospital, the boy was placed on a ventilator, his heart pumping but his temperature too low to be measured. On his third day of life, he died.

The State Board of Regents found that three Prison Health nurses, including Ms. Hunt, had failed to care properly for Ms. Venny or her baby. Each nurse was

placed on a year's probation and fined $500. The State Commission of Correction did not say whether anyone might have saved the child, but it emphasized that Ms. Hunt did not take basic steps to help. She did not return calls seeking comment.

The commission also found more deep-seated failures: a disorganized staff and prenatal training for nurses that consisted of e-mail messages with instructions copied from a university Web site.

Prison Health's lawyers defended Nurse Hunt -- saying she found the child in the toilet, but was pushed aside by guards -- and accused the commission of ignoring "inconvenient facts."

Ms. Venny, who completed a six-month boot-camp prison program after her son's death, now lives in the Bronx with her husband, Scott, and their 20-month-old daughter, Skye. The ashes of Scott Jr. are kept in a golden urn in the bedroom.

"I know what I was doing was wrong," she said. But still, "I can't find a reason why a baby had to die."

Connecting the Deaths A Pattern Emerges, And a Battle Begins

It was late 2000 when state investigators began to notice something strange. Reviewing deaths that had occurred in jails in upstate New York, they were not struck by the number or even the grim details of the cases, which they routinely examined as employees of the State Commission of Correction. Something else was wrong.

Working out of a cluttered office in Albany, the three commissioners and a six-member medical review board noticed that low-level employees were doing work normally done by better-credentialed people. Nurses without the proper qualifications, they said, were making medical decisions and pronouncing patients dead.

In Rochester, where Candy Brown had died that September, pleading for help as she withdrew from heroin, investigators found that one of the nurses responsible for her had been suspended by the state three times for negligent care.

In that case and others, commission members said, the people offering the most help and compassion were guards and inmates. And the company, it turned out, was always the same: Prison Health.

"Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the commission's director of operations.

It was the start of a long fight to get the company to change its ways, and when that failed, to get other officials in Albany to step in. Four years later, the commission has been stymied on both fronts.

Mr. Lawrence said Prison Health seemed unfamiliar with New York's tradition of regulated health care, "and dismissive of it." When the agency sought out those in charge, it would often be routed to lawyers or executives at the company's headquarters in Brentwood, Tenn., who bristled at the suggestion that they were answerable to New York State regulators. "The rules were not of any consequence," Mr. Lawrence said.

Prison Health entered New York in 1985 as medical provider for the Dutchess County Jail. Orange and Broome Counties hired the company for a few years, but ended those contracts in the 1990's.

By late 2000, when the company began to attract the state commission's notice, it had signed contracts with Schenectady, Ulster, Monroe and Albany Counties. The Albany jail superintendent at the time called the company "a godsend."

The commission called it a disaster. "Grossly and flagrantly inadequate," for instance, was its verdict on the care given Candy Brown.

Prison Health, in turn, challenged the commission's authority, and even sued over its report on one inmate's treatment, saying the panel had acted maliciously. The suit was dismissed on its merits.

Dr. Carl J. Keldie, the corporation's medical director, said the commission seemed to make up its mind before an investigation and then overstate its case in reports. "The tone, the timbre, the language is egregious," he said. Company

executives said the commission has refused to meet and try to reconcile their differences.

The commission in 2001 moved beyond the specific criticisms in its reports to sound a general alarm. Asking state education officials to investigate, it said Prison Health was allowing "dangerously substandard medicine" by hiring doctors and nurses with questionable credentials.

A month later, spurred by the commission, the Department of Education alerted the state attorney general that the company was operating illegally in New York by not having doctors in charge of medical care. "Nobody really noticed that they weren't licensed," one commission doctor said of Prison Health's presence in New York.

In the three years since, nothing has come of either complaint. The only agency with the power to enforce the state law -- the attorney general's office -- finally replied last October, telling the commission to resolve the matter on its own. In a heated exchange of letters, an assistant attorney general, Ronda C. Lustman, scolded the commission for refusing to meet with executives.

The company says that it is acting legally because it has set up local corporations with doctors in charge. But there is abundant evidence, state investigators say, that those corporations are shams.

For example, Dr. Trevor Parks is listed as the sole shareholder of P.H.S. Medical Services P.C., which the company says provides all medical care at Rikers Island, free of any influence from Prison Health executives. But investigators say that when they interviewed him, he had little idea of his role, or his corporation's.

Moreover, records show that Dr. Parks's corporation went out of business in July, for nonpayment of taxes and fees. After The Times pointed that out to company executives in December, Prison Health paid the money. Dr. Parks did not respond to phone calls and e-mail messages.

If frustration mounted at the commission, a sense of impending trouble was growing at the jail in Albany County, where the commission said doctors' decisions

on inmate treatment were being overruled by a regional medical director in Washington who was not licensed to practice in New York.

The doctor, Akin Ayeni, said in an interview that he never overruled any doctor there. But a former medical director at the jail said she quit in April 2001 because she felt the company's policies, and Dr. Ayeni's decisions, were dangerous.

"I told my staff, 'I know it's only a matter of time before they kill someone,' " she said, asking that her name not be used because she feared retribution. "I knew there was going to be a death. I could feel it."

In the six months after she left, two people died and a third was seriously injured after poor treatment by Prison Health, the state commission found; the dead included Aja Venny's newborn son.

The county and the company parted ways six months later, said Thomas J. Wigger, the jail superintendent, because he was unsatisfied with the quality of care.

One by one, other counties have followed suit. Ulster County, for example, caught Prison Health overbilling it for thousands of dollars of nurse hours and switched to another company in 2001. The company, for its part, said it lost most of the upstate contracts to competitors who had underbid them. Strangely, it said it had no record of working in Orange County, even though the state commission faulted the company in two inmate deaths, in 1989 and 1990.

Last October, Schenectady County dropped Prison Health after the death of Mr. Tetrault, the inmate with Parkinson's disease. The jail director, Maj. Robert Elwell, said in an interview that the medical director, Dr. Dufresne, had discouraged treatment for anything but the most urgent problems. "When you're dealing with a for-profit corporation, those are the types of decisions that get made," Major Elwell said.

The company's only remaining outpost in upstate New York is Dutchess County. "I believe they are a good company," said David W. Rugar, the county jail administrator. "It's just an intense thing to do, when you provide medical services."

Indeed, just days before it renewed its deal with Prison Health in 2002, the jail had an intense experience that would cost the company's medical director there his job.

Cries From the Heart Despite Days of Agony, 'No Body Will Help Me'

When they cleaned out Cell 6 in Unit 10 on Feb. 16, 2002, workers at the Dutchess County Jail found a letter that Victoria Williams Smith had written to her husband.

"My chest is tight & burns, my arms are numb," it said. "I been to the nurse about five times & no body will help me. I need to get out of this jail. It feels like I'm having a stroke, no bull."

Actually, it was a heart attack, and it had killed Ms. Smith a few hours earlier at the age of 35. The letter was just one in a skein of increasingly panicked pleas for help during her last 10 days in jail.

Ms. Smith was born in Brooklyn, but settled in North Carolina with her second husband, Justin Smith. They married in 1997, shortly after he was sent to a prison in Dutchess County for attempted robbery.

She shipped him canned food that he could sell for cash, and in January 2002 drove to the prison for what friends said was a visit allowed to married couples.

The reunion was called off by state troopers, who were waiting at the prison to search her. They found about seven ounces of heroin clearly intended for her husband to use or sell, state records show.

Thirteen days passed, state investigators said, before Ms. Smith was examined by a doctor: Vidyadhara A. Kagali, the part-time medical director at the jail in Poughkeepsie, who worked only on Wednesday and Friday evenings even though he was responsible for about 300 inmates.

She could have hoped for better. Dr. Kagali, who was board certified only as a pathologist, had never treated patients in a hospital and had "limited knowledge of his responsibilities as jail medical director," according to commission records.

On Feb. 6, when she began to complain of chest pains and numbness, Dr. Kagali told her she was suffering from inflamed cartilage in her chest, and had her continue taking the Vioxx arthritis medication that friends in North Carolina mailed to her.

