**Richard K. Hansen**, OSB #832231
Email: rhansen@schwabe.com
**Anne M. Talcott**, OSB #965325
Email: atalcott@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

Attorneys for Defendants, Corizon Health, Inc., Joseph
McCarthy, MD, Colin Storz, Leslie O'Neil, CJ Buchanan,
Louisa Duru, Molly Johnson, and Courtney Nyman

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **RUSSELL PITKIN** and **MARY PITKIN**, Co-Personal Representatives of the Estate of **MADALINE PITKIN**, Deceased, | Case No. 3:16-cv-02235-AA |
| Plaintiffs, | **INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | DEMAND FOR JURY TRIAL |
| **CORIZON HEALTH, INC.**, a Delaware Corporation; **WASHINGTON COUNTY**, a government body in the State of Oregon; **JOSEPH MCCARTHY, MD**, an individual; **COLIN STORZ**, an individual; **LESLIE ONEIL**, an individual; **CJ BUCHANAN**, an individual; **LOUISA DURU**, an individual; **MOLLY JOHNSON**, an individual; **COURTNEY NYMAN**, an individual, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

Page 1 -    INDIVIDUAL DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................13

*Ashcroft v. al-Kidd*,
 563U.S. 731(2011)...........................................................................................15

*Berry v. Peterman*,
604 F.3d 435 (7th Cir. 2010) ...........................................................................24

*Camarillo v. McCarthy*,
998 F.2d 638 (9th Cir. 1993) ...........................................................................14

*Castro v. County of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) .........................................................................17

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) ....................................................................18, 29

*Connick v. Thompson*,
563 U.S. 51 (2011).............................................................................................34

*Kneipp ex rel. Cusack v. Tedder*,
95 F.3d 1199 (3d Cir. 1996)..............................................................................33

*Far W. Fed. Bank, S.B. v. Director, Office of Thrift Supervision*,
787 F. Supp. 952 (D. Or. 1992), *aff'd*, 119 F.3d 1358 (9th Cir. 1997)....................13

*Franklin v. Fox*,
No. C 97-2443 CRB, 2000 U.S. Dist. LEXIS 19651, at *18 (N.D. Cal. Dec.
22, 2000) ...........................................................................................................14

*Franklin v. Fox*,
No. C 97-2443 CRB, 2000 U.S. Dist. LEXIS 19651 (N.D. Cal. Dec. 22, 2000) ...................15

*Gohranson v. Snohomish County*,
No. C16-1124RSL, 2018 U.S. Dist. LEXIS 89268 (W.D. Wash. May 29,
2018) .............................................................................................................22, 23

*Gordon v. County of Orange*,
888 F.3d 1118 (9th Cir. 2018), *petition for cert. filed* (U.S. Sept. 12, 2018) .................15, 17,
........................................................................................................18, 19, 22, 25, 32

INDIVIDUAL DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*J.H. v. Johnson*,
    346 F.3d 788 (7th Cir. 2003) ........................................................................23

*Jensen v. Lane County*,
    222 F.3d 570 ................................................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................13

*Motto v. Corr. Med. Servs.*,
    No. 5:06-cv-00163, 2010 U.S. Dist. LEXIS 121347 (S.D. W. Va. Nov. 16,
    2010) .............................................................................................................32

*Neuroth v. Mendocino County*,
    No. 15-cv-03226-RS, 2018 U.S. Dist. LEXIS 149492 (N.D. Cal. Aug. 31,
    2018) ......................................................................................................18, 19

*Rouster v. County of Saginaw*,
    749 F.3d 437 (6th Cir. 2014) ...............................................21, 24, 25, 26, 28, 29

*San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino County*,
    825 F.2d 1404 (9th Cir. 1987) ......................................................................33

*Sandoval v. County of San Diego*,
    No. 3:16-cv-01004-BEN-AGS, 2018 U.S. Dist. LEXIS 19545 (S.D. Cal. Feb.
    6, 2018) ...................................................................................................28, 29

*Scott v. Harris*,
    550 U.S. 372 (2007) ......................................................................................13

*See Wyatt v. Cole*,
    504 U.S. 158 (1992)......................................................................................14

*Simmons v. Navajo County*,
    609 F.3d 1011 (9th Cir. 2010) ......................................................................18

*Snow v. McDaniel*,
    681 F.3d 978 (9th Cir. 2012) ........................................................................18

*T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ........................................................................13

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ......................................................................13

*Williams v. Mehra*,
    186 F.3d 685 (6th Cir. 1999) ........................................................................19

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

**Statutes**

42 U.S.C. § 1983 ............................................................................................14, 15, 22, 33

**Other Authorities**

Eighth Amendment ..............................................................................................15, 18, 25

Fourteenth Amendment .......................................15, 17, 18, 20, 23, 24, 25, 28, 33, 34

Fed. R. Civ. P. 56(c) ...................................................................................................13

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

**LR 7-1 Certification**

Defendants Joseph McCarthy, MD ("Dr. McCarthy"), Colin Storz ("Storz"), Leslie O'Neil ("O'Neil"), CJ Buchanan ("Buchanan"), Louisa Duru ("Duru"), Molly Johnson ("Johnson"), and Courtney Nyman ("Nyman") (collectively, "Individual Defendants") certify that the parties have conferred in good faith but have been unable to resolve the issues involved in this motion.

**LR 7-2(b) Certification**

Individual Defendants certify that this motion complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,511 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

**Motion**

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, Individual Defendants move for summary judgment on the claims against them in Plaintiffs' First Amended Complaint ("FAC" or "Complaint") (ECF No. 78).

**Statement of Facts[1]**

I.      **Medical Care at the Washington County Jail**

Defendant Corizon provided medical services to inmates of the Washington County Jail (the "Jail") under a contract with Washington County.  (Decl. of Richard K. Hansen In Support

---

[1] This statement of facts describes the undisputed facts that were available to the Individual Defendants at the time of their relevant decisions.  Because medical staff members did not have access to housing units, the statement of facts does not reflect all evidence available in the record, such as surveillance video and deputies' observations.  Individual Defendants reserve the right to present additional evidence outside of this statement of facts at trial or in reply to Plaintiffs' opposition to this motion.

Page 1 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Of Individual Defendants' Motion For Summary Judgment And Corizon Health, Inc.'s Motion

For Partial Summary Judgment, Ex. 18 at 1.)[2]  Nurses—both Registered Nurses ("RN") and

Licensed Practical Nurses ("LPN")—provided medical care to inmates 24 hours a day.  (Ex. 24

at 4; Ex. 19.)  Physician Assistants ("PA") or Medical Doctors ("MD") were either on-site or on-

call 24 hours a day.  (Ex. 24 at 4.)

Corizon employees assessed the medical needs for inmates in multiple ways.  First, a

Corizon RN screened each incoming inmate after arrival at the Jail.  This process allowed

Corizon employees to determine and address any medical needs existing at the time of booking.

Second, inmates at the Jail could request non-emergency medical or mental-health treatment by

submitting Medical Request Forms ("MRF").  (*See*, *e.g.*, Ex. 15 at 4).)  A MRF is a standardized

form at the Jail, containing spaces for the inmate's name, identification numbers, medical

problem, date, and notes from medical staff.  (*Id.*)  The top of the MRF states "If you need

emergency care, contact your pod [or housing unit] deputy immediately."  (*Id.*)

Inmates filled out MRFs in their pod and deposited them into a locked box at the pod

deputy's station in their housing unit.  A Corizon employee retrieved the MRFs twice a day after

distributing medications to inmates in the pods (a process known in the Jail as "med-pass").  (Ex.

1 at 36:24–37:2.)  Corizon nurses reviewed and triaged the MRFs using a scale of 1-3.  (Ex. 10 at

20:22–21:8.)  A "1" indicated an urgent need requiring the requesting inmate to be seen as soon

as possible.  A "2" indicated a need for the inmate to be seen by medical staff, typically on the

next clinic day.  (*Id.* at 21:13–22:15.)  A "3" denoted a non-urgent need that may not require a

visit from medical staff.  (*Id.* at 21:9–12.)  Once Corizon nurses triaged incoming MRFs, they

---

[2] Unless stated otherwise, citations to Exhibits in this Motion refer Exhibits to the Hansen Declaration.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

placed the MRFs in a binder for follow-up if necessary, including scheduling with a provider at clinic or by a nurse visit to the inmate.  (Ex. 1 at 35:4–8.)  Clinic was held on weekdays.  (Ex. 10 at 19:11–20.)

Corizon employees provided medical care throughout the Jail, including in pods, the booking area, and the Medical Observation Unit ("MOU")—a co-ed block of 21 cells within the jail located near the medical offices in the Jail.  (Ex. 9 at 14:3-4.)  Jail staff housed inmates in the MOU for segregation purposes as well as for inmates needing closer medical observation and treatment.  For security reasons, Corizon employees did not have free access to any inmates in the Jail, even those assigned to MOU.  (Ex. 13 at 175:22–176:6.)  All visits, even emergencies, had to be coordinated with corrections deputies.