The next day, after Ms. Smith was found crying in pain in her cell, an electrocardiogram revealed abnormalities in her heart. But Dr. Kagali, notified by a nurse, did not see her, according to the state commission. On her third day in jail, records show, a second EKG showed the same heart problem, but the doctor still did not see her.

On the seventh day, a nurse turned to the jail's part-time psychiatrist for help in easing Ms. Smith's chest pain and labored breathing. Without seeing her, he prescribed a drug for intestinal problems. On the eighth day, Dr. Kagali saw Ms. Smith; he ordered a spinal X-ray and recommended Bengay.

Two days later, in tears, she phoned her North Carolina friends, Chris and Marjorie Bowers, three times. "She said these people would not help her at all," Ms. Bowers said.

In the early morning of Feb. 16, Ms. Smith's untreated heart ailment became an emergency, according to jail records and sworn statements from nurses and guards. Around 4:30 a.m., a guard found her rocking on her bunk, clutching her chest, and called Barbara Light, the registered nurse on duty.

Ms. Light concluded that Ms. Smith was having an anxiety attack -- even though, the commission said, the nurse had never seen the inmate's medical record.

A half-hour later, Ms. Smith, weeping, told the guard she wanted to go to a hospital -- a plea Nurse Light dismissed as an attempt to get drugs. Minutes after that, the guard placed a frantic third call to the nurse, who arrived to find the inmate on the floor, shaking. An ambulance rushed Ms. Smith to Vassar Brothers Medical Center, where she died in less than an hour.

The state commission, in its report, seemed hardly to know where to begin to catalog the failures.

It urged that Dr. Kagali be fired for "gross incompetence," and referred Ms. Light to state regulators for discipline. State health authorities eventually suspended the doctor's license for six months, but have not taken action against Ms. Light. Neither she nor Dr. Kagali would comment.

The company's confidential review of Ms. Smith's death found no fault with her treatment, but recommended that its staff offer grief counseling to colleagues and inmates after future jail deaths.

In a letter to the commission, Prison Health defended Ms. Light and Dr. Kagali. It said that over Ms. Smith's five weeks in jail the doctor had seen her numerous times and provided medications, knee braces and even an extra mattress for her arthritis. Ms. Smith had no known history of heart disease, the company said, and any suggestion that her death could have been prevented was "20-20 hindsight."

The letter was signed by Dr. Dufresne, whom the commission would later blame for Brian Tetrault's death.

The New York Times's yearlong examination of Prison Health Services, the biggest commercial provider of medical care to inmates, found instances of disturbing deaths and other troubling treatment.

DAY 1: Dying Behind Bars

DAY 2: Lost Files, Lost Lives

DAY 3: Mistreating Tiffany

Articles in this series are available online:

nytimes.com/nyregion

Joseph Plambeck contributed reporting for this article.

---

© 2017 The New York Times Company

Advertisement

# Modern Healthcare



Home > Government > Public Health

# Medical battle behind bars: Big prison healthcare firm Corizon struggles to win contracts

By David Royse | April 11, 2015

When Martin Harrison was brought to an Alameda County jail near Oakland, Calif., in 2010 on an outstanding DUI warrant, he received a health screening from a licensed vocational nurse who worked for Corizon, a private company that provided healthcare for the county correctional system. Harrison, 50, was in severe alcohol withdrawal and hallucinating, and his family says the nurse should have recognized he was in crisis.

"Any RN would have understood the gravity of the situation," said the family's lawyer, Michael Haddad.

But Harrison wasn't referred for treatment. A short time later, still hallucinating, he got into a fight with jail guards and was beaten. Two days later, he died.

Corizon, the licensed vocational nurse's employer, is the nation's largest for-profit provider of correctional health services. In February, Corizon and Alameda County together paid an $8.3 million settlement to Harrison's family. It was the largest civil-rights wrongful-death settlement in California history.

That was only the latest high-profile setback for Brentwood, Tenn.-based Corizon, which has lost five contracts with state prison systems over the past three years and is fighting

Golsan Decl., Ex. J
Page 33 of 64

9/7/2017    Big prison healthcare firm Corizon struggles with contracts - Modern Healthcare Modern Healthcare business news, research, data and events

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 34 of 64

to hold on to others. In New York City, some officials want to end Corizon's contract in city jails because of **quality-of-care** concerns.

## MH TAKEAWAYS

Moody's issued a negative outlook on Corizon in August, citing recent contract losses. The firm also is under pressure in Florida, where the head of the state prison system said she plans to rebid its healthcare contracts, including one with Corizon. In Washington, D.C., members of the District Council, citing litigation and complaints about Corizon services elsewhere, oppose the mayor's push to approve a Corizon contract to serve the city's inmates.

There have been numerous allegations of quality problems with Corizon's care raised in lawsuits and news reports around the country, including charges of long waits for care and prisoners dying after not being properly diagnosed with cancer and other diseases. Corizon staff reportedly gave a 19-year-old Florida inmate Tylenol for severe pain for months before outside doctors found bone cancer that later killed him. In New York City, an inmate allegedly was told to throw his severed finger away because it couldn't be reattached, though it later was.

Last August, **Moody's Investors Service** downgraded Corizon's parent company Valitas. In issuing its negative outlook, Moody's cited, in part, "operating headwinds due to recent contract losses." Moody's said, "We expect the company to continue to face near-term earnings pressure following recent contract losses and certain underperforming state department of corrections contracts." It noted, however, that Corizon remains the correctional healthcare sector leader, and said that with new contracts, it expected earnings improvements over the next couple years.

Dr. Woodrow Myers, who replaced Rich Hallworth as Corizon's CEO in a management shake-up in October 2013, downplayed the lawsuits and complaints about his company's services. "Every one of my patients has a lawyer," Myers said. And most suits are dismissed, he added. "There's a huge number of lawsuits, but they're not specific to Corizon. They are specific to this industry."

States spend $8 billion a year on prison healthcare, according to the Pew Charitable Trusts. Local governments spend additional millions for care in jails. According to a 2014 report by the Reason Foundation, only 14 states operate their own prison healthcare, while 36 contract for at least part of it and 24 have contracted out all prison healthcare services. There are no data on how many local jails use private medical vendors.

Privately held Corizon became the largest correctional healthcare provider in 2011 when

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 35 of 64

Valitas Health Services, parent of the former Correctional Medical Services, acquired America Service Group, creating a company serving more than 400 facilities.

Valitas is majority-owned by Chicago-based private-equity management firm Beecken Petty O'Keefe and Co.

Corizon had $1.4 billion in revenue for the fiscal year ended June 2014 and now cares for 345,000 inmates in 27 states. Competitors include Nashville-based Correct Care, which cares for about 250,000 people in 37 states, and Pittsburgh-based Wexford Health, which cares for 112,000 inmates in 13 states. Other providers include St. Louis-based Centurion Managed Care, a joint venture between **Centene Corp.** and MHM Services, and several other smaller for-profit and not-for-profit providers.

Many of Corizon's contracts are holdovers from its predecessor companies. Since the merger, it has won new contracts, including taking over Arizona's state prison contract from Wexford and winning part of Florida's business after a long court fight there over whether prison healthcare could be privatized.



States spend $8 billion a year on prison healthcare, the Pew Charitable Trusts says.

But since 2012, Corizon has lost statewide contracts covering 84,000 inmates in Maine, Maryland, Minnesota and Pennsylvania.

In Maine, a state audit said: "Some prisoners did not receive standard medical services, such as physicals, dental services or sick call response within the timeframe required." In Maryland, Corizon appears to have been underbid by Wexford in 2012. In Corizon's home state of Tennessee, it provides behavioral healthcare to prisoners. But in January, it lost the medical-care contract to Centurion, even though Corizon had a lower bid.

The contracts Corizon lost in the five states will be worth more than $1.2 billion over the next five years.