## II.   Pitkin's Arrest and Booking

At 10:30 pm on April 16, 2014,[3] officers of the Tualatin Police Department arrested Madaline Pitkin ("Pitkin") on an outstanding arrest warrant and for possession of heroin.  (Ex. 23 at 3.)  She entered custody at Washington County Jail at 1:55 am on April 17.  (Ex. 16 at 1.)  The arresting officer noted on booking documents that Pitkin reported last used heroin at 7:00 pm on April 16.  (*Id.* at 2.)

Nerissa Galvez, RN ("Galvez") conducted Pitkin's initial medical screening at 4:14 am on April 17.  (Ex. 15 at 1.)  Galvez noted that Pitkin reported using 1 gram of heroin per day, had needle marks on both hands, and had gone through heroin withdrawal a couple of years previously.  (*Id.*)  Based on her assessment of Pitkin, Galvez concluded that Pitkin was not yet experiencing heroin withdrawal in the early morning of April 17.  (Ex. 11 at 31:25–32:1.)

---

[3] Unless otherwise noted, all dates are in 2014.

Page 3 -   INDIVIDUAL DEFENDANTS' MOTION FOR
          SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Galvez ordered a Clinical Opiate Withdrawal Scale ("COWS") assessment for Pitkin for 48 hours after April 16. (Ex. 15 at 3, 15.) Galvez also explained to Pitkin how to utilize MRFs to obtain non-emergency medical care. (Ex. 11 at 30:8–12; Ex. 15 at 1.)

## III.    Clinical Opiate Withdrawal Scale ("COWS") Assessments

Corizon staff at the Jail used COWS to assess opiate withdrawal symptoms. COWS are commonly used for this purpose and are widely accepted as a research-validated assessment tool. (Ex. 24 at 2–3.) A COWS assessment relies on both the patient's self-reported, subjective symptoms and the clinician's objective observations of the patient. (*Id.* at 2.) The COWS assessment is meant to be used only in the presence of a patient. (Ex. 28 at 4.) The COWS assessment's ultimate score represents the sum of eleven symptoms rated on a 1-to-5 scale. (Ex. 24 at 2.) A patient's withdrawal symptoms may be classified as mild, moderate, or severe based on the COWS. (*Id.*) Corizon classifies COWS scores as moderate and severe at lower thresholds than the default COWS, creating an additional safety factor. (*Id.* at 2 n.1.) For example, a COWS score of 12 is "mild" under the default COWS classifications, but "moderate" under Corizon's classifications. (*Id.*) Clinicians generally determine a course of treatment based on a patient's COWS score. (*Id.* at 2.)

## IV.    Pitkin Receives Medical Treatment for her Withdrawal Symptoms

Defendant Louisa Duru, LPN ("Duru") conducted a COWS assessment on Pitkin at 9:59 am on April 18. (Ex. 15 at 6.) Duru scored Pitkin as "8," which was a miscalculation as Pitkin's symptoms actually produced a score of 10. (Ex. 15 at 6, Ex. 12 at 73:21–24.) However, both scores—even the more severe one resulting from Duru's scoring miscalculation—placed Pitkin in the "mild" withdrawal symptom category.

Page 4 -    INDIVIDUAL DEFENDANTS' MOTION FOR
                SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

After completing the COWS assessment, Duru spoke with Colin Storz, PA ("Storz") about Pitkin. (Ex. 12 at 80:20–83:10.) Storz prescribed Pitkin multiple medications to treat her mild withdrawal symptoms: acetaminophen for pain, promethazine for nausea, and hydroxyzine for anxiety and agitation. (*Id.*; Ex. 15 at 13.) Duru administered Pitkin the medications ordered by Storz. (Ex. 12 at 83:11–15.) Defendant Duru never saw or interacted with Pitkin again after April 18 medication administration. (*Id.* at 75:22–25.)

Pitkin submitted a MRF dated April 19, 2014, 3:30 pm. (Ex. 15 at 4.) In this MRF, Pitkin stated that medical staff at intake had told her that she "was not yet sick enough to start meds[.] Now I am in full blown withdrawals and really need medical care. Please help!" (*Id.*) As explained above, Pitkin had actually been assessed the prior day by Duru and was taking several medications to address her withdrawal symptoms. This MRF would have been picked up during the evening med-pass on April 19, at approximately 9:00 pm. Evangeline Nichols, RN ("Nichols") triaged Pitkin's first MRF as a level 2 medical request when she received the MRFs on the evening of April 19, 2014. (Ex. 7 at 56:5–13; Ex. 15 at 4.) A triage level of 2 generally meant the requesting inmate should be seen at the next clinic day. (Ex. 10 at 21:13–22:9.) Because April 19, 2014, was a Saturday, the next clinic day would have been Monday, April 21, 2014.

Pitkin submitted another MRF on Sunday, April 20 at 4:10 pm, which would have been picked up at approximately 9:00 pm during the evening med-pass on April 20. (Ex. 15 at 5.) The second MRF stated: "[D]etoxing from heroin REALLY bad. Can't keep any food down. Heart beating so hard that I can't sleep." (*Id.*) On the evening of April 20, Washington County Sheriff's Deputy Lloyd requested that a Corizon medical staff member assess Pitkin. (Ex. 8 at 46:4–8; Ex. 1 at 51:15–52:12.) In response to Deputy Lloyd's request, Defendant Courtney

Page 5 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Nyman, LPN ("Nyman") saw Pitkin in her housing unit at approximately 8:30 pm.  (Ex. 8 at 44:11–46:8.)  Nyman performed a COWS assessment.  (*Id.* at 44:6–22; Ex. 15 at 7.)  This second COWS assessment yielded a score of 8, again indicating mild withdrawal symptoms.  (*Id.*)

Defendant Molly Johnson, RN ("Johnson") also received a request to assess Pitkin from Deputy Lloyd.  Johnson encountered Nyman as Johnson prepared to go to Pitkin's housing unit to examine and assess her.  (Ex. 1 at 46:19–47:2.)  Nyman told Johnson that she had just seen Pitkin.  (*Id.* at 46:23–47:9; Ex. 8 at 68:24–69:10.)  Because Johnson understood that Nyman had just assessed Pitkin, she did not go to Pitkin's unit to perform another examination.  (Ex. 1 at 52:24–53:7.)

Later in the evening of April 20, Johnson triaged MRFs to identify patients who needed to be seen that night or the next clinic day and triaged any new MRFs, including Pitkin's April 20 MRF.  Around the same time, Johnson also reviewed Pitkin's April 19 MRF.  (Ex. 1 at 42:18–19.)  Because she was aware that Pitkin had been assessed that evening by Nyman, Johnson noted on both MRFs that Pitkin had been seen and "started on partial protocol."  (Ex. 15 at 4–5.)  In response to Pitkin's reported gastrointestinal symptoms Johnson added a nursing order for twice-daily administration of loperamide, an antidiarrheal medication.  (*Id.* at 3.)

Pitkin submitted a MRF on April 21 at 2:10 pm.  In her April 21 MRF, Pitkin reported that she had vomiting and diarrhea, could not keep food, medication, or liquids down, could not sleep, felt pain all over her body, could not walk or stand without nearly fainting, and felt "near death."  (Ex. 15 at 8.)  This MRF was likely picked up at approximately 8:40 pm during the April 21 evening med-pass.  Nyman reviewed Pitkin's third MRF in the evening of April 21.  She considered the symptoms Pitkin described in the MRF to be similar to the language Pitkin used when Nyman completed a COWS assessment on April 20, and concluded that Pitkin's condition

Page 6 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

had not changed.  (Ex. 8 at 57:11–22.)  Nyman did not reassess Pitkin or recommend additional

examination by medical staff after reviewing this MRF.  (*Id.* at 64:21–25.)

Pitkin's chart shows that she took acetaminophen, hydroxyzine, promethazine, and

loperamide at the morning and evening med-pass, which occurred at 9:40 am and 8:42 pm on

April 21, respectively.  (Ex. 15 at 18.)  On April 22, Pitkin did not go to the morning med-pass

line to receive medications.  (*Id.*)  She took acetaminophen, hydroxyzine, promethazine, and

loperamide during the evening med-pass at 8:56pm on April 22.  (*Id.*)

Pitkin submitted a MRF on April 23 at 9:05 am.  (Ex. 15 at 9.)  This April 23 MRF stated

that Pitkin had been unable to "keep food, liquids, meds down [for] 6 days."  (*Id*.)  This MRF

also stated that she felt "very close to death," couldn't hear, and was seeing lights and hearing

voices.  (*Id.*)  Tony Wertz, LPN ("Wertz") was in Pitkin's pod performing treatments later that

morning and was asked by a male deputy to assess Pitkin.  (Ex. 13 at 31:10–32:19.)  Pitkin spoke

with Wertz about her symptoms and withdrawal treatment.  (*Id.* at 35:17–36:4.)  Wertz could not

have been aware of the MRF Pitkin had submitted shortly before examining her because it had

not yet been picked up or triaged.

Wertz administered a COWS assessment at 10:20 am, yielding a score of 4.  (Ex. 15 at

10.)  Wertz attempted to take Pitkin's blood pressure as part of the COWS assessment, but was

unable to obtain a diastolic reading, and charted 40/UA, meaning the BP was unobtainable.  (*Id.*;

Ex. 13 at 52:24–55:3.)  Wertz did not consider this a valid reading and thought the difficulty was

because Pitkin's arms were too small for the cuff he had with him.  (Ex. 13 at 57:17–21.)