Corizon also has notched some wins. In February, Alabama renewed its contract, even though the state has been sued by the Southern Poverty Law Center over what the civil-rights group says is inadequate prison healthcare. Corizon isn't named as a defendant. But the company is joining with mental healthcare contractor MHM Correctional Services in paying for the state's defense under the terms of its contract.

Coletti Decl., Ex. J
Page 35 of 64

3/7

9/7/2017

Big prison healthcare firm Corizon struggles with contracts - Modern Healthcare Modern Healthcare business news, research, data and events

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 36 of 64

Last year, Corizon won a three-year $1.1 billion contract to provide care at Missouri's state prisons, and it got an extension of its contract for Indiana's prisons, while adding some large new local jail contracts.

But those gains have been overshadowed by its difficulties in keeping old contracts and winning new ones. New York City's deputy health commissioner recently said the city was "examining potential new strategies" after complaints about quality of care at Rikers Island led city commissioners to question the contract with Corizon.

Julie Jones, Florida's secretary of corrections, acknowledged to state lawmakers this year that Corizon and Wexford, which split care responsibilities in the state's prisons, have done an inadequate job.

Florida Republican state Sen. Greg Evers, chairman of the state Senate Criminal Justice Committee, recently told the Tampa Bay Times he was concerned that deaths in Florida prisons had gone up 10% since healthcare was privatized two years ago. Florida Democratic state Sen. Jeff Clemens called media reports about the companies' recent care record "disturbing to my sense of humanity."

Corizon is responsible for the care of 74,000 Florida inmates, while Wexford has a contract covering 15,000 in the state. Jones recently said she will move to rebid the contracts, worth $229 million a year for Corizon and $48 million through the end of 2017 for Wexford.

Corizon also faces a battle to serve jail inmates in the District of Columbia, where it won a bidding process but still needs approval from the District Council. The contract would pay Corizon $66 million over three years to take over from Unity Health Care, a not-for-profit that also runs health clinics for low-income patients in the District.

The bad press about lawsuits around the country and quality-of-care questions may derail Corizon's D.C. contract effort. "There's a pretty strong bloc of us here who don't want to see it happen," said council member David Grosso, citing questions about Corizon's care in New York City. "Why should the District of Columbia repeat the mistakes that other places have made?"

Corizon changed leadership in October 2013, with Myers, who previously had served on the board at Valitas and worked as chief medical officer at managed-care company WellPoint, taking over from Hallworth. Stuart Campbell stepped down as president and was replaced last year by Scott Bowers, who previously worked at UnitedHealthcare. While the company declined to comment on the reasons for the leadership changes, they

9/7/2017          Big prison healthcare firm Corizon struggles with contracts - Modern Healthcare Modern Healthcare business news, research, data and events

Case 3:16-cv-02235-AA          Document 42-10          Filed 10/20/17          Page 37 of 64

came shortly after an earlier 2013 downgrading of Valitas by Moody's and after the loss of the Maine, Maryland, Pennsylvania and Tennessee state correctional contracts.

Corizon officials and some outside observers say many problems the company faces are inherent in caring for inmates, many of whom have substance abuse, mental health and other chronic health problems. Prisoners also can be hostile to authority, said Dr. Sylvia McQueen, Corizon's vice president of clinical services. And Corizon's doctors and nurses have to accommodate themselves to institutional security priorities.

"Some (inmates) just don't want to be bothered" with interacting with healthcare providers, said McQueen, whose first exposure to the correctional system came when her father was jailed while she was growing up in Washington, D.C.

Myers said that's why it makes sense for correctional agencies to bring in Corizon, which through its predecessor companies has decades of experience and can use its size to save money and improve care. It can, for example, use data it collects about treatments that work in one location to create best practices in others.

While some local officials have cited the number of lawsuits filed against the company—there have been more than 1,300 in five years—as a reason for concern, Corizon officials say litigation isn't a good indicator of quality of care behind bars.

**CORIZON HEALTH AT A GLANCE**
**Headquarters:** Brentwood, Tenn.

**CEO:** Dr. Woodrow Myers

**Revenue:** $1.4 billion

**Average daily population cared for:** 341,000

**Contracts:** 27 states

**Total staff:** 12,216

552 doctors and midlevel providers

5,708 nurses

9/7/2017　　Big prison healthcare firm Corizon struggles with contracts - Modern Healthcare Modern Healthcare business news, research, data and events

Case 3:16-cv-02235-AA　　Document 42-10　　Filed 10/20/17　　Page 38 of 64

1,956 personnel in operations, clinical support and administration

Source: Corizon Health

Some outside experts agree that no matter who is treating inmates, there will likely be allegations of poor care. That's at least partly because correctional healthcare services are underfunded, said Dr. Marc Stern, an assistant professor of health services at the University of Washington, who previously headed healthcare services for Washington state's prison system. "There are so many stories about Corizon because it has so many contracts, so many covered lives," he said. "If we focus on Corizon as being the enemy, we will not fix the problem." Stern, who worked in the early 2000s for one of Corizon's predecessor companies, said that for the public and for elected officials, prisoners' well-being is a low priority. "Nobody has enough money and nobody has enough interest in caring for people behind bars, regardless of who is operating the system," he said. On the other hand, Stern wrote a scathing report in 2012 on problems with Corizon's care in the Idaho state prison system after he was appointed by a judge to investigate conditions there. He wrote that some mistakes likely resulted in deaths, and that one inmate wasn't told for several months that he had cancer. Corizon and the state of Idaho disputed Stern's findings, and in 2013 the state renewed the company's $41 million-a-year contract for five years. Corizon's McQueen acknowledged that the company's healthcare workers sometimes make mistakes. "We're human, things do happen," she said. "We take an intellectually honest look at what happened so it never happens again." In California, Corizon is now required to do things differently. Under the company's settlement with Martin Harrison's family, Corizon has to use registered nurses rather than licensed vocational nurses to screen inmates in county jails where it has contracts. "It was very important to the family that something be changed," said Haddad, the family's lawyer. "Beyond a doubt this settlement is going to save a lot of lives." Meanwhile, Myers said Corizon will continue to try to convince governments that it can do the best job. "There are certain things government doesn't do as well as the private sector and that includes providing complex health services." —*David Royse is a freelance writer based in Chicago*

**RELATED CONTENT**

**Corizon loses Minnesota prison healthcare contract**
**(http://www.modernhealthcare.com/article/20131018/NEWS/310189964)**
**'Rumble over jailhouse healthcare: As states broaden outsourcing to private vendors, critics**
**question quality of care and cost savings"**
**(http://www.modernhealthcare.com/article/20130831/MAGAZINE/308319891)**
**Corizon Health taps UnitedHealthcare exec as president**
**(http://www.modernhealthcare.com/article/20140708/NEWS/307089930)**

# Corizon across the country

Corizon Health is the nation's largest prison health care provider, reporting prison and jail contracts in 25 states. Here is a snapshot of recent news involving the company.



**Oregon**
Washington County chose another company, instead of Corizon, after a young woman undergoing heroin withdrawal died within seven days after pleading for help in 2014. An audit of the case later revealed the county had failed to monitor its contract with Corizon.

**Idaho**
Corizon won a new five-year contract in 2014, a year after a federally commissioned report described "cruel and unusual" care.

**Wyoming**
In May, DOC renewed Corizon contract, which it has held for 17 years.

**Minnesota**
Let its 15-year pact with Corizon end after reports of deaths and injuries linked to poor care.

**Michigan**
Just renewed contract with Corizon to provide doctors, mental health and pharmacy services. Hires third-party company to monitor care.

**Pennsylvania**
Allegheny County jail authorities let Corizon's contract expire last fall after the deaths of two inmates on the same day in May and an overall rise in deaths under Corizon's care.

**New York**
City of New York did not renew Corizon's contract with Rikers Island last year after accusations of hiring doctors and mental health workers with disciplinary and criminal histories, prisoner deaths and poor oversight.

**Maine**
Corizon's contract was canceled in 2012 after a state agency report found prisoners not receiving medications or being treated in a timely way.

**Maryland**
In 2012, officials chose a rival to Corizon, which carried the contract at the time, to provide prisoner medical care. Corizon's bid was $20 million less than that of its competitor, Wexford.