Pitkin's other vital signs—temperature, pulse, respiration rate, and blood oxygen saturation—

were within normal ranges.  (*Id.*)  Wertz was aware that dehydration due to fluid loss was a

potential complication of opiate withdrawals, and that a low blood pressure and high heart rate

Page 7 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

were potential symptoms of dehydration.  (*Id.* at 45:13–45:25; 46:14–47:25)  Wertz did not

perceive Pitkin's situation as critical because her heart rate and other vital signs were normal.

(*Id.* at 49:15–50:8.)  But because Wertz was unable to obtain a valid blood pressure reading on

Pitkin, he sent Pitkin to the clinic for further evaluation.  (*Id.* at 193:4–20.)  Wertz perceived

Pitkin's symptoms as typical of opiate withdrawal and did not believe she needed to be sent to

the hospital.  (*Id.* at 125:16–126:4.)  Wertz did not see any of the MRFs Pitkin submitted during

Pitkin's incarceration at the Jail.  (*Id.* at 95:1–3.)

## V.    <u>Pitkin Is Transferred to the MOU</u>

Correctional deputies brought Pitkin to the clinic in a wheelchair shortly after Wertz saw

her on April 23.  Defendant RN CJ Buchanan ("Buchanan") assessed Pitkin in the clinic.  (Ex. 2.

at 43:25–44:14; *see generally* Ex. 15 at 14 (Buchanan's chart note for this encounter).)

Buchanan perceived Pitkin as alert, aware of her surroundings, and not in apparent distress.  (Ex.

2 at 46:19–24.)   Buchanan, too, had difficulty obtaining Pitkin's blood pressure, and she

requested assistance from Defendant Joseph McCarthy, MD ("Dr. McCarthy") and Defendant

RN Leslie O'Neil[4] ("O'Neil"), the Director of Nursing for Corizon at the Jail.  (*Id.* at 44:15–20.)

Buchanan succeeded in obtaining a reading of Pitkin's blood pressure, and recalls thinking that

Pitkin's blood pressure was low.  (*Id.* at 57:17–58:2.)   Buchanan did not record the blood

pressure reading she obtained on the morning of April 23.  (*Id.* at 67:14–15.)  Buchanan did not

perceive Pitkin as dehydrated, as she had elasticity in her skin and did not have chapped lips.

(*Id.* at 134:15–18.)

---

[4] Ms. O'Neil is occasionally referred to as Leslie Fitzgerald in the record.  *See, e.g.*, Ex. 3 at 54:24-55:2.

Page 8 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

McCarthy and O'Neil both joined Buchanan in the clinic to help assess Pitkin's blood pressure. (Hansen Decl. Ex. 10 at 67:5–19; Ex. 6 at 131:3–16.) O'Neil recalls obtaining a blood pressure reading in the range of "90s over 60s." (Ex. 10 at 66:14–18.) O'Neil did not document this blood pressure reading. (*Id.* at 66:6–13.) McCarthy could not obtain a blood pressure reading. (Ex. 6 at 131:25–132:6, 137:10–24.) Dr. McCarthy was assured by Pitkin's normal pulse and appearance during the examination and concluded that Pitkin was clinically stable. (*Id.* at 148:14–149:4.) He specifically remembered Pitkin being "cooperative" and "conversant." (*Id.* at 131:20–21.) Dr. McCarthy decided to move Pitkin to the MOU for observation while pushing greater fluid intake. (*Id.* at 148:17–149:4; Ex. 15 at 12.) Dr. McCarthy planned to reassess Pitkin in the MOU later that day. (Ex. 6 at 149:22–150:1.) Pitkin's anti-nausea medication was also switched from promethazine to Zofran (ondansetron) in a sublingual (under the tongue) form, to minimize any loss of the medication through vomiting and to allow the medication a more direct route to the bloodstream. (Ex. 15 at 12; Ex. 10 at 70:12–24.) All medications were prescribed "PRN," meaning only to be given as needed. (Ex. 15 at 2.)

After Dr. McCarthy prescribed additional medications and ordered Pitkin's transfer to the MOU, Buchanan administered a dose of Zofran to Pitkin. (Ex. 2 at 130:20–131:2; Ex. 15 at 2.) Buchanan also gave Pitkin a cup of ice chips and a cup of water. (Ex. 2 at 131:3–4.) Buchanan observed that Pitkin was able to keep the ice chips and water down. (*Id.* at 70:2–5.) Buchanan, McCarthy, and Wertz do not recall Pitkin stating that she could not keep food, fluids, or her medications down; that she was having any difficulty hearing; or that she was experiencing visual or auditory hallucinations. (Ex. 2 at 76:12–23; Ex. 6 at 145:7–12; 146:7–9, 147:8–10; Ex. 13 at 96:2–18.) McCarthy had no doubt that Pitkin "was stable," "had a good pulse," and "was doing okay." (Ex. 13 at 155:4–5.)

Page 9 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

Shortly after Dr. McCarthy examined Pitkin, he was called into an office at the Jail to meet with Dr. Ivor Garlick, Regional Medical Director for Corizon, and Mandy Forsmann, Heath Services Administrator for Corizon at the Jail.  (Ex. 13 at 31:1–19.)  Dr. Garlick and Forsmann notified Dr. McCarthy that Corizon was terminating Dr. McCarthy's employment, effective immediately.  (*Id.* at 31:3–8; 34:11–12.)  A correctional deputy escorted Dr. McCarthy to his office to retrieve his personal belongings.  (*Id.* at 151:19–21.)  Dr. McCarthy did not inform Dr. Garlick or Forsmann about Pitkin or any other patients at the Jail.  (*Id.* at 152:13–15.)  Although Dr. McCarthy cared about Pitkin and his other patients, he believed that that "Corizon was a responsible organization with good physician leadership" and the "diligent" nursing staff would ensure that his successor knew about Pitkin and other patients at the Jail.  (*Id.* at 153:10–11, 153:16–25.)

Buchanan transferred Pitkin to a cell in the MOU at approximately 12:00 pm on April 23.  (Ex. 15 at 14.)  Pitkin received doses of hydroxyzine, loperamide, dicyclomine,[5] acetaminophen, and Zofran at 2:03 pm, from Wertz.  (*Id.* at 2.)  Wertz performed another COWS assessment in the MOU when he administered these medications on the afternoon of April 23.  (Ex. 13 at 164:16–22.)  Records of this assessment have not been located.  (*Id.* at 151:13–152:14.)  Wertz ordered Gatorade as an electrolyte fluid.  (*Id.* at 29:20–30:17.)  Pitkin received Gatorade from Wertz on April 23.  (Ex. 15 at 16.)  Wertz stressed to Pitkin the importance of drinking an electrolyte fluid.  (Ex. 13 at 165:14–18.)  Wertz also wrote an order allowing Pitkin to keep a water pitcher with her while in the MOU.  (*Id.* at 166:7–21; Ex. 15 at 11.)  He did not observe Pitkin fainting.  (Ex. 13 at 165:8–10.)  Pitkin was able to sit up on her own.  (*Id.* at 171:15–16.)

---

[5] The medication administration record ("MAR") lists dicyclomine by its brand name, Bentyl.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

In comparison to other persons undergoing heroin withdrawal, Pitkin's condition on April 23 was not one that alerted Wertz to anything remarkable.  (*Id.* at 170:4–14.)

After evening med-pass on April 23, at approximately 9 pm, Pitkin requested time out of her cell.  (Ex. 23 at 1; Ex. 3 at 6:18–7:4.)  Pitkin moved slowly, but was not unstable.  (Ex. 3 at 19:19–20:3.)  Piktin watched a basketball game with Deputy Ken Mitchell.  (Ex. 23 at 2.)  Deputy Mitchell did not perceive Pitkin's condition as abnormal for a person experiencing opiate withdrawal.  (*Id.*; Ex. 3 at 16:16–20.)  Pitkin did not tell Deputy Mitchell that she needed additional medical treatment.  (Ex. 3 at 22:7–10.)  Deputy Mitchell thought Pitkin looked better at the end of his shift (10 pm) than she had at the beginning of his shift (2 pm).  (Ex. 23 at 1–2.)

At approximately 6 am on April 24, Matthew Northup, RN administered medications to Pitkin and other inmates in the MOU.  (Ex. 4 at 16:8–11.)  Pitkin again received doses of loperamide, dicyclomine, Zofran, acetaminophen, and hydroxine.  (Ex. 15 at 2; Ex. 4 at 16:12–18.)  These medications were prescribed on an as-needed basis.  (Ex. 4 at 19:7–11.)  Because the order for these medications was PRN and thus depended on an inmate's needs, Northup would not have administered these medications without first taking Pitkin's vital signs and performing a COWS assessment.  (*Id.* at 19:12–20:1.)  Pitkin's chart does not contain a COWS assessment for the morning of April 24.  (*Id.* at 18:13–21.)