**Indiana**
Contracts with Corizon for all medical care.

**Kansas**
The state awarded Corizon an 18-month contract in 2013, with four two-year renewals.

**Washington D.C.**
Considered hiring Corizon last year for its jail but backed off after an outcry over the company's struggles elsewhere.

**Virginia**
A class-action lawsuit against Corizon alleging inadequate care of female prisoners was settled last fall, calling for timely access to care, medical supplies and specialty visits, new standards and better monitoring. In March, Corizon won a three-year contract for 1,450 jail inmates near Petersburg

**California**
A 2015 inmate death settlement , the largest in the state's history, called for changes in how Corizon operates in four county jails, including better training and staffing. On May 13, 2016, Corizon protests that Alameda County officials recommend another firm despite its 28 years of providing jail health care.

**Arizona**
A class-action lawsuit against Corizon was settled earlier this year, calling for better mental health care, compliance with healthcare standards and monitoring.

**New Mexico**
The New Mexican newspaper reported in April that Corizon has been sued more than 150 times since 2007, and that despite repeated warnings, auditing is inadequate.

**Texas**
Corizon was hired to provide medical services to the El Paso County Jail until the end of last year, when commissioners allowed the contract to expire.

**Missouri**
Corizon, which has provided health care for more than 20 years, inked a new three-year contract in 2014.

**Tennessee**
Another company in 2015 landed the state's prisoner health care contract despite Corizon holding the contract for two years prior and its bid being $15 million less. Previously, the state had fined Corizon millions for failing to meet contractual obligations.

**Alabama**
Southern Poverty Law Center sued the state in 2014, alleging prisoner health needs are ignored and that the state renewed Corizon's contract in 2012 despite the company failing "every major audit of its health care operations." The contract was renewed again last year.

**Kentucky**
Corizon in 2013 declined to rebid on its contract with the Louisville jail. During a seven-month period in 2012, the jail had seven healthcare related inmate deaths.

**Florida**
Corizon ended its contract with the state in 2015, after four years, amid allegations of inmate deaths and understaffing, as well as hundreds of lawsuits.

N

Tribune Graphic/JOHN STUMP & VIRGINIA BLACK
Sources: Corizon Health, news reports



HOME   LATEST NEWS ▾   FEATURED REPORTING ▾   ABOUT ▾   FREELANCE SUBMISSIONS   DONATE ▾

LATEST NEWS / PRISON PROTEST / UNCATEGORIZED

# CORIZON HEALTH SERVICES BREAKS SECOND DEATH SETTLEMENT RECORD THIS YEAR

08 AUG 2015  |  BRIAN SONENSTEIN

♡ 3   ⤳ 2



        35

2015 has been a big year for Corizon Health Services: in the span of six months, the nation's largest for-profit inmate healthcare provider has managed to break not one, but two different state records for the largest wrongful death settlement payouts in history.

On August 6, Corizon and Lane County in Oregon announced they would pay a combined $7 million to the family of Kelly Green — a 28-year-old mentally ill inmate who died from a major spinal injury after a psychotic episode at the local jail. Green broke his neck and became paralyzed after running headfirst into a concrete wall one day after he was arrested in February 2013.

County officials maintain Corizon misdiagnosed Green's injury and failed to take him to the hospital for six hours. He became quadriplegic and ventilator-dependent for ten months before he passed.

Earlier this year, Corizon and Alameda County in California paid $8.3 million to settle a lawsuit brought by the children of Martin Harrison: a 49-year-old black man who was Tased and beaten by ten sheriff's deputies at the Santa Rita Jail in 2010. Harrison had been arrested for jaywalking in Oakland when authorities realized he had a warrant for missing a court date after he got in drunk driving accident in which no one was injured.

The terms of Harrison's settlement dictated that Corizon must implement changes to its staffing policies in jails across the state — particularly with regard to the licensing and training of nurses. In Harrison's case, a licensed vocational nurse (LVN) was permitted to conduct and intake exam that should have indicated

he would experience alcohol withdrawal, triggering protocols that would have allowed him to detox safely. The nurse instead placed Harrison in general population.

After two days, delirium tremens set in and Harrison began to hallucinate. He was placed in isolation for several hours until "a deputy entered Harrison's cell, found him in a distressed state, shoved him to the back of the cell, Tased him twice, and called for backup, claiming that Harrison was attacking him." Nine other deputies showed up and joined the melee until Harrison was unconscious. He died at the hospital two days later.

      35

🏷 **TAGS:**  CORIZON HEALTH SERVICES    OREGON    PRISON    PRISON HEALTHCARE    PRIVATIZED PRISON HEALTHCARE

  PREVIOUS POST
CELEBRATE EVERY VICTORY, AND OTHER FEEDBACK ON OUR FIRST WEEK

NEXT POST
THE FORGOTTEN 5 MILLION NON-JEWISH VICTIMS OF THE HOLOCAUST

 | BRIAN SONENSTEIN

Publishing Editor at Shadowproof and columnist at Prison Protest.

## YOU MIGHT ALSO LIKE



OHIO PRISONERS BEGIN HUNGER STRIKE FOLLOWING PUNISHMENT FOR APPEARING ON NETFLIX SHOW, "CAPTIVE"

🕒 MARCH 3, 2017

Coletti Decl., Ex. J

Deaths at Louisville Jail Prompt Investigations, Corizon Changes, Prison Legal News

# Deaths at Louisville Jail Prompt Investigations, Corizon Changes

Loaded on AUG. 23, 2016

Filed under: Corizon (/search/?selected_facets=tags:Corizon), Contractor Misconduct (/search/?selected_facets=tags:Contractor%20Misconduct), Private Contractors (/search/?
selected_facets=tags:Private%20to%20Contractors), Failure to Treat (/search/?selected_facets=tags:Failure%20to%20Treat), Malpractice (/search/?selected_facets=tags:Malpractice), Medical
Neglect/Malpractice (/search/?selected_facets=tags:Medical%20Neglect/Malpractice), Failure to Treat (Mental Illness) (/search/?
selected_facets=tags:Failure%20to%20Treat%20%28Mental%20Illness%29). Location: Kentucky (/search/?selected_facets=locations:1490).

Five of eight prisoner deaths since 2011 at the Metro Corrections jail in Louisville, Ky., are currently under investigation, all of them involving allegations against private healthcare contractor Corizon Inc. that it provides inadequate treatment to maintain its revenues.

Investigations into two of those deaths last year—of prisoners Samantha George and Savannah Sparks—led to the resignations of six Corizon employees in December 2012, after Metro said they "may" have contributed to the deaths. Jail officials and Louisville police, however, are continuing to investigate.

Meanwhile, as Corizon faces lawsuits from prisoners and their families throughout Kentucky and many of the other 28 states where the company has jail contracts, Metro and its director, Mark Bolton, are considering how they could consciously renew Corizon's $5.5 million contract. Bolton said in February he believes that Tennessee-based Corizon waited too long to have one of its doctors treat George and Sparks.

"The more we looked into it, the more disturbed I was getting as to some of the service delivery gaps in the healthcare of those individuals," Bolton told the Nashville Tennessean.

George reportedly died Aug. 8, 2012 of complications from a severe form of diabetes, compounded by heart disease and, Bolton argued, a delayed evaluation by Corizon medical staff.

Four months earlier, Sparks, 27, was being held at Metro on a theft charge while also detoxing from heroin. But on April 12, 2012—six days after her arrest—Sparks died at University Hospital in Louisville from opiate abuse and withdrawal, according to the Jefferson County, Ky., coroner's office.

Bolton said he noticed in January 2012 that more prisoners were undergoing detox in the jail, and that Corizon employees were unprepared to treat Louisville's supposedly growing population of heroin addicts. To save money, Corizon only took Sparks to the hospital to allow her to die in one, though a Corizon executive disputes that assessment.

"We have no incentive not to provide the hospital trip," said Levin Jones, Corizon's vice president of operations. "There is no financial incentive to avoid it. None... The financial responsibility for all off-site care falls to the county."