While in the MOU, Pitkin was observed by deputies approximately every fifteen minutes.  (Ex. 3 at 16:3–17:2.)  Her behavior was unremarkable until 9:17 am on April 24, when Deputy Richard Thompson observed Pitkin standing in her cell, sweating profusely.  (*Id.* at 18:17–19:5.)  Deputy Thompson went back to his desk to call for medical staff to check on Pitkin.  (*Id.* at 20:6–16.)  However, he did not complete the call because he saw Buchanan entering the MOU.  (*Id.*)  Deputy Thompson told Buchanan that "something doesn't look right with [Pitkin]" and

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

asked Buchanan to look at Pitkin. (*Id.* at 20:17–20.) Buchanan responded that she needed to

check on a diabetic inmate. (*Id.* at 20:21–21:1; Ex. 2 at 97:7–11.) Buchanan recalls telling

Deputy Thompson that she would check Pitkin after checking the diabetic inmate. (Ex. 2 at

98:25–99:11.) According to Deputy Thompson, Buchanan also noted that she did not have the

equipment she needed to check Pitkin. (Ex. 9 at 21:14–19.) Even so, Buchanan went to Pitkin's

cell to check on her within a few minutes. (*Id.* at 25:23–26:4.)

Buchanan initially could not see Pitkin when she looked into Pitkin's MOU cell. (Ex. 2

99:13–16.) Buchanan then observed Pitkin lying on the floor in front of her cell door. (*Id.* at

99:17–19.) Buchanan immediately told Deputy Thompson to call for medical backup. (*Id.* at

99:20–23.) Once Pitkin's cell door was opened, Buchanan found her on the floor in a pool of

dark liquid. (*Id.* at 102:21–103:3.) Pitkin was non-responsive when Buchanan entered her cell.

(*Id.* at 102:25–103:1.) Either Corizon staff or Washington County staff called 911 to request an

ambulance. (Ex. 15 at 14.) Buchanan and PA Colin Storz attempted to resuscitate Pitkin using

cardio-pulmonary resuscitation (CPR), an automatic external defibrillator (AED) and rescue

breathing. (Ex. 2 at 103:4–16; Ex. 15 at 17.) Corizon staff turned resuscitation attempts on

Pitkin over to paramedics once they arrived. (Ex. 2 at 103:15–17.)

Paramedics were unable to resuscitate Pitkin. (Ex. 30 at 3.) She was pronounced dead in

her cell at 10:09 am. (*Id.*) An autopsy determined that Pitkin's cause of death was

complications of chronic intravenous drug abuse. (*Id.* at 1.) The medical examiner noted that

Pitkin's body was "well-hydrated." (*Id.* at 2.) Pitkin's vitreous electrolyte levels were "high

normal" and "low normal," but not at levels which would lead to death. (Ex. 25 at 2.) Pitkin's

vitreous creatinine levels were consistent with chronic kidney disease and markedly decreased

kidney function. (Ex. 26 at 2; Ex. 27 at 2; Ex. 25 at 1.)

Page 12 -    INDIVIDUAL DEFENDANTS' MOTION FOR
             SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Far W. Fed. Bank, S.B. v. Director, Office of Thrift Supervision*, 787 F. Supp. 952, 957 (D. Or. 1992), *aff'd*, 119 F.3d 1358 (9th Cir. 1997).

A "material" fact is one "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit."  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In order for a "genuine issue of material fact to exist," the record must contain evidence sufficient to allow "a rational trier of fact to find for the nonmoving party."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The nonmoving party must do more than establish "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[I]n responding to a summary judgment motion, the plaintiff can no longer rest on such mere allegations [in its pleadings], but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true."  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citation omitted).

## ARGUMENT

Madaline Pitkin's death was a tragedy.  Nonetheless, hindsight—with full knowledge that Pitkin's death would occur—is not an appropriate lens for analysis of Plaintiffs' claims.  Death from opiate withdrawal is rare.  (*See* Ex. 24 at 3 ("Deaths from opiate withdrawal, however, are extremely rar[e].").)  In light of the facts that they perceived, the Individual Defendants took reasonable actions to treat the only obvious risks to Pitkin's health: her symptoms of opiate withdrawal.  Plaintiffs' deliberate-indifference claims against individual Corizon employees are

Page 13 -    INDIVIDUAL DEFENDANTS' MOTION FOR
             SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

unsupported by the undisputed facts in the record.  For the reasons explained below, the Court

should grant the Individual Defendants' motion for summary judgment as to all claims[6] against

them.

**I.**     **The Court Should Grant Summary Judgment to the Individual Defendants to the Extent Plaintiffs Rely on an Objective Deliberate Indifference Standard, Which Was Not Clearly Established Until April 2018.**

As a threshold matter, the Individual Defendants seek summary judgment based on a

subjective good-faith defense to the extent Plaintiffs' claims rely on an objective, rather than

subjective, deliberate-indifference standard.[7]  Although private actors do not enjoy qualified

immunity in § 1983 lawsuits, both the Supreme Court and Ninth Circuit have acknowledged the

possibility of a good-faith defense for private defendants.  *See Wyatt v. Cole*, 504 U.S. 158, 169

(1992) ("[W]e do not foreclose the possibility that private defendants faced with § 1983 liability

. . . could be entitled to an affirmative defense based on good faith and/or probable cause . . . .");

*Jensen v. Lane County*, 222 F.3d 570, 580 n.5 ("We do not foreclose the possibility that Dr.

Robbins may be able to assert an affirmative good faith defense.").  The good-faith defense is

analogous to qualified immunity, but requires a defendant to show that she did not know, and

objectively should not have known, her conduct was unconstitutional.  *Id.* at 1115–17; *see also*

*Franklin v. Fox*, No. C 97-2443 CRB, 2000 U.S. Dist. LEXIS 19651, at *18 (N.D. Cal. Dec. 22,

---

[6] Plaintiffs only assert § 1983 claims against Individual Defendants.  Any alleged negligence by Individual Defendants is relevant only to Plaintiffs' claims against Corizon.  (FAC ¶¶ 60–67 (asserting negligence and gross negligence claims against Corizon based on a respondeat superior theory).

[7] The Individual Defendants did not raise good faith as an affirmative defense in their answer.  However, in absence of prejudice to Plaintiffs, the Individual Defendants may raise an affirmative defense for the first time at summary judgment.  *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (so holding).

Page 14 -     INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

2000) ("If a private person does not know, and has no reason to know, that his conduct is unconstitutional, section 1983 will not deter his conduct."). In essence, the objective component of the good-faith analysis is coextensive with qualified immunity. *Franklin*, 2000 U.S. Dist. LEXIS 19651, at *13–14 (so concluding). Conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A.   **The Individual Defendants Objectively Could Not Have Known that An Objective Deliberate-Indifference Standard Applied to their Conduct.**

The Ninth Circuit only very recently established a new objective standard for deliberate-indifference claims by pretrial detainees. *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *petition for cert. filed*, (U.S. Sept. 12, 2018) (No. 18-337).[8] Prior to 2018 the Ninth Circuit applied a subjective deliberate-indifference standard to claims for inadequate medical care "whether brought by a convicted prisoner under the Eighth Amendment or pretrial detainee under the Fourteenth Amendment." *Id.* at 1122. In *Gordon*, the Ninth Circuit disavowed that longstanding standard based on a defendant's subjective knowledge of an inmate's serious medical condition subjective intent of the defendant in favor of an objective standard. *Id.* at 1125. The objective standard allows liability for serious medical conditions of which a defendant was not subjectively aware if the lack of awareness is equivalent to reckless disregard. *Id.* Thus, the right to be free from objective, rather than subjective, deliberate indifference was

_____

[8] Individual Defendants maintain that *Gordon* was incorrectly decided and preserve the right to seek reconsideration of any orders in this case relying on *Gordon* if the Supreme Court reverses *Gordon*.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

not clearly established at the time of conduct at issue here in 2014.  The Individual Defendants

therefore had no objective notice that an objective deliberate-indifference standard would apply

to their conduct, and the new objective standard may not apply retroactively.

**B.      The Individual Defendants Subjectively Believed that their Conduct Was Constitutional Under the Then-Existing Standard.**

Under the law as it existed in 2014, the Individual Defendants could not have

subjectively understood their conduct as unconstitutional, as no defendant was subjectively

aware that Pitkin had a serious health need other than opiate withdrawals.  Duru saw Pitkin only

a single time, and she perceived nothing other than mild opiate-withdrawal symptoms.  (Ex. 12 at

107:15–108:6.)   Storz's involvement with Pitkin prior to her death was limited to ordering

medication based on Duru's assessment of Pitkin as having mild opiate withdrawal symptoms.

(Ex. 5 at 26:21–27:14.)  Buchanan also did not perceive a risk of electrolyte imbalance when she

saw Pitkin on April 23.   (Ex. 2 at 91:24–92:15.)   Johnson, who never personally examined

Pitkin, subjectively understood that Nyman had assessed Pitkin's symptoms, and she reasonably

relied on Nyman's assessment.  (Ex. 1 at 46:19–47:9.)  Based on the symptoms that he observed,

McCarthy concluded that Pitkin was clinically stable when he sent her to the MOU for

observation and increased fluid intake.  (Ex. 6 at 148:4–149:4.)  Nyman similarly believed that

Pitkin's withdrawal symptoms were mild on April 20 and that they had not worsened on April

21.  (Ex. 8 at 44:9–20; 66:18–67:14; Ex. 15 at 13.)  In O'Neil's limited interaction with Pitkin,

O'Neil subjectively perceived that Pitkin's presentation and vital signs did not show dehydration.