The Tennessean reported, however, that when Corizon (then called Correctional Medical Services) renegotiated its contract with Metro in 2010, it glorified its record of minimizing prisoners' trips to the hospital, thereby saving the city money.

A graph in Corizon's proposal showed that it had reduced the total length of hospital stays for prisoners from 38 days in 2007 to 20 days by late 2010; Corizon had also cut trips to the emergency room in half.

In 2008, however, Corizon surprisingly diverted 135 people arrested in Louisville to the hospital emergency room before they had been booked. Corizon claimed that, because each emergency room trip costs $855 on average, complaints from Louisville's fire department and EMS forced them to reduce ER visits.

By 2009, calls for EMS to take Metro prisoners to the ER had dropped by 20%—and not because prisoners had inexplicably become healthier. Nor was it Metro, according to Bolton, who pressured Corizon to save money at the expense of prisoners who needed emergency care.

"I don't want to send anybody to the hospital for stitches... or non-emergency services," Bolton said, citing ER and transportation costs, and overtime for Metro employees. But, he added, "If someone needs to go to the hospital, by God, that is Corizon's call and they better be sending them. We rely upon them to make those decisions. That's why we are paying them."

Corizon, through a public relations firm, said it was "working to improve the way we manage patients in keeping with the major recent changes in drug abuse" in Louisville. Since last year's deaths, according to the Tennessean, substance-abuse screening has been expanded; 15 new nurses, including a substance-abuse nurse, have been hired; and a treatment dorm for prisoners detoxing has been created.

Bolton said also that the National Commission on Correctional Health Care went to Louisville in January 2013 to audit Corizon, and gave the company "an outstanding exit review."

Which should put Bolton at ease, by God, should he renew Corizon's contract.

Source: *www.tennessean.com*

**PLN Inmate Locator**

(/inmate-locator/)

# INDIANA DEPT. OF CORRECTIONS CANCELS CONTRACT WITH HEALTHCARE PROVIDER

⏱ March 20, 2017    📁 Daily Local News, Headlines, News    👁 1,147 Views

▶

Podcast: Play in new window | Download (Duration: 2:09 — 2.0MB)

Subscribe: Android | RSS

The Indiana Department of Corrections has discontinued its contract with Corizon Health, the private corporation that handles most of the state's inmate healthcare. Corizon announced last week that it would be laying off about 700 employees in 22 locations around the state.

The contract, which is worth $100 million a year, is being taken up by Pittsburg-based Wexford Health Sources. A representative from Corizon said in a letter to the state that Wexford may end up hiring many of Corizon's former employees, though there's no guarantee that will happen.

The loss of the corrections contract is the most recent in a string of contract losses for Corizon. In the last two years, the for-profit company has lost their contracts with at least five states. They also lost an especially lucrative contract managing healthcare for Riker's Island in New York City. The losses were driven by a wave of complaints, lawsuits, and wrongful death settlements. Corizon has faced dozens of lawsuits in Indiana alone, alleging poor healthcare and at least one wrongful death. The firm paid $4.5 million to settle lawsuits in New Mexico resulting from two inmate deaths and alleged sexual assault by a company doctor. Corizon also paid $8.3 million to the family of a California inmate who died of severe alcohol withdrawal after being denied treatment.

An investigation by the South Bend Tribune last year revealed hundreds of inmate complaints and dozens of lawsuits against Corizon in Indiana. One severely disabled patient died after just 37 days in a state prison under the care of Corizon employees. Another died in an ambulance during a two-hour drive to a hospital, despite a much closer hospital being available.



Wexford Health Sources' record isn't spotless, either. Wexford paid out $3.1 million to settle five years of complaints in Illinois, including delayed treatment and low-quality care.

# Largest Wrongful Death Settlement In California History For Inmate Who Didn't Get Proper Treatment

**CARIMAH TOWNES**
FEB 11, 2015, 2:00 PM



CREDIT: SHUTTERSTOCK

The nation's largest prison healthcare provider just agreed to pay $8.3 million—the largest wrongful death settlement California has ever seen—to the children of an inmate who received inadequate healthcare and died several days later. The settlement comes more than four years after jail officials used excessive force that resulted in the inmate's death.

According to a lawsuit filed against Corizon Correctional Healthcare in 2011, Martin Harrison's death was due, in large part, to the inadequate medical attention that he received. Three days before his death, Harrison was arrested for failing to appear in court, after which he was placed in an isolation cell in Alameda County's Santa Rita Jail. During a medical exam that was conducted upon his arrival, Harrison informed Corizon's Licensed Vocation Nurses about his history of alcoholism, but the nurses failed to administer the necessary treatment to prevent Harrison from experiencing alcohol withdrawal. On August 16, he began to hallucinate and lash out in his cell. And after Harrison broke food trays and clogged the toilet in his cell, prison deputies tried to subdue him by beating and tasing him. Harrison died from cardiac arrest, shortly thereafter.

Corizon and Alameda County previously settled a federal lawsuit in December 2013, but on Tuesday the health care provider settled a separate lawsuit filed by Harrison's family. The company also committed to end its use of vocational nurses

9/7/2017    Largest Wrongful Death Settlement in California History For Inmate Who Didn't Get Proper Treatment – ThinkProgress

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 46 of 64

instead of registered nurses, which saved the company 35 percent of its service costs.

Although the Eighth Amendment guarantees that all prisoners have the right to adequate health care, this is not the first time Corizon has been accused of medical neglect. In Arizona, a stroke victim said that medical staff refused to change his diaper, which left him with ulcers and sores. Staff also reportedly told sick inmates to pray, instead of providing the necessary treatment. A 73-year-old woman who filed a lawsuit in New Mexico alleges that she was left unattended in an isolation cell for 34 days. Kentucky employees resigned after two inmates died from medical neglect.

Still, Corizon remains a major player in prison healthcare. It currently serves 345,000 inmates in 531 facilities nationwide.

**#JUSTICE**

## Sponsored Content

Recommended by

### More From ThinkProgress



**White House walks back promise about Trump donating his 'personal money' to Harvey**
ThinkProgress



**U.N. rights experts stunned by Trump's attacks on media**
ThinkProgress



**Men of sleet: The snowflakes behind Trump's macho-man act**
ThinkProgress



**CNN identifies white nationalist as supporter of 'immigration reform'**
ThinkProgress



**White House acknowledges Trump lied about 'witnessing first hand' the devastation of**
ThinkProgress



**The man behind Trump Jr.'s $100,000 payday**
ThinkProgress

About    Careers    Tips    Email    Masthead    Pitches

© 2017 ThinkProgress

Powered by WordPress.com VIP

Coletti Decl., Ex. J

required surgery and inpatient rehabilitation. The client also suffered sternal and rib cage injuries. In addition, she missed a significant amount of work while recuperating from her injuries.

## $960,000 SETTLEMENT

### Inmate negligence results in death

On 8/1/2013, Gladstein Law Firm achieved an $960,000 settlement in a prison rights case, involving claims of negligent provision of medical care to a woman suffering from severe heroin withdrawal. Due to the defendant's negligence, the decedent, then age 27, died from dehydration while she was incarcerated in a Kentucky jail. All settlement proceeds will go to the decedent's three minor sons.

From the *Courier-Journal* Newspaper:

Louisville to pay $160K to dead inmate's family

*The city has agreed to pay $160,000 to the family of a heroin addict who died in 2012 while detoxing at the city jail. Savannah Sparks, 27, received scant medical attention for days, despite obvious signs of a fierce withdrawal, Louisville Metro Police investigators found. Mark Bolton, director of the Louisville Metro Department of Corrections, acknowledged that Corizon, the company contracted to provide inmate health care, was ill-prepared to handle the heroin epidemic that exploded in early 2012. In the wake of Sparks' death, Bolton said, the jail overhauled its system for dealing with detoxing inmates. It trained its staff to better screen for and monitor withdrawal symptoms. Corizon is no longer used for medical services.*

## $550,000 SETTLEMENT

### Failure to diagnose prostate cancer

This Kentucky medical malpractice case involved a medical provider's negligent failure to timely diagnose prostate cancer in a 51 year-old man. It was alleged that the medical provider failed to timely act upon an abnormal blood test, which was highly suggestive of prostate cancer. When the patient's prostate cancer was finally diagnosed over one year later, the tumor had unfortunately escaped the prostate and spread into the nearby anatomical structures. As a result, the patient now suffers from permanent urinary problems.