(Ex. 10 at 73:21–74:3.)  In sum, Individual Defendants subjectively believed Pitkin had only one

serious health condition—opiate withdrawal.  Individual Defendants are entitled to a good-faith

defense against all claims that assert deliberate-indifference to a serious medical condition.

Consequently, Plaintiffs' only viable claims are those arising from Individual Defendants'

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

treatment of Pitkin's opiate-withdrawal symptoms.

## II.    The Court Should Grant Summary Judgment to Individual Defendants Where The Undisputed Facts Show No Deliberate Indifference.

A pretrial detainee has a Fourteenth Amendment right to be free from deliberate indifference to a serious medical need. *Gordon*, 888 F.3d at 1124–25. A claim for deliberate indifference to a serious medical need requires a plaintiff to establish:

> (i)    the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii)    those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii)    the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (iv)    by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). After *Gordon*, the third element requires a case-specific showing of objective unreasonableness, requiring a mental state analogous to reckless disregard. *Id.* (citing *Castro*, 833 F.3d at 1070). Although this standard allows a defendant to be held accountable for risks that she was not subjectively aware of, *Gordon* is clear that the risk must be obvious to a reasonable official.

Under *Gordon*, it is insufficient to show that a defendant could have prevented harm by taking a different course of action. Indeed, the deliberate-indifference standard does not require a defendant to eliminate the risk of harm—*Gordon* requires Plaintiffs to show that a defendant took no reasonable actions to *abate* or lessen the risk of harm. *Gordon*, 888 F.3d at 1125. Thus, the analytical inquiry is not whether the defendant took an action that eliminated the risk of

Page 17 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

harm, but whether the defendant's action was a reasonable means to lessen or reduce the risk of harm. Similarly, where multiple courses of treatment are available, a difference of medical opinion regarding the course of treatment is insufficient to show deliberate indifference in the provision of medical care. *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014); *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012).[9]

Importantly, deliberate indifference "cannot be evaluated on the basis of 20/20 hindsight." *Neuroth v. Mendocino County*, No. 15-cv-03226-RS, 2018 U.S. Dist. LEXIS 149492, at *34 (N.D. Cal. Aug. 31, 2018); *see also Simmons v. Navajo County*, 609 F.3d 1011, 1010 (9th Cir. 2010) (noting that although a defendant "may not have made the best or even the proper medical decisions" when viewed in hindsight, she was not deliberately indifferent). To be deliberately indifferent, a defendant must fail to take reasonable action to reduce or lessen an obvious risk of serious harm. *Gordon*, 888 F.3d at 1125. As discussed below, particularly in light of the rarity of deaths from opiate withdrawal, Plaintiffs' claims against individual Corizon employees cannot satisfy the *Gordon* standard. (*See generally* FAC ¶ 36 (asserting 16 deliberate-indifference claims against all individual defendants).) Accordingly, the Court must dismiss these claims.

---

[9] *Colwell* and *Snow* arise under the Eighth Amendment's prohibition on deliberate indifference to serious medical needs, which is coextensive with the Fourteenth Amendment's analytical framework except as to the requisite knowledge of a serious medical need and risk of harm. An Eighth Amendment claim requires a showing of subjective "know[ledge] and disregard[ of] an excessive risk to inmate health and safety." *Colwell*, 763 F.3d at 1066. A Fourteenth Amendment claim requires a lesser showing of disregard of an obvious, substantial risk to a detainee's health or safety. *Gordon*, 888 F.3d at 1125. Accordingly, deliberate indifference cases arising under the Eighth Amendment apply here except to the extent they depend on the defendant's subjective knowledge and disregard of a substantial risk to an inmate/detainee's health or safety. *Id.* at 1125 n.4.

Page 18 -   INDIVIDUAL DEFENDANTS' MOTION FOR
             SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

**A.      The Individual Defendants Did Not Act With Deliberate Indifference When Treating Pitkin**

As an initial matter, Plaintiffs' framing of their deliberate-indifference claims against individuals is inconsistent with the elements of a deliberate-indifference claim under *Gordon*. Plaintiffs frame their claims against Individual Defendants as failures to take specific actions. (FAC ¶ 36(a–r).)   But demonstrating that an individual did not take a specific action is independently insufficient to establish the third element of a deliberate-indifference claim under *Gordon*—that the defendant failed to take reasonable action to abate a risk of serious harm. *Gordon*, 888 F.3d at 1125.   For example, Plaintiffs' claim in subparagraph 36(i) of the Complaint, that not administering "intravenous therapy" constituted deliberate indifference, assumes that no other form of treatment was a reasonable action in light of an obvious risk to Pitkin's health.  Plaintiffs' other deliberate indifference claims rest on similar assumptions.

Showing that alternative means of treatment could have avoided Pitkin's death is not sufficient to show that Individual Defendants were deliberately indifferent.  *See, e.g.*, *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) ("[T]he standard [for deliberate indifference] is not whether there is something easy that the [medical staff], with the benefit of hindsight, could have done."); *Neuroth*, 2018 U.S. Dist. LEXIS 149492 at *33 ("That immediate hospitalization could have avoided the events that led to [plaintiff]'s death is not sufficient to show [defendant] acted with deliberate indifference . . . .").  Ultimately, the law requires the court to look past Plaintiffs' assumptions to the actions of Individual Defendants.  *Gordon*, 888 F.3d at 1125 (requiring analysis of whether the defendant's conduct was "objectively unreasonable").  An examination of the Individual Defendants' actions shows that Plaintiffs cannot meet show this element of their claims.

The factual record, even with every factual inference drawn in Plaintiffs' favor, shows

Page 19 -   INDIVIDUAL DEFENDANTS' MOTION FOR
             SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

that Individual Defendants took reasonable actions to lessen or reduce the obvious risks to Pitkin's health during the entire time she was incarcerated at the jail.  While these reasonable actions were not enough to prevent Pitkin's unexpected and tragic death, the Fourteenth Amendment does not impose liability on jail medical staff for failing to prevent all in-custody medical emergencies.  When viewed through the appropriate analytical lens, Plaintiffs' deliberate-indifference claims cannot survive summary judgment.

Accordingly, this motion first explains why, on the record before the court, the Individual Defendants took reasonable action in light of the obvious risks to Pitkin's health (*i.e.*, those stemming from opiate withdrawal) prior to her death.  This motion then shows why Plaintiffs' specific claims in paragraphs 36 and 37 of the Complaint are subject to summary judgment.  As explained below, the court should grant summary judgment to Buchanan, Duru, Johnson, Dr. McCarthy, O'Neil, and Storz on all individual deliberate-indifference claims against them.

### 1.    Louisa Duru Took Reasonable Action to Abate the Risk of Harm to Pitkin's Health During Her April 18 COWS Assessment

Plaintiffs' claims against Duru cannot withstand summary judgment.  It is undisputed that Duru's only interaction with Pitkin was administering a COWS assessment on April 18.  On April 18, Pitkin's symptoms did not pose a serious risk to her health.  (Ex. 29 at 2.)

Duru examined Pitkin in her housing unit approximately 29 hours and 45 minutes after her intake into the jail.  Pitkin reported her symptoms to Duru.  Based on Pitkin's representations and a physical examination, Duru determined that Pitkin's withdrawal symptoms were mild. The only error Duru made was an arithmetic error, scoring Pitkin's withdrawal symptoms as "8" rather than "10."  And in any event, both scores classified Pitkin's withdrawal symptoms as mild. (*See* Ex. 15 at 6; Ex. 29 at 2.)  Duru consulted with Storz and gave Pitkin medications to treat Pitkin's withdrawal symptoms.  (Ex. 15 at 6; Ex. 12 at 80:20–83:10.)  Duru's actions did not

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

reflect any deliberate indifference.

The Sixth Circuit upheld summary judgment in favor of a correctional nurse under similar circumstances. *Rouster v. County of Saginaw*, 749 F.3d 437, 452 (6th Cir. 2014). There, a nurse conducted an alcohol-withdrawal assessment on an inmate exhibiting apparent alcohol withdrawal symptoms. *Id.* She concluded that he needed treatment for alcohol withdrawal and called a physician to place the inmate on withdrawal protocols. *Id.* Although the inmate had an undiscovered life-threatening condition, summary judgment was appropriate because the nurse treated his obvious medical need. *Id.* Similarly, Duru treated Pitkin's obvious symptoms of withdrawal, even if these symptoms obscured a more serious underlying health condition. Thus, Duru took reasonable action to abate the risk of harm to Pitkin.

Moreover, Plaintiffs cannot establish that Duru's addition error had any causal relationship with Pitkin's death. Duru's erroneous score on the April 18 assessment (8) and the actual score of the assessment (10) resulted in the same classification of Pitkin's withdrawal symptoms. Both scores were in the "mild" range. There is nothing in the record to suggest that Duru would have taken any different action had Pitkin's COWS score been recorded as 10 on April 18. (*See* Ex. 29 at 2 (concluding that a correct calculation of Pitkin's April 18 COWS score would not have changed the course of Pitkin's assessment or treatment).) Accordingly, this addition error could not have had a causal relationship with Pitkin's death.