## $500,000 SETTLEMENT

### Negligent failure to diagnose a stroke after aneurysm surgery case

In this case, Mr. Gladstein's client underwent an endovascular procedure to treat a cerebral aneurysm. Approximately four days after surgery, his client began experiencing clinical signs and symptoms of an impending stroke. She thus called her doctor's office several times. Each time, the client was advised she had nothing to worry about. Ultimately, the client suffered a stroke, which left her without use of her leg, which prevents her from performing her physical labor job.

## $195,000 SETTLEMENT

### Negligent failure to diagnose a fatal heart condition

While being examined at her local emergency room, Mr. Gladstein's client underwent an electrocardiogram ("EKG"), which showed second-degree heart block. Heart block is a problem with the heart's electrical system, and is potentially fatal. The ER physicians either misinterpreted the EKG, or ignored the condition, as they failed to call for a cardiology consult before discharging the client. The client returned to the same ER approximately 15 hours later, and underwent a second EKG. That test showed the client's heart block had worsened. Again, however, the attending ER physician failed to order a cardiology consult, or placed an external pacemaker on the

 **GLADSTEIN LAW FIRM, PLLC**   

# Louisville, KY Personal Injury Attorneys Recent Successes

## $1.8 Million Settlement

**Medical Malpractice Case**

This medical negligence action involves Defendants' negligent failure to appropriately diagnose Plaintiff as suffering from endometriosis before performing a robotic-assisted laparoscopic abdominal hysterectomy in 2013. Because Defendants failed to confirm the diagnosis preoperatively, and the postoperative pathology conclusively showed no endometriosis, Plaintiff, then age 34, underwent a surgery that was neither clinically indicated nor medically necessary. Furthermore, while performing the hysterectomy, Defendant Physician failed to recognize and treat an intraoperative injury, namely a jejunal (small bowel) perforation. As a result, Patient became septic, and went into organ failure. Patient was ultimately admitted to the hospital for four months, during which time she underwent thirteen (13) separate surgeries. Patient still requires two additional surgeries to repair a large abdominal defect resulting from the delayed diagnosis.

## $75,000.00 SETTLEMENT

**Motor Vehicle Accident Case**

Car accident during which Mr. Johnson suffered a severe foot fracture requiring two surgeries, a sternal fracture, and a concussion. The foot fracture still causes Mr. Johnson pain, and prevents him from completing his activities of daily living.

## $1.75 MILLION SETTLEMENT

**Medical Malpractice Case**

In September, 2014, Kentucky personal injury attorney, Seth Gladstein, obtained a $1.75 million settlement on behalf of his clients in case pending in Jefferson (Kentucky) Circuit Court. The recovery was issued for damages resulting from two radiologists and a pulmonologist's negligent failure to timely diagnose and treat the client's lung cancer. The case, which according to Gladstein involved a number of medical issues, was significant because of the amount, and difficulty, of the medical issues presented.

## $150,000 SETTLEMENT

**Motor Vehicle Accident Case**

Attorney Seth Gladstein obtained a $150,000 settlement for a client. This case involved a $100,000.00 policy limits motor vehicle accident case. In the crash, the client, age 48, suffered a patellar (knee cap) fracture, which

Coletti Decl., Ex. J
Page 48 of 64

GET READY FOR FALL **$9⁹⁹** / **yr** SALE EXTENDED

SUBSCRIBE NOW
(HTTP://OFFERS.COURIER-
JOURNAL.COM/SPECIALOFFER?
GPS-
SOURCE=BENBSEP&UTM_MEDIUM=NANOBAR&UTM_SOURCE=BOUNCE-
EXCHANGE&UTM_CAMPAIGN=LABORDAY17EXT)

# Louisville to pay $160K to dead inmate's family

Claire Galofaro, The Courier-Journal;     Published 7:33 p.m. ET April 21, 2014



*(Photo: Scott Utterback/The Courier-Journal)*

The city has agreed to pay $160,000 to the family of a heroin addict who died in 2012 while detoxing at the city jail.

Savannah Sparks, 27, received scant medical attention for days, despite obvious signs of a fierce withdrawal, Louisville Metro Police investigators found.

Mark Bolton, director of the Louisville Metro Department of Corrections, acknowledged that Corizon, the company contracted to provide inmate health care, was ill-prepared to handle the heroin epidemic that exploded in early 2012.

In the wake of Sparks' death, Bolton said, the jail overhauled its system for dealing with detoxing inmates. It trained its staff to better screen for and monitor withdrawal symptoms. Corizon is no longer used for medical services.

Bolton said in a statement Monday that the jail has not had "any significant events" related to withdrawals since the plan was put into place last year.

But Sparks' estate sued both Corizon and the city, charging that both the medical staff and corrections officers acted negligently in allowing Sparks to grow worse without adequate treatment.

Corizon settled with the family last year. The jail signed its settlement Friday.

"We wish it didn't have to come to this," said attorney Seth Gladstein, who represented her estate. "Had they followed their clearly worded protocols, Savannah would be alive today. But they failed to do that. So this case is about three kids who lost their mom."

Sparks' children, he said, are now 3, 6 and 12.

She was booked into the jail on a theft charge on April 7, 2012, Gladstein said. She told the intake officers she used one gram of heroin every day.

Two days later, a sergeant wrote a note acknowledging that Sparks was having a "severe detox," Gladstein said. She'd been found having tremors, covered in her own sweat, urine, feces and vomit. They gave her a shower and put her back in her cell, Gladstein said.

Gladstein said the jail's policies required that any officer who sees an inmate with signs of withdrawal to immediately contact medical staff, and an inmate suffering severely should be taken to the hospital. Sparks should have been taken to the hospital that day, he said.

But she remained at the jail. Sparks never saw a doctor, Gladstein said, though some officers would later tell investigators it was the worst detox they'd ever seen. They lined her cell with garbage bags.

Early on the morning of April 12, a nurse concluded that she looked very sick and said a doctor would be contacted that day, Gladstein said.

But nobody checked on her for 12 hours. A corrections officer discovered her unresponsive in her cell around 4:30 p.m.

Reporter Claire Galofaro can be reached at (502) 582-7086. Follow her on Twitter at @clairegalofaro.

Read or Share this story: http://cjky.it/1i9paS1

# Active Alerts

Mandatory evacuation issued for Chatham County, coastal Georgia (http://savannahnow.com/news/2017-09-07/gov-deal-issues-evacuation-order-chatham-county-coastal-georgia)

Hurricane Irma cancellations (http://savannahnow.com/hurricane-guide/news/2017-09-07/hurricane-irma-cancellations)



(/)

Posted February 23, 2016 08:47 am - Updated May 2, 2016 10:12 am

By Jan Skutch (/jan-skutch)

jan.skutch@savannahnow.com

## Mother of dead Chatham County jail inmate sues Corizon Health, sheriff's officials for ignoring son's medical needs



The mother of a Chatham County jail inmate who died while in custody sued Corizon Health, the jail's health provider, for allegedly putting profits ahead of patient care and refusing to provide him with hospitalization.

The federal court suit, filed Monday by Belinda Lee Maley for the estate of her son Matthew Clinton Loflin, also named Chatham County, several sheriff's officials and several medical staffers for failing to address the inmate's needs.

SEE ALSO

**Officials seek solutions to mental health care at Chatham County jail (http://savannahnow.com/news/2017-08-23/officials-seek-solutions-mental-health-care-chatham-county-jail)**

**Condemned Ohio killer of 2 wants September execution delayed (http://savannahnow.com/news/2017-08-24/condemned-ohio-killer-2-wants-september-execution-delayed)**

"Matthew Loflin died because defendants were deliberately indifferent to his serious medical need," the suit filed by attorneys Will Claiborne and Wesley Woolf said. "Corizon, by and through its agents, chose to protect its own profits rather than preserve Mr. Loflin's life.