There is nothing in the record to suggest that Pitkin began to develop symptoms suggesting dehydration on April 18 and he had no notice that Pitkin had submitted any MRFs. In a nearly identical case where an inmate died of an electrolyte imbalance due to withdrawal-related vomiting and diarrhea, a district court granted summary judgment on negligence claims—which is a much lower standard than the deliberate-indifference standard here—to a

Page 21 -    INDIVIDUAL DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

nurse who treated the patient before symptoms suggesting dehydration or electrolyte imbalance arose. *Gohranson v. Snohomish County*, No. C16-1124RSL, 2018 U.S. Dist. LEXIS 89268 at *13 (W.D. Wash. May 29, 2018) ("[T]here is no evidence that any of the nursing failures identified on Nurse Leight's part caused Ms. Kronberger's death.").[10]  So too here.  Regardless of whether the record shows that dehydration or electrolyte imbalance was an obvious risk to Pitkin's health at any point—and they were not—Duru's single assessment of Pitkin on April 19 could not have had a causal relationship with her death on April 24.  Accordingly, the court must grant summary judgment to Duru on all of Plaintiffs' claims against her under § 1983.

### 2. Colin Storz Was Not Deliberately Indifferent in Prescribing a Modified Protocol to Pitkin on April 18

Prior to administering CPR and other resuscitation measures to Pitkin on April 24, Storz had no interaction with Pitkin, except to sign off on the phone orders prescribing Pitkin a standard protocol of medication for mild opiate withdrawal symptoms based on Duru's April 18 COWS assessment.  (Ex. 5 at 26:21–27:14.)  There is no evidence that Pitkin's condition was brought to his attention after the morning of April 18 and he had no notice that Pitkin had submitted any MRFs.  (*Id.* at 35:16–18.)  Thus, the only question as to Storz's actions is whether prescribing medications to treat mild opiate-withdrawal symptoms based on Duru's assessment was an appropriate action to abate a serious risk to Pitkin's health.  And nothing about Pitkin's April 18 symptoms (as recorded by Duru) suggested anything other than mild opiate withdrawal. (Ex. 29 at 2.)  Because Pitkin's symptoms were consistent with mild opiate withdrawal, treating

---

[10] The *Gohranson* court reserved rulings on any of the deliberate-indifference claims in light of *Gordon*.  *See* 2018 U.S. Dist. LEXIS at *12 (so holding and requesting supplemental briefing on *Gordon*).  As of the date of this filing, the *Gohranson* court has yet to rule on the impact of *Gordon*.

Page 22 -    INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

her symptoms as such does not demonstrate deliberate indifference.  *See Gohranson*, 2018 U.S. Dist. LEXIS 89268 at *13.  Moreover, prescribing medications based on Duru's assessment was consistent with the standard of medical care, and axiomatically within the constitutional minimum required by the Fourteenth Amendment.  (Ex. 24 at 7–8.)  Thus, Storz was not deliberately indifferent to Pitkin's serious health needs in prescribing these medications based on Duru's assessment of mild withdrawal symptoms.  Summary judgment for Storz on all deliberate indifference claims against him is therefore appropriate.

### 3. Molly Johnson's Reasonable Reliance on a Coworker's Assessment of Pitkin Shows No Deliberate Indifference

Johnson's involvement with Pitkin is limited to triaging one MRF (April 20) and making notes on two MRFs indicating accurately that Pitkin was already on a withdrawal protocol and had already been seen by healthcare staff.  Johnson made those notations on Pitkin's MRFs after Nyman assessed Pitkin and completed a COWS assessment.  Although Johnson did not personally assess Pitkin, it is inaccurate to state that she ignored Pitkin's complaints or took no reasonable action.  She reasonably relied on Nyman's assessment of Pitkin in noting that Pitkin had been seen and started on medications to treat her withdrawal symptoms.  This reasonable reliance is sufficient for the court to grant summary judgment to Johnson on the deliberate-indifference claim against her.

The information available to Johnson—under both an objective and subjective standard—demonstrated that Nyman and Duru had taken action to abate the risk of obvious harm to Pitkin from her withdrawal symptoms.  Relying on a fellow nurse's assessment of a patient when resolving a request for medical care was a reasonable action to take in light of the medical needs Pitkin expressed in her first and second MRFs.  *See J.H. v. Johnson*, 346 F.3d 788, 794 (7th Cir. 2003) (employees of a state agency were not deliberately indifferent when relying on results

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

other agency employees' investigations).  The Fourteenth Amendment does not require every medical staff member who learns of an inmate's medical condition to independently examine the inmate absent some indication that another medical staff member had made an error.  *See Rouster*, 749 F.3d at 449 (medical staff member "took appropriate steps to protect" an inmate with a serious medical condition by relying on others to observe the inmate); *Cf. Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurse was not justified in relying on a physician's order only when she became aware that the plan of treatment was not working).

Here, Nyman had just seen and assessed Pitkin on April 20 when Johnson was about to go assess Pitkin.  Nothing Johnson was or reasonably could have been aware of suggested that Nyman's assessment was flawed—nor was it.  Accordingly, Johnson's reliance on Nyman's assessment does not constitute deliberate indifference.  Johnson testified that she noted that Pitkin had been seen and started on the partial opiate withdrawal protocol after learning that Nyman had seen Pitkin.  (Ex. 1 at 46:19–47:2.)  Thus, Johnson's decision to note Nyman's assessment of Pitkin and provide an anti-diarrheal medication to treat Pitkin's newly reported gastrointestinal symptoms was a reasonable action to abate the risk of harm to Pitkin.

### 4.    Courtney Nyman Took Reasonable Action to Abate the Risk of Harm to Pitkin's Health in Her April 20 COWS Assessment and April 21 Review of Pitkin's MRF

Nyman also was not deliberately indifferent to Pitkin's serious health needs.  Nyman directly interacted with Pitkin once, when conducting a COWS assessment on April 20.  She indirectly interacted with Pitkin again on April 21 by triaging and reviewing Pitkin's MRF. Neither interaction demonstrates deliberate indifference.

Nyman's April 20 COWS assessment of Pitkin was the only time Nyman saw Pitkin. (Ex. 8 at 46:9–12.)  As Duru had the previous day, Nyman visited Pitkin in her housing unit,

Page 24 -   INDIVIDUAL DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

talked to Pitkin, took her vital signs, and assessed Pitkin's symptoms in the categories listed on the COWS assessment form.  (*Id.* at 44:9–22.)  The COWS assessment Nyman performed on April 20 yielded a score of 8, indicating mild withdrawal symptoms.  (Ex. 15 at 7.)  Pitkin was already on multiple medications to alleviate her withdrawal symptoms, and she continued to receive these medications after Nyman examined her.  Nyman did not observe anything during her COWS assessment suggesting serious health needs and she concluded that Pitkin's complaints were consistent with mild opiate-withdrawal symptoms, for which Pitkin had been prescribed several medications.  (Ex. 29 at 3.)  In sum, even if Pitkin had another latent (as opposed to objectively discernible) serious health issue, Nyman's conclusion that Pitkin's symptoms were attributable to Pitkin's opiate withdrawal did not ignore any obvious concerns to Pitkin's health.

Here, *Rouster* is again instructive.  *Rouster* arose under the Eighth Amendment, but applies here except to the extent it does not apply an objective deliberate-indifference standard. 749 F.3d at 441 (noting that the plaintiff was serving a three-day jail sentence); *see Gordon*, 888 F.3d at1125 n.4 (stating the different state-of-mind requirements in Eighth and Fourteenth Amendment deliberate-indifference cases).  In *Rouster*, the inmate complained of stomach pain. 749 F.3d at 441.  He also began to display mental-health symptoms.  *Id.* at 442.  After learning from a correctional officer that the inmate "dr[ank] a lot," medical staff concluded that his symptoms were those of alcohol withdrawal and treated him accordingly.  *Id.*  The inmate, in fact, had a perforated ulcer and died of sepsis.  *Id.* at 443–44.  The court observed that treating the inmate only for alcohol withdrawal was not deliberately indifferent even though alcohol withdrawal was not consistent with all of the inmate's symptoms, because his symptoms were not "clearly inconsistent with alcohol withdrawal."  *Id.* at 451.  The court held that the nursing

Page 25 -   INDIVIDUAL DEFENDANTS' MOTION FOR
              SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

staff was not deliberately indifferent to serious medical needs because they mistakenly "interpreted [the inmate's] symptoms as indicating a different condition, for which they provided appropriate treatment." *Id.* at 453. Thus, *Rouster* stands for the proposition that treating an inmate for her apparent symptoms bars Plaintiffs from recovering on a theory of deliberate indifference for failing to adequately treat another condition, unless the symptoms of that other condition are obvious.

Applying *Rouster* to the facts of this case, Nyman was not deliberately indifferent. Nyman interpreted Pitkin's reported symptoms as consistent with opiate withdrawal, and she reasonably continued her treatment accordingly. Nyman did not demonstrate deliberate indifference in her April 20 COWS assessment of Pitkin.