9/7/2017        Mother of dead Chatham County jail inmate sues Corizon Health, sheriff's officials for ignoring son's medical needs

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 52 of 64

"The Chatham County defendants, in turn, chose to ignore Mr. Loflin's cries for help and instead protected their private contractor."

Named defendants are Corizon Health Inc.; Corizon LLC; Chatham County; Roy Harris, former chief deputy sheriff, now acting Chatham County sheriff; the estate of the late sheriff Al St Lawrence; John Wilcher, individually and in his capacity as the former Chatham County jail administrator; Dr. Scott H. Kennedy; Dr. Adamar Gonzalez; and Virginia O'Neill.

Corizon has a contract with Chatham County for $5.1 million to provide medical care for inmates at the jail. Both Kennedy, and later Gonzalez, were Corizon's Southeast Regional Medical directors, and O'Neill was Corizon's health care service administrator at the jail, the suit said.

St Lawrence was sheriff until he died in office on Nov. 24. Harris, who was his chief deputy since 2011, was named to succeed him. Both Harris and Wilcher are running to fill St Lawrence's unexpired term in a special election March 1.

Harris said Tuesday he had not been served with a copy of the suit, but when he receives it "I will discuss it with the county attorney and we will certainly go forward."

Wilcher, who retired from the department in mid-April 2014, declined comment on the suit Tuesday.


Background

Loflin was arrested on Feb. 6, 2014, for non-violent drug use and held in the jail.

He suffered repeated episodes of unconsciousness in his jail cell and showed signs of congestive heart failure, the suit said.

"Despite this result, Corizon staff took no further actions," the suit alleged.

"On March 24, 2014, a woman named Betty McRae called" Loflin's mother, telling her Loflin had asked her husband in the next cell "to have his wife get in touch with Ms. Maley and inform her that he (Loflin) was not being treated, needed to go to the hospital and was afraid he was going to die," the suit said.

Despite a determination by Corizon's Dr. Charles Pugh that Loflin needed to be sent to the hospital, Kennedy rejected the request, the suit said.

Kennedy, who worked in the Corizon regional office in Punta Gorda, Fla., "never personally observed, evaluated or interacted" with Loflin, the suit said.

Loflin was taken to Memorial University Medical Center on April 7, 2014, and on April 24, 2014, life support was withdrawn, the suit said.

According to the suit, under the contact with Chatham County, "Whatever Corizon does not spend providing medical care it retains as profit. ... The 'keep what you do not spend' compensation structure provides Corizon with a direct, dollar-for-dollar incentive to deny medical care to inmates."

As a result, the suit said that "During 2014, Corizon's executive and administrative teams deliberately engaged in a pattern of delaying necessary treatment for as long as possible in order to avoid responsibility for the costs of basic health care. The primary motivation was to enlarge its profit margin."

Corizon's "Southeast Regional Medical Director, first Scott H. Kennedy, then Alamar Gonzalez, repeatedly denied local staff requests to have Mr. Loflin sent to the hospital because any hospitalization had the potential to undermine Corizon's profit margin," the suit said.

And the suit alleged that at Corizon's 2014 annual meeting, CEO Dr. Woodrow Myers, told the audience "the primary function of Corizon was to make money and that he was not embarrassed to say it."

The suit also alleged that Kennedy, as Corizon's regional medical director, was compensated with a base salary and performance incentives linked to profits.

"In 2014 Kennedy received such performance incentives and casually joked that he would be able to 'buy some fine Scotch' with the increased pay he received," the suit said.

The suit alleges that the Maleys spoke with Wilcher, who referred them to St Lawrence but that the sheriff did not respond.

The suit alleges that Harris was deliberately indifferent to Loflin's critical medical needs despite knowing about them in March 2014, adding that it was the department's "widespread custom, policy, practice, and/or procedure to support Corizon's decisions to deny medical treatment of, or be deliberately indifferent the serious medical needs of (Loflin)."

Martha Harbin, director of external relations for Corizon Health, said Tuesday: "It is important to emphasize that the existence of a lawsuit is not necessarily indicative of quality of care or any wrongdoing. While we do not comment on active litigation, nor would we violate our patients' medical privacy by sharing personal health information in the media, we are confident in the care we provided."

Family's grief vs. jail policy (/news/2014-04-25/familys-grief-vs-jail-policy)

**0 Comments**                                                      Sort by  Oldest ▾

 Add a comment...

 Facebook Comments Plugin

## Recommended for you

 **GOV. DEAL ISSUES EVACUATION ORDER FOR CHATHAM COUNTY, COASTAL GEORGIA**

(HTTP://SAVANNAHNOW.COM/NEWS/2017-09-07/GOV-DEAL-ISSUES-EVACUATION-ORDER-CHATHAM-COUNTY-COASTAL-GEORGIA)

 **PORTS OF SAVANNAH, BRUNSWICK PREPARE TO BATTEN DOWN HATCHES**

(HTTP://SAVANNAHNOW.COM/NEWS/2017-09-06/PORTS-SAVANNAH-BRUNSWICK-PREPARE-BATTEN-DOWN-HATCHES)

 **TRAFFIC NIGHTMARE AS 500K PEOPLE TOLD TO LEAVE FLORIDA**

(HTTP://SAVANNAHNOW.COM/NEWS/2017-09-07/TRAFFIC-NIGHTMARE-500K-PEOPLE-TOLD-LEAVE-FLORIDA)

 **SUPERINTENDENT ANN LEVETT WORKING WITH SAVANNAH-CHATHAM SCHOOL BOARD TO AVOID PENALTIES**

(HTTP://SAVANNAHNOW.COM/NEWS/2017-08-31/SUPERINTENDENT-ANN-LEVETT-WORKING-SAVANNAH-CHATHAM-SCHOOL-BOARD-AVOID-PENALTIES)

**SOUTH CAROLINA GOVERNOR DECLARES STATE OF EMERGENCY FOR IRMA**

(HTTP://SAVANNAHNOW.COM/NEWS/2017-09-06/SOUTH-CAROLINA-GOVERNOR-DECLARES-STATE-EMERGENCY-IRMA)

 STORM SKATES PAST SAVANNAH AREA BUT RUFFLES TYBEE WATERS

(HTTP://SAVANNAHNOW.COM/NEWS/2017-08-28/STORM-SKATES-PAST-SAVANNAH-AREA-RUFFLES-TYBEE-WATERS)

VIEW ALL LOCAL STORE SALES » (/CIRCULARS)

## Jobs

(http://jobs.savannahnow.com/jobs/i
services-manager-cdm-hilton-
head-sc-29910-99959806-d?
widget=1&type=job&?
utm_source=savannahnow.com&utr
Vi At TIdePointe
Bluffton, SC

PORT POLICE OFFICER
(http://jobs.savannahnow.com/jobs/|
police-officer-garden-city-

## Search Savannah jobs

Job Title, Keywords or Company Nar

☐ Search job title only

Savannah, GA

Advanced Search
(http://savannah.careers.adicio.com/jobs/search/advanced)
| Browse All Jobs
(http://savannah.careers.adicio.com/jobs/search/results?
location=Savannah%2C+Georgia%2C+United+States&radius=50&sort=IsFe

Coletti Decl., Ex. J

Search

# LOCAL GUIDE (HTTP://OWNLOCAL.SAVANNAHNOW.COM/)

**FEATURED BUSINESSES**     **RECENT ADS**

(http://ownlocal.savannahnow.com/pooler-ga/food-and-beverage/cafes-and-coffeehouses/the-front-porch-coffeehouse-912-348-2240)
The Front Porch Coffeehouse

Pooler, GA

(http://ownlocal.savannahnow.com/savannah-ga/real-estate/real-estate-agents/the-landings-home-team-912-598-0500)
The Landings Home Team

Savannah, GA

(http://ownlocal.savannahnow.com/savannah-ga/shopping/furniture/flexsteel-home-savannah-912-927-6660)
Flexsteel Home - Savannah

Savannah, GA

(http://ownlocal.savannahnow.com/savannah-ga/real-estate/real-estate-agents/coldwell-banker-platinum-partners-800-505-8111)
Coldwell Banker Platinum Partners

(http://ownlocal.savannahnow.com/pembroke-ga/real-estate/apartments/fairway-management-inc-912-653-0081)
Fairway Management Inc.