Nyman's second involvement with Pitkin was in reviewing Pitkin's MRF dated April 21. Nyman reviewed the MRF and determined that Pitkin's reported symptoms were consistent with her symptoms from the previous day and that Pitkin had described her symptoms using "very similar language" during that prior assessment. (Ex. 8 at 57:1–22.) In Nyman's experience, Pitkin's comment that she felt "near death" was a common type of comment from inmates at the Jail. (*Id.* at 63:25–64:10.) Nyman concluded that Pitkin's condition had not changed, and she would have examined Pitkin on April 21 had Nyman perceived Pitkin's condition as deteriorating. (*Id.* at 57:14–17.; 67:9–14.) Because of this, Nyman confirmed that Pitkin was receiving medications for her symptoms and took no further action. (*Id.* at 64:21–25.)

Nyman's conduct was reasonable in light of her recent examination of Pitkin, the similarity of Pitkin's MRF to Pitkin's reported symptoms on April 20, and a common pattern of other opiate-withdrawal patients reporting feeling subjectively worse before ultimately resolving. Indeed, Nyman was presumably aware from her clinical experience that symptoms of withdrawal

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

rarely becoming life-threatening.  (Ex. 29 at 3.)  Nyman's decision regarding Pitkin's MRF also does not show deliberate indifference because Nyman verified that Pitkin was receiving treatment for her opiate-withdrawal symptoms.  Thus, Nyman did not fail to take reasonable action to abate a serious risk to Pitkin's health.

### 5.  CJ Buchanan Took Reasonable Action When Treating Pitkin on April 23

Buchanan took, or assisted with, several actions to address Pitkin's symptoms and presentation on April 23—bringing Pitkin to the medical clinic for further evaluation, assessing Pitkin in the medical clinic, seeking assistance from Dr. McCarthy and the Director of Nursing, O'Neil, when she had difficulty obtaining a blood pressure reading, transferring Pitkin to the MOU for further observation, providing Pitkin with a glass of water and a glass of ice chips and watching her consume them and ordering Pitkin a sublingual anti-vomiting medication.  While these actions did not prevent Pitkin's death, they still demonstrate that Buchanan was not deliberately indifferent to Pitkin's obvious serious medical needs.

First, contrary to Plaintiffs' allegations, Buchanan was not deliberately indifferent after learning about Wertz's "40/UA" reading with a cuff that did not fit Pitkin's arm.  Neither Wertz, Buchanan, O'Neil, nor Dr. McCarthy interpreted the 40/UA reading as accurate.  (Ex. 13 at 52:24–53:8; Ex. 2 at 45:25–46:24; Ex. 10 at 62:15–18; Ex. 6, at 86:13–17.)  Nor should they have.  A blood-pressure reading of "40/UA" on a person who is alert, aware, conversant, and has otherwise normal vitals indicates an error in measuring blood pressure, not an actual blood-pressure reading.  (Ex. 24 at 7; Ex. 29 at 3; Ex. 25 at 3.)  Indeed, relying on a blood pressure reading that is facially inconsistent with Pitkin's symptoms would be medically incompetent.  (*See* Ex. 25 at 3 (noting that a person with no diastolic blood pressure would be dead).)  Thus, that Buchanan did not immediately call for emergency medical services based on a clearly wrong

Page 27 -   INDIVIDUAL DEFENDANTS' MOTION FOR
              SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

reading of 40/UA cannot be the basis for a deliberate-indifference claim.   A blood-pressure reading of 40/UA is simply not a valid blood pressure reading.  (*Id.* at 3.)

Once the Court looks beyond the erroneous 40/UA reading, life-threatening dehydration was not an obvious risk based on the information then available to Buchanan.  Dangerously low blood pressure corresponds with tachycardia—an elevated heart rate.  (Ex. 6 at 204:5–205:1.) Pitkin's heart rate during the April 23 examination was 71 during Wertz's COWS assessment, which is well within normal range of 60-80 for average adults.  (Ex. 15 at 10; Ex. 6 at 225:1–9.) Because tachycardia is the principal symptom of dehydration, Pitkin's normal heart rate strongly suggested that Pitkin was not severely dehydrated.  (Ex. 6 at 214:25–215:3.)

Buchanan also obtained an unrecorded blood-pressure reading, which she characterized in Pitkin's chart as "low."   (Ex. 2 at 44:24–45:8; Ex. 15 at 14.)   Buchanan appropriately considered this reading in context with Pitkin's overall clinical presentation.  (Ex. 2 at 47:1–12.) Pitkin's normal heart rate, temperature, and respiratory rate as well as her overall stable presentation were inconsistent with an obvious risk of life-threatening dehydration due to low blood pressure alone.  (Ex. 29 at 3.)  Because Pitkin's symptoms were generally consistent with ordinary opiate withdrawal, Buchanan's conclusion that opiate withdrawal was Pitkin's only serious health issue was objectively reasonable.   A deliberate-indifference claim cannot be predicated upon her reasonable assessment.

The Fourteenth Amendment requires medical staff to not be deliberately indifferent, but it does not impose liability for medical negligence or a failure to discover the root cause of an inmate's symptoms.  *See Rouster*, 749 F.3d at 451–52 (where most, but not all, of a patient's symptoms were consistent with alcohol withdrawal, no deliberate indifference in treating patient only for alcohol withdrawal).  For example, in *Sandoval v. County of San Diego*, No. 3:16-cv-

Page 28 -   INDIVIDUAL DEFENDANTS' MOTION FOR
           SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

01004-BEN-AGS, 2018 U.S. Dist. LEXIS 19545 (S.D. Cal. Feb. 6, 2018), the court granted summary judgment to a nurse who was unable to determine why an inmate was sweaty and disoriented. *Id.* at *3–4, 27. The nurse checked the inmate's blood sugar, which was normal, and did not observe any signs of distress. *Id.* at *21. The inmate died hours later from a methamphetamine overdose. *Id.* at *8–9. The court rejected the plaintiff's argument that the nurse had a duty "to find the root cause of [decedent's] symptoms." *Id.* at *22. Although the nurse in *Sandoval* concluded that the decedent had no serious medical condition, *Sandoval* nonetheless shows that medical staff's failure to find the root cause of an inmate's symptoms is not deliberate indifference if the medical staff appropriately assesses and responds to an inmate's symptoms. Here, Buchanan concluded that Pitkin's symptoms were consistent with opiate withdrawal. Some inconsistencies between Pitkin's symptoms and Buchanan's conclusion does not amount to deliberate indifference. *Rouster*, 749 F.3d at 451–52.

Buchanan's response to Pitkin's withdrawal symptoms was far from deliberately indifferent. Buchanan continued Pitkin's treatment on the partial protocol. Buchanan also acted to prevent dehydration by giving Pitkin ice chips and water, and she confirmed that Pitkin was able to keep down these fluids before transferring her to the MOU for further observation. Thus, Buchanan took reasonable action to abate the dehydration risk to Pitkin on April 23. Additionally, Buchanan and other Individual Defendants appropriately acted to abate the risk of further dehydration and loss of medication through vomiting by switching Pitkin to an anti-vomiting medication with a sublingual administration. (Ex. 10 at 70:12–24.) This change provided anti-vomiting medication in a pathway that vomiting would not affect. Although other routes of administration were available, Buchanan's (and McCarthy's) choice of route is the type of differing medical opinion that does not give rise to deliberate indifference. *Colwell*, 763 F.3d

Page 29 -    INDIVIDUAL DEFENDANTS' MOTION FOR
                    SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4

at 1068.  The administration of anti-vomiting medication in response to Pitkin's complaints of ongoing vomiting was a reasonable action to abate the risk that Pitkin's medications would be ineffective.  And while Buchanan did not chart her blood-pressure reading on Pitkin, this record-keeping error does not amount to intentional disregard of an obvious risk to Pitkin's health Accordingly, the Court should grant summary judgment to Buchanan on all claims against her.

### 6.    Dr. Joseph McCarthy Was Not Deliberately Indifferent to Pitkin's Medical Needs When Treating Her Or After His Termination

McCarthy also took reasonable action to abate risks to Pitkin's health during and after his encounter with Pitkin on April 23.  McCarthy moved Pitkin to the MOU, changed her anti-nausea medication to one less susceptible to loss through vomiting, and planned to follow up with Pitkin to manually retake her blood pressure in the MOU.  (Ex. 6 at 132:21–25, Ex. 10 at 70:12–24.)  Given that Pitkin's presentation and other vital signs were inconsistent with an acute medical condition, McCarthy's course of action was a reasonable means to abate any risk to Pitkin's health that could have stemmed from her low blood pressure.  Alternate treatment options existed, but Pitkin's overall presentation and symptoms on April 23 did not objectively suggest an impending medical crisis.  (Ex. 24 at 6–7.)  McCarthy therefore did not react with deliberate indifference to Pitkin's blood-pressure reading on April 23.