PEMBROKE, GA

(http://ownlocal.savannahnow.com/savannah-ga/community/assisted-living/john-wesley-villas-savannah-912-257-4991)
John Wesley Villas - Savannah

Savannah, GA

SEE MORE (HTTP://OWNLOCAL.SAVANNAHNOW.COM/BUSINESSES)     BY CATEGORY (HTTP://OWNLOCAL.S.

# Popular Stories



KEEP SCROLLING OR

Adams County Jail footage of Tyler Tabor shortly before his death. Additional images, video and more below.

**AA**

Fox31

# See Tyler Tabor's Heroin Withdrawal Jail Death, Detailed in Shocking Video, Suit

**MICHAEL ROBERTS** | JUNE 23, 2016 | 7:58AM

Last October, when we first reported about Tyler Tabor's heroin-withdrawal death in Adams County jail, we wrote that while no lawsuit had been filed in the case, "one will arrive soon."

Powered by WIBBITZ

That day has come. At 2:30 p.m., Tabor's family will appear at a press conference announcing a suit they've filed against Adams County and Corizon, the private company contracted to provide health-care services to the

numerous individuals, Adams County Sheriff Michael McIntosh among them.



**KEEP SCROLLING OR CLICK TO READ:**

## RELATED STORIES

- **Tyler Tabor's Slow, Agonizing Jail Death: "People Are Being Treated Like Animals"**

- **Christopher Lopez: $3M in Death of Man Whose Jailers Joked and Laughed as He Slowly Died**

- **Jeffco to Pay $2.5M for Jennifer Lobato's Jail Death From Opioid Withdrawal**

AA

The suit is accompanied by a series of videos by TriCuzz Productions; see them below. The first details the tragedy with assistance from jail footage shot over the three long days it took Tabor to die, while the second and third take on the topics of "prison profiteering" and punishment versus treatment as it relates to addiction.

This last subject is key when it comes to Tabor's case, according to attorney David Lane, who's representing his family, including Dustin, the young son Tyler left behind.



**See Tyler Tabor's Heroin Withdrawal Jail Death, Detailed in Shocking Video, Suit**

Tenth Fourteener Death of 2017: Remembering Dr. Jamie Rupp

My I-70 Labor Day Weekend Clusterf*ck Diary

Bitter End of Racist Gang Member Kirk Boyd's Meth-Fueled Crime Spree

Threesome on Video Leads to School of Mines Sexual-Conduct Lawsuit







Tyler Tabor and his son, Dustin, who's now elementary-
school age.

**Courtesy of the Tabor family**



Now Playing ▶ Denver Students    1:09 ▶ Colorado Fourteeners    1:07 ▶ Col... Sch...

"His bond was only $300," Lane
points out. "But the family decided,
'Let's get him detoxed, and then
we'll put him in a rehab program,'
thinking jail would be a safe place
to detox. But it wasn't."

This death was easily preventable,
Lane maintains.

"Tyler was a welder who became
addicted to opioid pain killers
when he hurt his back on the job,
and that morphed into a heroin
addiction," he notes. "He told the
jail he was suffering from
withdrawal, and he begged them
for an IV, which would have saved
his life. But they completely
ignored him, and it killed him."

According to the lawsuit, Tabor
was busted on May 14, 2015, by a
police officer in Thornton "on two
outstanding warrants in Larimer
County for failure to comply with
probation conditions in
connection with a misdemeanor

Powered by ▶ WIBBITZ

to appear on a misdemeanor charge of driving under restraint."



A closer look at a stricken Tabor.    **Fox31**

From the outset of Tabor's incarceration, Lane allows, his symptoms were evident — but he wasn't taken to see a doctor. Instead, nurses administered what he calls "the easy fix: Gatorade, since one of the serious problems with withdrawal is dehydration. But that only works if you can keep it down, and Tyler couldn't. And anyone could see what was happening to him. We have videos of Tyler falling down in his cell, crawling to the emergency button and pushing it. And still they didn't put him on an IV." Instead, he was provided more Gatorade and medication that included Clonidine, Hydroxyzine, Acetaminophen, Pepto-Bismol, Loperamide and Promethazine.

On May 16, the lawsuit states, Tabor's blood pressure went

**KEEP SCROLLING OR CLICK TO READ:**

Powered by ▶ WIBBITZ

11:38 p.m., and another two-liter serving of Gatorade didn't improve the situation. At 2:20 a.m. the following morning, he was taken to a treatment area in a wheelchair because he was too weak to walk. But he was subsequently returned to his cell, where his physical deterioration continued.

**KEEP SCROLLING OR CLICK TO READ:**

AA

Here's an excerpt from the suit featuring two named defendants, Nurse Cheryl Groothuis and Adams County Deputy Michael Brown.

At approximately 4:10 a.m. on May 17, 2015, Nurse Groothuis and Deputy Brown visited Tyler's cell to administer medication. Tyler had difficulty standing and fell multiple times in Nurse Groothuis's and Deputy Brown's presence. Nurse Groothuis handed Tyler his medications, but again his hands were so cramped that he could not hold them. As Tyler let go of the wall he was holding on to for balance to retrieve the dropped medication, he fell to the floor. Nurse Groothuis attempted to help Tyler to his feet, but was unable to do so. Deputy Brown entered the cell and helped Tyler into his bed, where Nurse Groothuis gave Tyler the medication he had dropped. Nurse Groothuis did not provide any further treatment or check Tyler's vitals. She left the cell.

Powered by **WIBBITZ**



Tabor during his final hours.     **Fox31**

**KEEP SCROLLING OR CLICK TO READ:**

Forty minutes later, Tabor pressed the emergency button again, but the call was "essentially ignored," the lawsuit claims. Then, at 5:20 a.m., he crawled to the cell door, vomited on the floor and passed out while lying on his back.

He was discovered five minutes later by another defendant, Deputy Cory Engel. Tabor is said to have "had a gray color to him and was having difficulty breathing. Deputy Engel attempted to speak to Tyler and kicked Tyler a few times, but Tyler could only moan in response."

That finally prompted a call for emergency medical services, but it was too late. Tabor was pronounced dead at 6 a.m.

The following October, Dave Young, district attorney for the 17th Judicial District, announced in a letter to Sheriff McIntosh that he <span style="color:red">hadn't found any criminal wrongdoing in the Tabor case</span>

Powered by WIBBITZ

a condemnation of Corizon, "which has been sued repeatedly. These private health-care companies are so profit-driven, and they view their client base as high-volume, low-asset clients. To save twenty bucks, they're willing to risk people's lives."

**KEEP SCROLLING OR CLICK TO READ:**



The Tabor family including Dustin, who is holding a photo of his late father.

**Courtesy of the Tabor family**

As regular readers know, Tabor's death is hardly an isolated incident. In 2014, the family of Christopher Lopez, whose jailers laughed and joked as he slowly died, was awarded $3 million in a lawsuit settlement.

Powered by ▶ WIBBITZ

And Lane is also representing the family of Jennifer Lobato, who died in March 2015 from the effects of heroin-withdrawal dehydration in Jefferson County jail. That lawsuit quotes one of Lobato's jailers as telling fellow inmates trying to alert authorities about her

Case 3:16-cv-02235-AA    Document 42-10    Filed 10/20/17    Page 64 of 64

In regard to Tabor, Lane says his loved ones remain shattered by what happened to him. "Oh, my God, they're the most grief-stricken family I've ever met."

The family and Lane are featured in the first video below, which also includes jailhouse footage of Tabor's final, agonizing hours. Two more videos and the Tabor complaint follow.

AA

**KEEP SCROLLING OR CLICK TO READ:**





Powered by ▶ WIBBITZ



**IF YOU LIKE**