Moreover, the fact that McCarthy did not voice concerns about Pitkin during his termination meeting does not support a legally cognizable deliberate-indifference claim.  McCarthy understood Pitkin to be stable when he was terminated.  (Ex. 6 at 155:4–8.)  He relied on nursing staff to ensure that Pitkin and all inmates at the Jail continued to receive appropriate care after his termination.  (*Id.*)  In light of the continuity of nursing staff and Pitkin's stability during McCarthy's examination of her, McCarthy did not fail to take reasonable action when he left the Jail without mentioning Pitkin to Forsmann or Dr. Garlick.  Accordingly, Dr. McCarthy

Page 30 -    INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

is entitled to summary judgment for all deliberate-indifference claims against him in paragraphs 36 and 37.

### 7.  <u>Leslie O'Neil Was Not Deliberately Indifferent in her Minutes-Long Interaction with Pitkin</u>

O'Neil's interactions with Pitkin similarly do not demonstrate deliberate indifference. O'Neil first became aware of Pitkin's condition when she offered help in obtaining Pitkin's blood pressure in the clinic on April 23 while Pitkin was being assessed by McCarthy. (Ex. 10 at 69:22–25.)  While in the room, O'Neil obtained a blood-pressure reading on Pitkin. (*Id.* at 66:1–18.)  The blood-pressure reading O'Neil obtained ("90s/60s") is on the low end of the normal scale, which O'Neil attributed to Pitkin's slimness. (Ex. 10 at 69:6–16.)  That single interaction was O'Neil's only involvement with Pitkin.  Particularly that O'Neil interacted with Pitkin only while Buchanan and Dr. McCarthy were assessing Pitkin, O'Neil was not indifferent in assisting in measuring Pitkin's blood pressure and then leaving Pitkin's care to a physician and another nurse where there was no obvious risk to Pitkin's health.  Accordingly, the court should grant O'Neil summary judgment on all deliberate-indifference claims against her.

### B.  <u>Some of Plaintiffs' Specific Deliberate Indifference Claims Cannot Survive Summary Judgment Regardless of the Individual Defendants' Actions</u>

As discussed above, no Individual Defendant was deliberately indifferent in his or her treatment of Pitkin.  But regardless of the court's resolution of summary judgment on Individual Defendants' actions, some of Plaintiffs' specific allegations of deliberate indifference against Individual Defendants cannot withstand summary judgment either because they have no support in the record or because they could not have caused Pitkin's death.  *First*, Plaintiffs' claims in subparagraphs 36(g), (h), and (l) of the Complaint fail because they allege only general violations of Corizon policies, the contract between Corizon and Washington County, and the

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

National Commission on Correctional Healthcare's ("NCHCC") standards.  Although Corizon disputes Plaintiff's allegations regarding breach of contract and violations of Corizon policies or NCHCC standards, even if true, these allegations do not independently establish the existence of a substantial risk of serious harm and the lack of reasonable action to abate such risk.  *See Motto v. Corr. Med. Servs.*, No. 5:06-cv-00163, 2010 U.S. Dist. LEXIS 121347, at *17, 33 (S.D. W. Va. Nov. 16, 2010) (NCCHC "standards do not establish the constitutional minima to demonstrate a violation of Plaintiff's constitutional rights.").   *Second*, Plaintiffs' claims regarding supervisory decisions in subparagraphs 36(p) and (q) of the Complaint cannot support claims against defendants who had no supervisory authority.  The Court should grant summary judgment to the Individual Defendants on these specific claims, for the reasons explained below.

### 1.    Alleged Policy/Standard Violations and Breaches of Contract

Plaintiffs cannot show that any Individual Defendant acted with deliberate indifference simply by alleging deviations from Corizon's internal policies, NCHCC standards, or the contract between Washington County and Corizon.  Even if Plaintiffs' allegations were correct, they do not amount to a showing that Individual Defendants failed to take reasonable action to abate an obvious risk to Pitkin's health or safety.  For Plaintiff's policy, standard, and contract-based claims to succeed, they would have to establish that Corizon policies, NCHCC standards, and the contract between Washington County and Corizon were the only reasonable means to abate a serious risk of harm to Pitkin.  *See Gordon*, 888 F.3d at 1125.  Put differently, Plaintiffs must show that departure from policies, standards, and contracts was an unreasonable action presenting an unconstitutionally serious risk of injury.  They cannot do so.  Moreover, Plaintiffs advance several specific claims based on discrete actions the Individual Defendants allegedly

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

took and decisions the Individual Defendants allegedly made.[11]  Plaintiffs' standard, policy, and contract-based claims do not allege violations of the Fourteenth Amendment and add nothing to this litigation.  *See San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino County*, 825 F.2d 1404, 1408 (9th Cir. 1987) ("It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim. . . . [T]he Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts." (footnote omitted) (citation omitted)).

## 2.    Supervisory Claims against Non-Supervisory Defendants

Plaintiffs' broad allegations against all Corizon staff, if taken literally, assert that all Individual Defendants "fail[ed] to provide adequate staffing levels" and "allow[ed] medical staff to operate without the benefit of physician supervision."  (FAC ¶ 36(p & q), respectively.)  Other than McCarthy and O'Neil, no individual defendant had supervisory authority over staffing at the Jail.  The record does not suggest otherwise.  Plaintiffs therefore cannot satisfy their burden of production on their claims under subparagraphs 36(p) and (q) of the Complaint as to defendants Buchanan, Duru, Johnson, Nyman, and Storz.

## 3.    Failure-to-Train Claims

Plaintiffs' failure-to-train claims asserted in paragraph 56 of the Complaint against O'Neil, Storz, and Dr. McCarthy cannot survive summary judgment.  *First*, a failure-to-train claim requires an underlying constitutional violation caused by the lack of training.  *See Kneipp ex rel. Cusack v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996).  Because no Individual Defendant was deliberately indifferent, no failure-to-train claim is possible.  *Third*, a failure-to-

---

[11] *See* FAC ¶ 36 (a–r).

Page 33 -    INDIVIDUAL DEFENDANTS' MOTION FOR
              SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

train claim requires a pattern of similar constitutional violations by untrained employees. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011). To put a supervisor or municipality on notice of the need for additional training, the alleged pattern of violations must be highly similar to the violation giving rise to a *Monell* failure-to-train claim. *Id.* at 63. All of the alleged failures to train in paragraph 56 relate to opiate withdrawals, dehydration, or both. But the record contains no instances, let alone a pattern, of constitutional violations by untrained Corizon employees arising from either condition. Plaintiffs cannot meet their burden of production on these claims.

*Third*, even if the court concludes that some failure-to-train claim can survive summary judgment, Storz cannot be liable for any alleged failure-to-train because he held no supervisory authority at the Jail. (*See* Ex. 22 (Storz's job description).) Without authority to select training for Corizon staff, Storz cannot be liable for the adequacy of such training.

//

//

//

//

//

//

//

//

//

//

//

//

Page 34 -    INDIVIDUAL DEFENDANTS' MOTION FOR
             SUMMARY JUDGMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

## **CONCLUSION**

Madaline Pitkin's death was a tragedy. The cause of Pitkin's death, however, was not obvious or apparent from the facts that confronted the Individual Defendants when making treatment decisions. In light of the symptoms Pitkin reported, and vital signs and demeanor that Corizon staff observed in Pitkin, the Individual Defendants consistently took reasonable and appropriate steps to protect Pitkin's health and safety as she experienced heroin withdrawals. That these actions ultimately failed does not create a constitutional violation. Medical errors, ordinary negligence, and missed opportunities are insufficient to demonstrate a violation of the Fourteenth Amendment. Accordingly, the Individual Defendants ask for partial summary judgment on Plaintiffs' claims against them, as laid out above.

Dated this 3rd day of October, 2018.

Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.


By:    /s/Richard K. Hansen
        Richard K. Hansen, OSB #832231
        Anne M. Talcott, OSB #965325
        Telephone: 503.222.9981
        Facsimile: 503.796.2900

        Trial attorney: Richard K. Hansen
        Attorneys for Defendants Corizon Health,
        Inc., Joseph McCarthy, MD, Colin Storz,
        Leslie O'Neil, CJ Buchanan, Louisa Duru,
        Molly Johnson, and Courtney Nyman

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of October, 2018, I served the foregoing

INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT on the following

parties:

Timothy J. Jones, Esq.                          Vicki M. Smith
Tim Jones PC                                    Bodyfelt Mount LLP
888 SW Fifth Avenue, Suite 1100                 319 SW Washington St Ste 1200
Portland, OR 97204                              Portland OR  97204
Email: tim@timjonespc.com                       Email: smith@bodyfeltmount.com

*Attorneys for Plaintiffs*                      *Attorneys for Washington County*

John M. Coletti
Paulson Coletti
1022 NW Marshall St Ste 450
Portland OR  97209
Email: john@paulsoncoletti.com

*Attorneys for Plaintiffs*

by:

☐  U.S. Postal Service, ordinary first class mail
☐  U.S. Postal Service, certified or registered mail,
☐  return receipt requested
☐  hand delivery
☐  facsimile
☒  CM/ECF electronic service
☐  other (specify)  <u>Email                                    </u>

<u>/s/Richard K. Hansen                                    </u>
Richard K. Hansen

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

PDX\128493\204567\AMT\23980313.4