**Timothy J. Jones**, OSB No. 890654
tim@timjonespc.com
TIM JONES PC
888 SW 5th Avenue, Suite 1100
Portland OR 97204
(503) 374-1414

**John Coletti**, OSB No. 942740
john@paulsoncoletti.com
Paulson Coletti
1022 NW Marshall #450
Portland OR 97209
(503) 226-6361

**W. Eugene Hallman**, OSB No. 741237
office@hallman.pro
Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857
      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON - PORTLAND DIVISION

| | |
|---|---|
| **RUSSELL PITKIN** and **MARY, PITKIN,** Co-Personal Representatives of the **ESTATE of MADALINE PITKIN**, **Deceased,**<br><br>      Plaintiffs,<br>  v.<br><br>**CORIZON HEALTH, INC.**, a Delaware Corporation; **CORIZON** | Case No: 3:16-cv-02235-AA<br><br>**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT BY CORIZON HEALTH, INC.**<br><br>REQUEST FOR ORAL ARGUMENT |

Page 1 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

**HEALTH, INC.**, a Tennessee Corporation;
**WASHINGTON COUNTY**, a government
body in the State of Oregon; **JOSEPH
MCCARTHY, MD,** an individual; **COLIN
STORZ**, an individual; **LESLIE ONEIL,**
an individual; **CJ BUCHANAN**, an individual;
**LOUISA DURU**, an individual; **MOLLY
JOHNSON**, an individual, **COURTNEY NYMAN,**
an individual; **PAT GARRETT**, in his capacity
as Sheriff for Washington County; **JOHN DOES
1-10;** and **JANE DOES 1-10.**

       Defendants.

_____

Page 2 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

# Table of Contents

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Original Contract - Patient Safety.. . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Corizon Knowledge - Health Needs Related to Opioid  Withdrawal.. . . . . 5

    C.    Corizon's Custom and Practice - Ignoring the Contract and
        Standards for Opioid Withdrawal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Corizon's Custom and Practice - Understaffing.. . . . . . . . . . . . . . . . . . 7

    E.    The Washington County Audit Report of May, 2013 - Understaffing.. . . 11

    F.    Corizon's Customs and Practices Failed to Ensure That
        Inmates and Detainees Had Access to Basic Medical Care
        to Meet Their Serious Health Needs.. . . . . . . . . . . . . . . . . . . . . . . . . . 12

    G.    Corizon's Customs and Practices - Emergency Room Referral.. . . . . . . 12

    H.    Corizon's Custom and Practice - IV Use for Opioid Withdrawal.. . . . . . 13

    I.    Corizon's Custom and Practice - Insufficient Training.. . . . . . . . . . . . . 13

    J.    Corizon's Custom and Practice - Profits First.. . . . . . . . . . . . . . . . . . . 16

    K.    Cris Rettler Report to Sheriff Garrett.. . . . . . . . . . . . . . . . . . . . . . . . . 17

    L.    Corizon's Bonus Program.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    M.    Corizon's Custom and Practice - No Continuous Quality
        Improvement Program.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    N.    In Spring 2014 Corizon Was Not in Compliance with
        NCCHC Standards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Page iii - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton, OR 87801
(541) 276-3857    dhhll@Hallman.pro

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I     SUMMARY JUDGMENT STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II    *MONELL* CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.    Municipal Liability - The Elements.. . . . . . . . . . . . . . . . . . . . . . . . . . 24

          1.    Deprivation of a Constitutional Right.. . . . . . . . . . . . . . . . . . 25
          2.    Policies and Customs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          3.    Deliberate Indifference. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
          4.    Moving Force... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    B.    Specific Customs and Policies - Causation.. . . . . . . . . . . . . . . . . . . . 28

          1.    Staffing Levels.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          2.    Storz's On-Call Payments.. . . . . . . . . . . . . . . . . . . . . . . . . . 29
          3.    Training Policies... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          4.    Staff Meetings and Physician Supervision... . . . . . . . . . . . . . . 31
          5.    Suboxone Use.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          6.    Treatment of Inmates Perceived as Nearing Release.. . . . . . . . . 33

    C.    Breaches of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    D.    Remaining Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    E.    Failure to Train.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

III    NEGLIGENCE CLAIMS BASED ON CONDUCT OF DURU,
     JOHNSON AND STORZ.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Page iv - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

# Table of Authorities

## Cases

*Anderson v. City of Atlanta,* 778 F2d 678 (11th Cir, 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Anderson v. Liberty Lobby, Inc.*, 477 US 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Burke v. Cty. of Alameda*, 586 F3d 725 (9th Cir, 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Castro v. County of Los Angeles*, 833 F3d 1060 (9th Cir, 2016). . . . . . . . . . . . . . . . . . . . . . . . 26

*Celotex Corp. v. Catrett,* 477 US 317 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Canton v. Harris*, 489 US 378 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*City of St. Louis v. Praprotnik,* 485 US 112 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Connick v. Thompson*, 563 US 51 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*David Hill Development, LLC v. City of Forest Grove*, 688 F Supp 2d 1193 (D Or, 2010). . . . 35

*Deloney v. County of Fresno*, 2018 WL 3388921 (ED Cal, 2018). . . . . . . . . . . . . . . . . . . . . . . 24

*Estate of Vela v. Cty. of Monterey*, 2018 WL 4076317 (ND Cal, 2018).. . . . . . . . . . . . . . . . . 26

*Fricano v. Lane County,* 2018 WL 2770643 (D Or, 2018).. . . . . . . . . . . .    24-27, 29, 31, 34, 36

*Frost v. Agnos*, 152 F3d 1124 (9th Cir, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Garcia v. Salt Lake Cty.*, 768 F2d 303 (10th Cir, 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gibson v. County of Washoe, Nev.*, 290 F3d 1175 (9th Cir, 2002). . . . . . . . . . . . . . . . 25, 27, 36

*Gordon v. Cty. of Orange*, 888 F3d 1118 (9th Cir, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Johnson v. Corizon Health, Inc.*, 2015 WL 1549257 (D Or, 2015). . . . . . .  24, 25, 27, 31, 33, 36

*Long v. Cty. of Los Angeles,* 442 F3d 1178 (9th Cir, 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Page v - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574 (1986). . . . . . . . . . . . . . . . . 23

*Mendiola-Martinez v. Arpaio*, 836 F3d 1239 (9th Cir, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Monell v. Dep't of Social Servs. of the City of New York*, 436 US 658 (1978). . . . . . . . 24, 34, 36

*Navarro v. Block,* 72 F3d 712 (9th Cir, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Oyenik v. Corizon Health Inc.*, 696 Fed Appx 792 (9th Cir, 2017). . . . . . . . . . . . . . . . 30, 32, 36

*Paris v. Conmed Healthcare and Coos County*, 2017 WL 7310079 (D Or, 2017)
    (Findings and Recommendations of Magistrate Judge Coffin) adopted by 2018
    WL 664807 (D Or, 2018)(McShane, J). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35, 36

*Rivera v. Phillip Morris, Inc.*, 395 F3d 1142 (9th Cir, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*San Bernardino Physicians Servs. Med. Grp., Inc. v. San Bernardino County*,
    825 F2d 1404 (9th Cir, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Speer v. Glover*, 276 F3d 980 (8th Cir, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Tsao v. Desert Palace, Inc.*, 698 F3d 1128 (9th Cir, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## Statutes

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 35

Fed. R. Civ. P. 56(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Vince@Hallman.pro

## Certificate of Compliance

This brief complies with th applicable word-count limitation under LR 7-2(b) because it contains 9,382 words, including headings, footnotes and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

## INTRODUCTION

This Response to Motion for Summary Judgment by Corizon Health, Inc. is supported by the Declaration of John Coletti and Supplemental Declaration of John Coletti with Exhibits 101-150, filed concurrently herewith.[1]

Plaintiffs incorporate their Response to Motion for Summary Judgment by Individual Defendants.

## SUMMARY OF ARGUMENT

There is evidence from which a jury could conclude that Madaline Pitkin was deprived of a constitutional right to medical care, that Corizon had a policy or custom evincing its deliberate indifference to her constitutional right, and that the policy or custom was the moving force behind the constitutional violation.

## STATEMENT OF FACTS

Washington County opened its current jail in 1998. At approximately the same time, it contracted out its healthcare services for the jail. The County's initial contract was with Prison

---

[1] All footnoted exhibits in this response refer to exhibits to the Declaration of John Coletti and Supplemental Declaration of John Coletti.

Page 1 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Health Services (PHS), which later became known as Corizon Health, Inc. (Corizon).[2]

### A.    The Original Contract - Patient Safety.

In addition to its specific terms, the healthcare contract incorporated Washington County jail policies, while specifying healthcare services be provided in compliance with the standards established by the National Commission on Correctional Healthcare (NCCHC).  The NCCHC standards are designed to assure patient safety and represent the national standard of care within the corrections healthcare industry.[3]

The contract specified the medical provider was to:

> provide a medical detoxification program for drug and/or alcohol addicted inmates, which shall be administered only at the jail. PHS (Corizon) shall provide intermittent monitoring of the detoxification cells located in the jail to determine the health status of individuals held in this area. Such monitoring shall include, at a minimum, documented vital signs and a determination of level of consciousness every two hours (for severe cases).[4]

The NCCHC standards required:

> inmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are transferred immediately to a licensed acute care facility.[5]

---

[2] Ex 137, Deposition of Chin at 27.  Ex 138, Deposition of Otis at 11.  Ex 139, Deposition of Lynn at 66-140.

[3] Ex 139, Deposition of Lynn at 80.  Ex 133, Deposition of Vaughan at 68. Ex 140, Deposition of McQueen at 8-9, 25.

[4] Ex 139, Deposition of Lynn at 82.

[5] Ex 133, Deposition of Vaughan at 74. Ex 140, Deposition of McQueen at 19-21.

Page 2 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

And further that:

> individuals at risk for progression to more severe levels of intoxication or withdrawal are kept under constant observation by qualified healthcare professionals or health-trained correctional staff, and whenever severe withdrawal symptoms are observed, a physician is consulted promptly…. as a precaution, severe withdrawal syndromes must never be managed outside of a hospital.… In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.[6]

PHS and its successor Corizon assured Washington County the medical detoxification program would come with a set of treatment protocols which met or exceeded NCCHC standards. It also underscored Corizon's commitment to transfer inmates and detainees experiencing severe withdrawal to a licensed acute care facility for management.[7]

The Medical Observation Unit (MOU) is a secure area within the jail where the jail's sickest patients are housed.[8]  The MOU does not qualify as an infirmary or an acute care facility.[9]   The inmates and detainees are kept in individual cells.[10]  To gain access, medical personnel must be

---

[6] Ex 140, Deposition of McQueen at 19-21.

[7] Ex 133, Deposition of Vaughan at 74.

[8] Ex 121, Deposition of Baker at 2.  Ex 124, Deposition of Wertz at 9-10.  Ex 127, Deposition of Forsmann at 24-27.

[9] Ex 114, Deposition of Storz at 7-8.

[10] Ex 132, Deposition of Thompson at 2-3. Ex 114, Deposition of Storz at 9, 10-11.  Ex 141, Deposition of Rettler at 24.

**Page 3 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

accompanied by two corrections officers.[11]

Corizon's internal policies and protocols directed staff to:

- Send those patients suffering from severe withdrawal to an emergency room;[12]

- In cases of moderate withdrawal, close observation was required;[13]

- When in doubt, the staff was to choose the safest option with the goal being to protect the patient from injury.[14]

Corizon's policies echoed those of the NCCHC in that:

- Inmates and detainees experiencing severe life-threatening intoxication or withdrawal were to be transferred to a licensed acute care facility;[15]

- Individuals at risk for progression to more severe levels of withdrawal were to be kept under close observation by a qualified healthcare professional or trained correctional staff and whenever severe withdrawal symptoms were observed, a physician be consulted;[16]

- Patients suffering withdrawals were required to be assessed and treated every day, a

---

[11] Ex 121, Deposition of Baker at 3-4.  Ex 132, Deposition of Thompson at 3. Ex 127, Deposition of Forsmann at 27.

[12] Ex 107, Deposition of O'Neil at 18. Ex133, Deposition of Vaughan at 74.

[13] Ex 107, Deposition of O'Neil at 19.

[14] Ex 107, Deposition of O'Neil at 18.

[15] Ex 127, Deposition of Forsmann at 54.

[16] Ex 127, Deposition of Forsmann at 54.

Page 4 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

COWS assessment completed every shift during an acute phase of withdrawal;[17]

- Any patient in the medical unit was to be seen every shift, with a focused assessment and vital signs documented, the assessment and scores of all COWS assessments reviewed, and a shift report – every patient;[18]

- When dehydration was detected in a patient, vital signs were required every four hours;[19]

- Patients with abnormal vital signs were to have repeats scheduled.[20]

**B.    Corizon Knowledge - Health Needs Related to Opioid  Withdrawal.**

A predictable and primary byproduct of opioid withdrawal is dehydration.  This is outlined by Corizon in its policies and procedures.[21] Corizon describes in its policies and procedures that "dehydration left untreated may lead to death."[22] Dr. Ivor Garlick, a Corizon Regional Director, described dehydration as deadly.  He testified further that in combination with diarrhea and vomiting it becomes severe and life-threatening.[23]   LPN Tina Barnes knew dehydration was a potentially

---

[17] Ex 127, Deposition of Forsmann at 36-37.

[18] Ex 127, Deposition of Forsmann at 45.

[19] Ex 135, Deposition of Orr at 7.

[20] Ex 135, Deposition of Orr at 8.

[21] Ex 107, Deposition of O'Neil at 8, 20.

[22] Ex 135, Deposition of Orr at 7.

[23] Ex 126, Deposition of Garlick at 8-9.

Page 5 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

dangerous side effect of drug withdrawal which can be deadly if not treated properly.[24]   Corizon's Health Services Administrator was trained that dehydration is a medical emergency.[25]   Corizon's Director of Nursing knew that dehydration was a medical emergency.[26]   Corizon employees were trained that dehydration, if not timely treated, can cause kidney failure and electrolyte imbalance leading to a heart attack.[27]

Corizon employees also were well aware that when unable to obtain a blood pressure they must send the patient to the emergency room.[28]   If one tries and is unable to achieve a blood pressure, they are facing a life-threatening situation according to Dr. Garlick.[29]   Corizon employees also knew a patient losing consciousness likely has low blood pressure.[30]

## C.    Corizon's Custom and Practice - Ignoring the Contract and Standards for Opioid Withdrawal.

In fact, the monitoring required by contract, by policy and by national standards was ignored by Corizon in its entirety.   Corizon did not observe the two-hour monitoring provision required by

---

[24] Ex 142, Deposition of Barnes at 7.

[25] Ex 127, Deposition of Forsmann at 17.

[26] Ex 107, Deposition of O'Neil at 4-5.

[27] Ex 135, Deposition of Orr at 2-4. Ex 127, Deposition of Forsmann at 18-19. Ex 126, Deposition of Garlick at 14-18.

[28] Ex 107, Deposition of O'Neil at 11-12.  Ex 127, Deposition of Forsmann at 14.  Ex 126 Deposition of Garlick at 19-21.  Ex 114, Deposition of Storz at 18-19, 20-21.

[29] Ex 126, Deposition of Garlick at 19-21.

[30] Ex 115, Deposition of Molly Johnson at 2-5.

Page 6 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

the contract.  It did not adhere to the four-hour rule promulgated by Corizon itself.  Those suffering from severe life-threatening withdrawals remained in the jail.  Those at risk for progression to more severe levels of withdrawal were not kept under constant observation. In the end, patients were monitored once every eight-hour shift, if at all.

Corizon's Medical Director, Dr. Joseph McCarthy, was unaware of any policy or procedure concerning monitoring requirements.  He was likewise unaware of any contractual requirement for monitoring those suffering from drug detoxification.  Dr. McCarthy was unfamiliar with the NCCHC standards, could not remember if he had ever read them, did not remember anything about them.[31] Corizon's Health Services Administrator, Mandy Forsmann, had never seen, nor heard of the two-hour monitoring requirement contained within the contract, nor was she familiar with Corizon's four-hour rule regarding drug withdrawal.  The only policy that she was aware of was one time per shift.[32] Dr. Garlick had never seen or heard about the two-hour rule contained within the contract.[33] RN Matthew Northup, the last Corizon employee to see Madaline Pitkin prior to her death, testified the only monitoring Corizon did was once per eight-hour shift, unless deputies called for an assessment.[34]

> **D.**    **Corizon's Custom and Practice - Understaffing.**

Corizon's Western Region Vice President, George Vaughan, testified that understaffing is a

---

[31] Ex 125, Deposition of McCarthy at 7-8, 13-14, 31-32.  Ex 140, Deposition of McQueen at 12, 13, 16, 17, 18.

[32] Ex 127, Deposition of Forsmann at 4.

[33] Ex 126, Deposition of Garlick at 4-5.

[34] Ex 143, Deposition of Northup at 4-5.

Page 7 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

safety hazard.[35]  But nonetheless, Corizon's custom and practice at the Washington County jail prior to Madaline Pitkin's death was to understaff the jail to maximize its profits.

Corizon's Regional Director Debbie Fye testified that it is Corizon's responsibility to make an informed educated guess on staffing.[36]  Corizon represented to Washington County they would provide a responsible staffing plan that provided the appropriate number of qualified medical personnel to deliver quality care and meet NCCHC standards.  Specifically, they assured the County their staffing plan would enable them to meet the immediate medical needs of the inmates and detainees in the jail.[37]  The NCCHC standards requires:

> A sufficient number of health staff of varying types to provide inmates with adequate and timely evaluation and treatment consistent with contemporary standards of care....The adequacy and effectiveness of the staffing plan are assessed by the facility's ability to meet the health needs of the inmate population.[38]

The intent behind the national standards is that the healthcare delivery system has sufficient numbers and types of health staff to care for the inmate population.[39]

> Physician time must be sufficient to fulfill both clinical and administrative responsibilities... Administrative responsibilities include but are not limited to: reviewing and approving policies, procedures, protocols and guidelines; participating in staff meetings; conducting in-service training programs, participating in quality improvement; and

---

[35] Ex 133, Deposition of Vaughan at 25-26.

[36] Ex 134, Deposition of Fye at 24-26.

[37] Ex 133, Deposition of Vaughan at 70, 71, 72, 73, 75.

[38] Ex 140, Deposition of McQueen at 15a-15b.

[39] *Id* at 15b.

Page 8 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

infection control programs."[40]

Corizon CEO Sylvia McQueen MD was clear: a "Medical Director's obligation is to see that the contract is complied with."[41] However, Corizon's Medical Director at the Washington County jail never read the contract, and therefore had little to no idea what the contract required.  In fact, the Medical Director fulfilled few, if any of the administrative responsibilities associated with his role.[42] The general expectation set forth in the NCCHC standards is that a staffing plan includes, at a minimum, one physician on site 3.5 hours a week for each 100 inmates housed at the facility.[43] The Washington County jail houses up to 573 inmates and detainees at any given time, and is close to full at all times.[44]  This would, at a minimum, require 20 hours of physician time weekly, Corizon's staffing plan provided for 12 hours.[45]

Corizon's Health Services Administrator, Mandy Forsmann, was of the opinion the jail was understaffed.  She received numerous complaints from the staff regarding the lack of standard staffing at the jail.  She voiced her concerns to the Regional Director, Debbie Fye.  She made it known she was concerned regarding patient safety due to understaffing.  She realized the care that was required

---

[40] *Id* at 42.

[41] Ex 140, Deposition of McQueen at 10.

[42] Ex 125, Deposition of McCarthy at 31.

[43] Ex 140, Deposition of McQueen at 16.

[44] Ex 136, Deposition of Garrett at 4.

[45] Ex 139, Deposition of Lynn at 125, 131, 86. Ex 140, Deposition of McQueen at 16.

Page 9 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

was not always being provided because of understaffing issues. The contract required that an RN perform intakes, which meant LPNs were dealing with the most serious patients in the Medical Observation Unit of the jail. Mandy Forsmann made her concerns known that the least credentialed staff were dealing with the sickest patients in the jail. She knew how dangerous this was and informed senior management. Ms. Forsmann's concerns were further compounded by the fact that Washington County required two deputies be present before medical providers were allowed to enter into the MOU to attend the sickest patients, and frequently there were not enough deputies to ensure this would occur.[46]

Ms. Forsmann determined the Corizon Medical Director was falsifying medical charts; charting he had seen patients, when, in fact, he had not. She complained to senior officials for months requesting Dr. McCarthy be fired.[47] After many months, Corizon fired Dr. McCarthy, leaving no physician in his place.[48] The firing of Dr. McCarthy rendered the Physician Assistant Colin Storz unable to practice medicine the day of Madaline Pitkin's death.[49] Ms. Forsmann further testified that given the Medical Director was falsifying medical records, this position was understaffed by definition.[50]

Corizon's Director of Nursing sent an email to the Regional Director of Corizon within days

---

[46] Ex 127, Deposition of Forsmann at 20-21, 22-23, 26-31, 32-33.

[47] Ex 127, Deposition of Forsmann at 8-11.

[48] Ex 144, Deposition of Wortham at 32-5. Ex 114, Deposition of Storz at 5-6.

[49] Ex 114, Deposition of Storz at 2-5.

[50] Ex 127, Deposition of Forsmann at 35.

Page 10 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

of Madaline Pitkin's death telling Ms. Fye that the registered nurses at the jail were overwhelmed.[51] Physician Assistant Cris Rettler testified the jail was understaffed.[52] Tina Barnes, an LPN, believed they should have had more nurses to adequately treat the needs of the patients at the jail.[53] LPN Courtney Nyman testified the jail was frequently understaffed and it was therefore unrealistic for those on staff to deliver the quality of care required under the circumstances.[54] Dr. Garlick assumed the role of Regional Director in the month after the death of Madaline Pitkin; he commented there were "real issues" regarding staffing.[55]

### E.    The Washington County Audit Report of May, 2013 - Understaffing.

By May of 2013, the Washington County Auditor, John Hutzler, sent his preliminary findings to senior administrators at Washington County, including the Director of Health and Human Services and the Assistant County Administrator, outlining the staffing deficiencies at the jail. He recommended the County consider suing Corizon over the failure to provide more than $350,000 worth of staffing called for by the contract. He concluded between fiscal years 2008 and 2012, Corizon was providing well below the minimum specified hours across all disciplines within the jail, specifically the Medical Director, registered nurses, licensed clinical social workers, and dentists.[56]

---

[51] Ex 133, Deposition of Vaughan at 84-85.

[52] Ex 141, Deposition of Rettler at 8-9, 22-23.

[53] Ex 142, Deposition of Barnes at 2-3.

[54] Ex 118, Deposition of Nyman at 4-5.

[55] Ex 126, Deposition of Garlick at 3, 30-31.

[56] Ex 145, Deposition of Hutzler at 34-36.

Page 11 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Office@Hallman.pro

Mr. Hutzler reiterated his findings and concerns in a further report in the Fall of 2013 to senior Washington County officials.[57]

### F. Corizon's Customs and Practices Failed to Ensure That Inmates and Detainees Had Access to Basic Medical Care to Meet Their Serious Health Needs.

The standards, promulgated by the NCCHC, were intended to ensure that inmates and detainees have access to care to meet their serious health needs.[58] This is the principle upon which all NCCHC standards are based.  Corizon represented to Washington County it was their policy to provide patients with all necessary medical care, while claiming that withholding necessary care was unethical, against company policy, and would not be tolerated.  Corizon represented they would run a program developed to provide service to the patients in compliance with NCCHC standards.[59] Despite its promises, Corizon routinely denied patients access to the most basic medical care to meet their serious health needs.  Corizon and its employees were well aware that opioid withdrawal, specifically, heroin withdrawal, and associated dehydration, could be deadly if not appropriately managed.

### G. Corizon's Customs and Practices - Emergency Room Referral.

CJ Buchanan, an RN who worked for Corizon and the predecessor company for 17 years, the Medical Director Dr. Joseph McCarthy, the Health Services Administrator Mandy Forsmann, the previous Health Services Administrator Stevens Hyppolite, and RN Matthew Northup cannot recall

---

[57] Ex 145, Deposition of Hutzler at 37-42.

[58] Ex 140, Deposition of McQueen at 11.

[59] Ex 133, Deposition of Vaughan at 68-69.

Page 12 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

ever sending a patient suffering from drug withdrawal, specifically heroin withdrawal, to a hospital setting.[60] Further, Ms. Buchanan, Dr. McCarthy, Ms. Forsmann, and Mr. Northup cannot recall any other Corizon employee doing so.[61] In fact, as discussed below, Corizon adopted a financial rewards program for staff who avoid emergency room referrals.

**H.     Corizon's Custom and Practice - IV Use for Opioid Withdrawal.**

CJ Buchanan, Dr. Joseph McCarthy, Leslie O'Neil, Tony Wertz, Tina Barnes and Mandy Forsmann never administered an IV to a patient suffering from opioid/heroin withdrawal, nor were they ever aware of any other Corizon staff member doing so.[62] Dr. Ivor Garlick testified Corizon does not use IVs unless it's a "real emergency...but then we get them out," send them to the hospital.[63]

**I.     Corizon's Custom and Practice - Insufficient Training.**

Corizon's Western Region Vice President, George Vaughan, testified it was critically important to patient safety that staff be well trained, well supervised and well organized.[64] However,

---

[60] Ex 108, Deposition of Buchanan at 2-3. Ex 125, Deposition of McCarthy at 18-20.   Ex 127, Deposition of Forsmann at 5. Ex 146, Deposition of Hyppolite at 2. Ex 143, Deposition of Northup at 2-3.

[61] Ex 108, Deposition of Buchanan at 3-4. Ex 125, Deposition of McCarthy at 18-20.   Ex 127, Deposition of Forsmann at 12. Ex 143, Deposition of Northup at 2-3.

[62] Ex 108, Deposition of Buchanan at 12-14, 81. Ex 125, Deposition of McCarthy at 28-30.   Ex 107, Deposition of O'Neil at 2-3. Ex 124, Deposition of Wertz at 8. Ex 142, Deposition of Barnes at 8. Ex 127, Deposition of Forsmann at 6,12 .

[63] Ex 126, Deposition of Garlick at 28-29.

[64] Ex 133, Deposition of Vaughan at 24-26, 33-34, 35-37.

Page 13 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Office@Hallman.pro

training was routinely overlooked by Corizon.  Corizon employees told this story in their own words during depositions:

• RN CJ Buchanan did not know if heroin withdrawal could cause death.[65] She had no idea if an electrolyte imbalance could stop one's heart.[66]

• Corizon's Medical Director at the Washington County jail was unaware of any policies or procedures regarding monitoring those suffering from drug withdrawal.[67] He could not define "acute care facility."[68]  He was unfamiliar with the NCCHC standards.  He could not remember if he had ever read them and certainly did not remember anything about them. He was unclear whether the Washington County Medical Observation Unit would constitute an "acute care facility." He had no idea if there was a Continuous Quality Improvement program in place at the jail. He was unaware of any policy or contract provision requiring referral to an acute care facility for those patients experiencing severe progressive withdrawal from opioids. It was his belief Corizon medical staff could effectively manage such people at the jail. He testified that he did not necessarily need to follow either the American Medical Association guidelines or the NCCHC standards.[69] He had never heard of Corizon's

---

[65] Ex 108, Deposition of Buchanan at 5.

[66] *Id* at 16-17.

[67] Ex 125, Deposition of McCarthy at 26-27.

[68] *Id* at 30.

[69] Ex 125, Deposition of McCarthy at 5-10, 11-14, 15, 16.

Page 14 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

golden rule.[70]  LPN Courtney Nyman described Dr. McCarthy as someone who did not appear to be a knowledgeable physician.[71]

- RN Matthew Northup, the last Corizon employee to see Madaline Pitkin alive, cannot recall any specific training he ever received regarding severe withdrawal syndromes.[72] Tony Wertz testified he "supposes" dehydration could be deadly.[73] Tina Barnes noted a lack of leadership, management and support.  She had no idea what the term "severe withdrawal syndrome" meant.[74]

- Corizon's Health Services Administrator testified she never saw the two-hour rule outlined in the contract, nor did she ever see the Corizon policy relating to a four-hour rule regarding the treatment of dehydration.[75] In fact, she never saw any policy regarding dehydration.[76] The Regional Medical Director had never seen or heard of the two-hour rule outlined in the contract. He had no idea what an acute care facility was per the NCCHC standards. In fact, Dr. Garlick trained the medical staff that when severe opioid withdrawal is occurring in a patient at the jail, it is permissible to keep

---

[70] *Id* at 17, 16.  Ex 107, Deposition of O'Neil at 16-17.

[71] Ex 118, Deposition of Nyman at 2-3.

[72] Ex 143, Deposition of Northup at 2.

[73] Ex 124, Deposition of Wertz at 6.

[74] Ex 142, Deposition of Barnes at 4, 5-6.

[75] Ex 127, Deposition of Forsmann at 4.

[76] Ex 127, Deposition of Forsmann at 7.

Page 15 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

the patients at the jail.[77]  Physician Assistant, Cris Rettler, testified the Corizon staff

was insufficiently trained.[78]

As a staff, they were poorly trained and completely unprepared for what they faced with

Madaline Pitkin, a textbook case of severe opioid withdrawal, which caused extreme dehydration,

resulting in her death.

### J.    Corizon's Custom and Practice - Profits First.

Cris Rettler was a Physician Assistant employed by Corizon for approximately 18 months,

leaving in the latter part of 2013.  She left over concerns about the level of care being offered to

patients at the Washington County jail and the fear she would lose her medical license if she continued

to practice medicine as prescribed by Corizon's senior administrators.  During her tenure at the

Washington County jail, Ms. Rettler developed the opinion that Corizon was placing profit over

patient safety.  It was her belief Corizon's policies and customs of cutting costs were in direct conflict

with the goal of caring for the patients of the jail.  She concluded the Corizon nurses were

undertrained and the jail understaffed.  She testified she was under constant pressure from

supervisors, particularly Corizon's Regional Manager, Dr. Ivor Garlick, to minimize emergency room

visits and referrals to outside physicians for specialty consultations.  Ms. Rettler was required to

attend weekly meetings with Dr. Garlick, who made it clear that virtually everything could and should

be handled within the confines of the jail.  She could not remember a single occasion when Dr.

Garlick agreed with any of her ER referrals.  She repeatedly watched Corizon delay care to patients

---

[77] Ex 126, Deposition of Garlick at 6-7, 32.

[78] Ex 141, Deposition of Rettler at 6.

Page 16 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

pending their release from jail, jeopardizing their safety while attempting to maximize profits. This was openly touted as a cost savings measure. It was her belief that Corizon's constant efforts to reduce costs interfered with her ability and the ability of the jail healthcare staff to provide appropriate levels of care.[79]

She attended meetings at Corizon's corporate headquarters. These meetings were almost exclusively focused on cost savings. Among the topics highlighted was limiting emergency room visits. She recalled little regarding patient care and safety from the meetings; virtually everything was devoted to cost savings and profit maximization. As a healthcare provider she was sickened by what she heard.[80]

### K.    Cris Rettler Report to Sheriff Garrett.

In 2013, Ms. Rettler took the extraordinary step of meeting on two occasions with Washington County Sheriff Pat Garrett. She also had multiple discussions with a representative of the Washington County Auditor's staff, Latham Stack, and summarized all of her concerns regarding patient safety. She specifically told Sheriff Garrett about the critical nursing shortage at the jail. She detected no changes in jail staffing after meeting with the Sheriff. She told Sheriff Garrett the level of care was very concerning from a medical ethics standpoint and it was only a matter of time until there was a bad outcome. [81]

---

[79] Ex 141, Deposition of Rettler at 2-7, 9-13, 21.

[80] Ex 141, Deposition of Rettler at 9-18.

[81] Ex 141, Deposition of Rettler at 4-6, 12-13, 19-20, 25-26.

Page 17 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

### L.    Corizon's Bonus Program.

Corizon offered a bonus program to medical staff by compensating employees for eliminating emergency room visits.  PA Colin Storz' offer of employment included a bonus clause as follows:

> …for every patient/procedure you treat that results in the elimination of an emergency room visit, you will be compensated an additional $150.00 per instance."[82]

### M.    Corizon's Custom and Practice - No Continuous Quality Improvement Program.

A Continuous Quality Improvement Program (CQI) as outlined in the NCCHC standards, monitors and improves healthcare delivery within the facility.[83]

The standards outlined by the NCCHC are intended to ensure that a facility uses a structured process to find areas in the healthcare delivery system that need improvement, and that when such areas are found, staff develop and implement strategies for improvement. One essential element of quality improvement is the monitoring of high risk, high volume, or problem-prone aspects of healthcare provided to the patients. The CQI committee should meet at least quarterly to establish objective criteria for use in monitoring quality of care, developing plans for improvement based on monitoring findings and to assess the effectiveness of these plans after they are implemented. The responsible physician has a leadership role in the CQI process. Certain events, such as acute care hospital admission, medical emergencies and deaths must be routinely reviewed. When reviewed routinely, one of the benefits of a successful CQI program is that problems can be identified early and

---

[82] Ex 114, Deposition of Storz at 24-25.

[83] Ex 140, Deposition of McQueen at 12.

Page 18 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

strategies developed for resolution before they worsen.

> A comprehensive CQI program includes a multidisciplinary quality improvement committee, includes monitoring of the areas specified in the compliance indicators, and an annual review of the effectiveness of the CQI program itself. In addition, the program includes two process quality improvement studies and two outcome quality improvement studies, and both studies identify areas in need of improvement and effective remedial actions strategies. A multidisciplinary quality improvement committee is a group of health staff from various disciplines (e.g. medicine, nursing, mental health, dentistry, health records, pharmacy, laboratory) that design quality improvement monitoring activities, discusses the results, and implements corrective action.

> Process quality improvement studies examine the effectiveness of healthcare delivery process. Outcome quality improvement studies examine whether expected outcomes of patient care were achieved.

> Fundamentally, a CQI program identifies problems, implements and monitors corrective action, and studies its effectiveness. The NCCHC requires facilities with an average daily population of greater than 500 inmates have a comprehensive CQI program that does the following:

> A.    "Establishes a multidisciplinary quality improvement committee that meets as required, but not less than quarterly, designs quality improvement monitoring activities, discusses the results, and implements corrective action;

> B.    Completes an annual review of the effectiveness of the CQI program by reviewing CQI studies and minutes of CQI, administrative, and/or staff meetings, or other pertinent written materials; and

> C.    Performs at least two process quality improvement studies and two outcome quality improvement studies a year."[84]

Corizon's Chief Medical Officer for the community division testified that when Corizon is

---

[84] Ex 140, Deposition of McQueen at 13-14.

**Page 19 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

working with a client like Washington County, which is accredited by the NCCHC, they were to have

an appropriate CQI program in place.  Given the Washington County jail houses in excess of 500

detainees and inmates, this would mean a "comprehensive" CQI program.[85]  When asked, Corizon's

own Medical Director for the Washington County jail did not know if Corizon had a CQI program

in place.[86]

Twenty-nine days before Madaline Pitkin's death, Regional Vice President, Debbie Fye, sent

an email to Western Region Vice President George Vaughan, Chief Clinical Officer Dr. Harold Orr,

Regional Vice President Charles Guffey, Regional Medical Director Dr. Ivor Garlick, and Regional

Director of Nursing Vicki Thomas, referencing a meeting with the Health Services Administrator at

the Washington County jail. The two of them discussed "the forming of a Quality Improvement

Committee – currently they do not have one."[87] The Washington County Auditor pointed out that the

contract required all jail healthcare services be reviewed and evaluated for quality of care through

established and regularly performed audits.  He found no evidence the audits had been performed.

Corizon represented to the Auditor it had a quality assurance program, but it did not report any of

the results of his quality assurance audits to the Medical Audit Committee (MAC) or the contract

administrator.  Despite numerous requests by the Auditor, Corizon could not provide the Auditor

with evidence that specific audits were actually conducted.  In fact, Corizon took the position it was

---

[85] Ex 140, Deposition of McQueen at 2-5.

[86] Ex 125, Deposition of McCarthy at 10.

[87] Ex 133, Deposition of Vaughan at 82-83.

Page 20 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

the County's responsibility to perform the audits.[88]

The Washington County Auditor concluded that Corizon breached its contract with the County requiring it to review and evaluate quality of care through established and regularly performed audits. He found no evidence that these audits had been performed. He concluded that contrary to its representations, Corizon did not have a quality assurance program in place and did not report the results of its quality assurance audits to the MAC or the contract administrator. Despite his many requests for documents, he was never provided sufficient proof demonstrating the quality of care at the jail was being reviewed consistent with the terms of the contract.[89]

The Auditor also found Corizon had not tailored its policies and procedures to the Washington County jail as required by the NCCHC.[90] Corizon was severely understaffing the jail. He estimated that between July 1, 2008 and June 30, 2012, Corizon received at least $350,000 of County funds for services never provided. In fiscal year 2012, Corizon provided only 56% of the contracted hours for the medical director position and 46.5% for registered nursing time. There was a 275 hour deficit in the medical director time. Mr. Hutzler further found Corizon did not report claims made against it, did not obtain County approval of subcontractors like that of Dr. McCarthy, and refused to provide access to records, stonewalling the Auditor in his quest to determine the cause

---

[88] Ex 139, Deposition of Lynn at 39-44. Ex 145, Deposition of Hutzler at 39-41.

[89] 140, Deposition of Lynn at 39-44. Ex 145, Deposition of Hutzler at 39-41.

[90] Ex 139, Deposition of Lynn at 39.

Page 21 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

of cost overruns to the taxpayers of Washington County.[91]

As of the time of Madaline Pitkin's death, despite all the recommendations from the Auditor extending back to the Spring of 2013, there had been little, if anything, acted upon by Corizon or the County.[92]

### N.    In Spring 2014 Corizon Was Not in Compliance with NCCHC Standards.

The NCCHC reviews jail healthcare systems for accreditation purposes every three years. Compliance with 85% of standards is required to maintain accreditation.[93] Corizon's Western Region Vice President George Vaughan testified it was incumbent upon Corizon to comply daily with the NCCHC standards, as failing to do so jeopardizes patient health and safety. On a scale of 1 to 10, Mr. Vaughan rated compliance with the standards as a 10 in terms of importance.[94]

Corizon representatives conducted a "site visit" at the Washington County jail in October of 2014. The purpose of the visit was to evaluate preparedness for the oncoming NCCHC audit to occur in December. The site visit was led by Leonora Mohammed. She concluded "there is quite a bit of work to pass this NCCHC audit as well." After the visit, Corizon representatives discussed contacting the NCCHC and delaying the audit. They indicated multiple site issues needed attention "currently not NCCHC prepared…"[95]

---

[91]Ex 139, Deposition of Lynn at 39.

[92] Ex 145, Deposition of Hutzler at 29-31.

[93] Ex 139, Deposition of Lynn at 44.

[94] Ex 133, Deposition of Vaughan at 28-32.

[95] Ex 133, Deposition of Vaughan at 78-81.

Page 22 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Specifically:

- Access to care issues - staff unable to access the MOU (Medical Observation Units) as necessary for medication pass assessments.

- Missing pertinent policies, procedures, binders, etc. This included the policy and procedure manual and the CQI binder.

- Nurses sick call out of compliance. There were no mechanisms to determine a timeline of Health Service Requests, triage and being seen.

- The PA and SMD (Site Medical Director) clinic is very unorganized. PA states he has no mechanism to keep track of patients in chronic care. Not sure of procedures for starting medications.[96]

## ARGUMENT

### I    SUMMARY JUDGMENT STANDARDS

Defendants' initial burden as the moving party on summary judgment is to show that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is missing. *Celotex Corp. v. Catrett,* 477 US 317, 322-324 (1986). If the movant carries its burden, then the nonmovant must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a

---

[96] Ex 133, Deposition of Vaughan at 78-81.

**Page 23 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Office@Hallman.pro

reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F3d 1142, 1146 (9th Cir, 2005) (citation omitted); *Fricano v. Lane County,* 2018 WL 2770643 at *5 (D Or, 2018).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

**II**    ***MONELL* CLAIMS**

Plaintiffs' claims, as those of a pretrial detainee, are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Frost v. Agnos*, 152 F3d 1124, 1128 (9th Cir, 1998). 42 U.S.C. § 1983 allows an individual to bring suit against a municipality and its officials for depriving her of a constitutional right. *Monell v. Dep't of Social Servs. of the City of New York*, 436 US 658, 690-91 (1978). To prevail in such an action, a plaintiff must show that the defendant both (1) acted "under color of state law" and (2) deprived her of a "right secured by the Constitution or laws of the United States." *Long v. Cty. of Los Angeles,* 442 F3d 1178, 1185 (9th Cir, 2006).

There is no dispute that Corizon, as a contract provider of medical services, may be liable under *Monell*. *Johnson v. Corizon Health, Inc.*, 2015 WL 1549257, at *9 (D Or, 2015), *Deloney v. County of Fresno*, 2018 WL 3388921, *8 note 15 (ED Cal, 2018) (citing *Johnson*); *Oyenik v. Corizon Health Inc.*, 696 Fed Appx 792, 793–95 (9th Cir, 2017).

**A.    Municipal  Liability - The Elements.**

The requirements for municipal liability under *Monell* was most recently discussed in *Fricano,* 2018 WL 2770643, at *9:

**Page 24 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

> A municipal entity is not responsible for the acts of its employees under a respondeat superior theory of liability. *City of Canton v. Harris*, 489 US 378, 386 (1989). Instead, "it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be liable under § 1983." *Id*. To prevail on a claim of deliberate indifference against a municipal entity, a plaintiff must show that (1) she was deprived of a constitutional right, (2) the entity had a policy or custom evincing its deliberate indifference to the prisoner's constitutional right, and (3) the policy or custom was the moving force behind the constitutional violation. *Burke v. Cty. of Alameda*, 586 F3d 725, 734 (9th Cir, 2009).

See also *Johnson,* 2015 WL 1549257, at *12.

### 1.      Deprivation of a Constitutional Right.

The deprivation of a constitutional right may be based on the deliberate indifference of an individual to the serious medical needs of a detainee "if the municipality's policies and customs were a moving force behind this deprivation and reflect their own deliberate indifference." *Fricano* at *10.

However, the deliberate indifference of an individual is not a requirement for finding deprivation on the part of a municipality.  The court in *Fricano*, at *10 said:

> [A] jury may find that, even if Mr. Pleich [the individual]  is not personally liable, the combined acts or omissions of other officials operating under a municipal policy or custom, or an affirmative policy or custom which is constitutionally suspect on its face, created a "substantial risk of serious harm" to Mr. Fricano and was employed despite the risk of such harm being "obvious." [*Gibson v. County of Washoe, Nev.*, 290 F3d 1175 (9th Cir, 2002)] *Id*. at 1188-90; see also *Speer v. Glover*, 276 F3d 980, 986 (8th Cir, 2002); *Garcia v. Salt Lake Cty.*, 768 F2d 303, 310 (10th Cir, 1985); *Anderson v. City of Atlanta,* 778 F2d 678, 686 (11th Cir, 1985).

### 2.      Policies and Customs.

A local government may be liable for policies of inaction as well as action.  In *Johnson*, at *9

Page 25 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

the court describes the policies:

> A policy of action is one in which the governmental body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a governmental body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F3d 1128, 1143 (9th Cir, 2012).

Following the case of *Gordon v. Cty. of Orange*, 888 F3d 1118, 1185 (9th Cir, 2018) there is no distinction between policies of "action" and policies of "inaction." Both are analyzed under an objective standard and "both require deprivation of a constitutional right, a causal link between that deprivation and municipal policy and recklessness." *Fricano* at *9.

In *Estate of Vela v. Cty. of Monterey*, 2018 WL 4076317, at *3 (ND Cal, 2018) the court explained:

> The deliberate indifference standard for municipalities is an objective standard. *Castro [v. County of Los Angeles*, 833 F3d 1060 (9th Cir, 2016)] at 1076. "[A]n objective standard applies to municipalities 'for the practical reason that government entities, unlike individuals, do not themselves have states of mind.'" *Mendiola-Martinez [v. Arpaio*, 836 F3d 1239 (9th Cir, 2016)] at 1248 (quoting *Castro*, 833 F3d at 1076). "This *Castro* objective standard is satisfied when 'a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Id* at 1248-49 (quoting *Castro*, 833 F3d at 1076) (alteration in original).

A policy or custom includes the decisions of a government's lawmakers and its policymaking officials. *Connick v. Thompson*, 563 US 51, 61 (2011); *Fricano* at *10. It may also be established " by showing that the municipal entity had a permanent and well-settled practice, or "custom," which gave rise to the constitutional violation. *City of St. Louis v. Praprotnik,* 485 US 112, 127 (1988);"

Page 26 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

*Fricano* at *10.

Random or isolated acts are insufficient to establish custom. However, behavior toward a single individual may be sufficient. The court in *Fricano* at *10 stated:

> [T]here is no case law that a custom cannot be inferred from behavior toward a single individual." *Oyenik v. Corizon Health, Inc.,* 696 Fed Appx, 792, 794 (9ᵗʰ Cir, 2017) (citation omitted); see also *Navarro v. Block,* 72 F3d 712, 714-15 (9ᵗʰ Cir, 1995) ("Once such a showing is made, a municipality may be liable for its custom irrespective of whether official policy-makers had actual knowledge of the practice at issue.")

### 3.    Deliberate Indifference.

The policy or custom must amount to a deliberate indifference to the serious medical needs of the prisoner or detainee. *Fricano* at *12:

> A jury can consider the policies and contracts of Corizon to show awareness of the risks. Here, Corizon's customs of failing to screen, treat, and transfer acutely ill detainees were all contrary to its own written policies and contract with Lane County. A jury could find it obvious that failing to perform these services would likely result in dangerously deficient medical care, and, indeed, *Corizon's own policies evidence that it understood these risks.* See *Johnson v. Corizon Health, Inc.,* No. 6:13–cv–1855–TC, 2015 WL 1549257, at *10 (D Or, Apr. 6, 2015) (relying on policies and contract to find the same). [Emphasis added.]

### 4.    Moving Force.

A policy or custom must be a moving force behind the violation of a constitutional right. To be a moving force the policy must be "closely related to the ultimate injury." *Gibson v. County of Washoe, Nev.,* 290 F3d 1175, 1196 (9ᵗʰ Cir, 2002) quoting *City of Canton v. Harris,* 489 US 378, 391 (1989).

Page 27 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

B.    **Specific Customs and Policies - Causation.**

Corizon first challenges 7 customs and practices as not being a cause. They are answered separately.

1.    **Staffing Levels.**

Corizon states:  "Pitkin was assessed several times over seven days by a total of six Corizon employees at the jail * * *." Corizon Motion at 5.

Ms. Pitkin was evaluated with vital signs and the COWS scale 3 times rather than the 21 times required by Corizon's own standards.  Her vitals should have been documented every 2 hours.  None were done during the 22 hours she was in the Medical Observation Unit.[97]  None of the 4 Medical Request Forms submitted by Ms. Pitkin resulted in her being seen by a nurse or other medical provider.  These constitute violations of the standard of care and of Corizon's own policies. [98]

Corizon states:  "There is no suggestion, much less proof that her death was caused by a failure of staff to address her needs because of staffing levels."  Corizon Motion at 5.

The jail was frequently understaffed and the staff was overwhelmed and concerned with their inability to provide adequate care to the inmate population.[99] The medical team was understaffed, and not supervised as required by law.  Several staff members on duty the day of Madaline Pitkin's death

---

[97] Ex 106, Expert Statement of John May, MD (Certified Correctional Health Care) at 2.

[98] Ex 111, Expert Statement of Marge Willis, RN (Nursing Practices) at 2-3.

[99] Ex 147, Expert Statement of Stephen Kinder, RN (Head of Division of Management, School of Medicine, OHSU) at 3.

Page 28 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

were not adequately trained. [100]

The standards for health services and jails by the NCCHC were not followed. Medical staff did not provide constant observation of Ms. Pitkin, physician supervision was not adequate and medical staff did not transfer Ms. Pitkin immediately to an acute care facility for emergency care. [101]

Non-action by staff was a breach of the standard of care and grossly negligent, leading to the death of Ms. Pitkin.[102]

The grossly deficient staffing levels at the jail, including the medical director and the nursing staff, are outlined above. This is similar to the situation faced in *Fricano*. There the court detailed the staffing deficiencies by Corizon at the Lane County jail. The court, at *11 said:

> A reasonable jury could find that, based on the paltry hours worked by Dr. Richenstein and the absence of an onsite clinical supervisor, Corizon had a custom of inadequately staffing and supervising its mental health division and that, along with the lack of ameliorative care offered by available staff, this created a substantial risk of serious harm.

Corizon's failure to act on concerns communicated to it regarding staffing levels posed a risk of harm to patients and a reckless disregard to the health, safety and welfare of Ms. Pitkin. [103]

### 2.    Storz's On-Call Payments.

Corizon argues that plaintiffs misinterpret Storz's on-call compensation. Corizon Motion at

---

[100] Ex 128, Expert Statement of David Smith, MD (Addiction Medicine) at 1.

[101] Ex 104, Expert Statement of Susan Garson, RN (Nursing Practices) at 3.

[102] Ex 111, Expert Statement of Marge Willis, RN (Nursing Practices) at 3.

[103] Ex 111, Expert Statement of Marge Willis, RN (Nursing Practices) at 4.

Page 29 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Office@Hallman.pro

5-6.

Offering Storz a $150 incentive in his welcome letter upon hiring to do procedures in the MOU rather than send an inmate to the hospital fits the profile of intentional underutilization that benefits both parties (Storz and Corizon). [104]  It creates a clear conflict of interest. [105]

A jury could find that financial incentives to Corizon employees who avoid transferring patients to the emergency room are part of a custom and practice designed to maximize Corizon profits.  The Corizon plan was successful.  As noted above, Buchanan, McCarthy, Forsmann and Northup cannot recall ever sending a patient suffering withdrawal to a hospital.  Nor can they remember any other Corizon employee doing so, nor do they recall ever sending an inmate to the ER for opioid withdrawal or hearing of anyone else doing that.[106]  Dr. McCarthy was not aware of any policy of Corizon to send someone to the hospital suffering from severe or progressive withdrawal.[107]

### 3.    Training Policies.

Corizon states: "[T]here is no pattern of incidents similar to Pitkin's situation showing a clear need for different training." Corizon Motion at 6.

Corizon staff was inadequately trained and failed to follow training guidelines in numerous

---

[104] Ex 147, Expert Statement of Stephen Kinder, RN (Head, Division of Management, OHSU) at 3.

[105] Ex 109, Expert Statement of Samuel Freedman, MD (Emergency Medicine) at 8.

[106] Ex 125, Deposition of McCarthy at 18-19.

[107] Ex 125, Deposition of McCarthy at 13.

**Page 30 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

respects related to care of Ms. Pitkin.[108]

Contrary to Corizon's statement, behavior towards a single individual may be sufficient to show a custom.  *Oyenik v. Corizon Health, Inc.,* 696 Fed Appx, at 794; *Fricano* at *10.

Evidence of inadequate training includes ignorance of national standards with regard to health care and ignorance of contract terms regarding health care.  *Johnson* at *11 (discussing national standards and contract requirements for intake screening).

### 4.        Staff Meetings and Physician Supervision.

Corizon makes the conclusory statement that lack of physician supervision or staff meetings "could have no causal relationship with Pitkin's treatment or death." Corizon Motion at 7.

Dr. McCarthy was the only physician ever to see Ms. Pitkin at the jail.  In the middle of his assumption of treatment he was fired for falsifying medical records and not examining patients in need of clinical evaluation.[109]

After McCarthy's firing the staff was unsupervised.  The next highest level of medical professional was a physician's assistant, who was unable to practice without a supervising physician. The Regional Medical Director, a policy-making official at Corizon, chose not to assume the care of patients himself or to obtain an immediate substitute.  He  took no action to evaluate the patients in the MOU and provided no instruction to staff.  This approach increased a risk of injury to all the patients.[110]

---

[108] Ex 104, Expert Statement of Susan Garson, RN (Nursing Practices) at 4-5.

[109] Ex 109, Expert Statement of Samuel Freedman, MD (Emergency Medicine) at 3.

[110] Ex 109, Expert Statement of Samuel Freedman, MD (Emergency Medicine) at 4-6.

Page 31 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

The termination of Dr. McCarthy was planned.  No alternative physician was in place and the plan for coverage was ambiguous.  McCarthy's actions amount to abandonment and Corizon's nearly amount to abandonment of not only Ms. Pitkin but all of the patients in the facility.[111]

Dr. Garlick, the Regional Medical Director, had no plan to tell the staff about the firing.  He didn't think it was necessarily important to have a medical director at the site.  He didn't know that PA Storz could not practice without a physician supervisor.  Dr. Garlick was sent by Corizon to do a task - Fire Dr. McCarthy - and he did it.[112]

It seems obvious that if there is no physician there can be no physician supervision.  See *Paris v. Conmed Healthcare and Coos County*, 2017 WL 7310079 at *5, 12 (D Or, 2017)(Findings and Recommendations of Magistrate Judge Coffin) adopted by 2018 WL 664807 (D Or, 2018)(McShane, J).

###### 5.    Suboxone Use.

Corizon contends that failure to use Suboxone could not be a cause of Ms. Pitkin's death.  Corizon Motion at 4, 7.  Corizon claims that it was but one alternative form of treatment.  Corizon points to the report of Linda Moore, RN, that Subozone is not recommended for patients with a COWS score of 10 or below.  This ignores the fact that Ms. Pitkin's second COWS score was more accurately a "25" and her third a "36."

Suboxone is used at some Corizon facilities.  According to Dr. Garlick it is an effective

---

[111] Ex 106, Expert Statement of John May, MD (Correctional Health Care) at 4.

[112] Ex 126, Deposition of Garlick at 25-27.

**Page 32 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857    Office@Hallman.pro

treatment for maintenance and for detox.[113] He has advocated using the drug at Corizon since 2010 or 2011.  It takes time to get the physicians licensed.  As of April 2014 it was only used in New Mexico by Corizon. [114]

Suboxone is a form of Buprenorphine.  Ms. Pitkin's life could have been saved had she been adiminstered buprenorphine in the form of Suboxone.  This is the standard of practice for the treatment of opioid withdrawal.  It can be administered by a waivered physician who has taken an eight hour training course. The medical supervisor was waivered to administer Suboxone.[115]

Buprenorphine was listed as a medication option.  It is a lifesaving medication used to prevent dangerous withdrawal from opioids.  This protocol was not initiated for Ms. Pitkin.[116]

### 6.    Treatment of Inmates Perceived as Nearing Release.

Corizon argues that there is no evidence that Ms. Pitkin was nearing release and that there is no causal relationship because she did get medical care.  Corizon Motion at 8.

With regard to patients thought soon to be released from jail, Corizon misapprehends the plaintiffs' position.  Corizon's practice was to delay referral treatment, including emergency room treatment, in anticipation that the patient would be released.

PA Chris Rettler, a former Corizon employee, described the practice.  Emergency room referrals and physician referrals had to be approved by Dr. Garlick in a once-weekly phone

---

[113] Ex 126, Deposition of Garlick at 10-11.

[114] Ex 126, Deposition of Garlick at 22-24.

[115] Ex 128, Expert Statement of David Smith, MD (Addiction Medicine) at 2-3.

[116] Ex 105, Expert Statement of Lisa Sewell, RN (Addiction Medicine) at 3.

**Page 33 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

conference.  Corizon would procrastinate on referrals as long as possible.  Chris Rettler  reported directly to Dr. Garlick.  In that weekly phone conference Rettler would go through the list of patients she felt needed to be referred to the ER.  He would tell her why it was not appropriate to send that person to the ER.[117]  They would procrastinate as long as they could on referrals because you had to get approval.  Ms. Rettler was told that they were hoping that the patient would leave before they had to be referred.[118]

> Because, again, they were hoping that they would get kicked.  And they specifically told me that; that, like they were hoping that the patient would leave before they had to get this referral."[119]

With regard to Corizon's causation argument that Ms. Pitkin did get the medical care she needed, suffice it to say there is evidence to the contrary.

### C.    Breaches of Contract.

First, Corizon claims that a contract breach cannot form the basis of the claim.

The contract between Washington County and Corizon sets out many provisions for the health and safety of inmates.  This contract was routinely breached by Corizon and the breaches were ratified by Washington County.  See Response to Motion of Washington County.  It is well established that such a breach of contract can give rise to *Monell* liability if it is a custom or policy. See eg *Fricano* at *12 ("Since there is no evidence that Sheriff Truner ever penalized or enforced the terms of Corizon's contract, it would be reasonable to find that Lane County ratified Corizon's

---

[117] Ex 141, Deposition of Rettler at 6, 7.

[118] Ex141, Deposition of Rettler at 11, 12.

[119] Ex 141, Deposition of Rettler at 11.

Page 34 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

deficient practices."); *Paris,* 2017 WL 7310079 at *13 (Coos County failure to enforce contractual provisions which require higher levels of medical expertise that actually provided.)

The only authority Corizon cites is *San Bernardino Physicians Servs. Med. Grp., Inc. v. San Bernardino County*, 825 F2d 1404, 1408  (9th Cir, 1987).  That was a breach of contract claim  by a medical group against the county for terminating their contract.  It is true that not every breach of contract claim against a state is a federal 1983 claim.  Whether a contract breach can give rise to a 1983 violation depends on the type of contract; if the contract involves certain protected interests. Certain contracts, including certain property contracts are entitled to 1983 protection.  *David Hill Development, LLC v. City of Forest Grove*, 688 F Supp 2d 1193 (D Or, 2010).

Which is all beside the point.  Plaintiffs do not sue for breach of contract.  Rather, plaintiffs claim that Corizon had customs and policies to ignore the important safety protections which they had agreed to follow in their contract with Washington County and that the violation of those protections resulted in a constitutional violation of the right to adequate medical care.

Second, Corizon argues that the contractual requirements for monitoring were not a moving force.

Corizon's argument requires acceptance that there was a "low risk of harm from opiate withdrawal and that the COWS assessments were never above ' mild.'" Corizon Motion at 10.  Each of these contentions has contradictory evidence.

**D.    Remaining Claims.**

Defendant Corizon contends that plaintiffs cannot prevail on the remaining claims because they do not show an underlying constitutional violation by a Corizon employee.  Corizon motion at

Page 35 - **Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

11.

First, as discussed above, liability of an individual is not a requirement for *Monell* liability for customs and policies. *Gibson v. County of Washoe, Nev.*, 290 F3d at 1188-90; *Fricano* at \*10. Second, Corizon's position requires the court to agree that "no Individual Defendants were deliberately indifferent." Corizon Motion at 11. There is contradictory evidence. See Response to Motion for Summary Judgment - Individual Defendants.

>    **E.    Failure to Train.**

This is previously discussed.

**III    NEGLIGENCE CLAIMS BASED ON CONDUCT OF DURU, JOHNSON AND STORZ**

The conduct of each employee is discussed above.  With Johnson and Storz there is evidence of deliberate indifference.  Deliberate indifference claims require a higher standard than negligence claims.  If deliberate indifference claims are supported by the evidence then negligence claims are likewise supported. *Paris,* 2017 WL 7310079 at \*15.

With LPN Duru plaintiffs have conceded that her conduct did not rise to the level of deliberate indifference.  However there is evidence that she negligently recorded Ms. Pitkin's COWS assessment as an "8" rather than the correct "10".  Such a mistake would have significant consequences.  A score of "8" is classified as mild.  A score over a of "10" requires substantial increases in monitoring.

**CONCLUSION**

At each stage in her incarceration at the Washington County Jail Ms. Pitkin's serious medical needs were met with deliberate indifference.  Up until the very end when she was abandoned by her

**Page 36 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

physician she could have been saved by transfer to a competent acute care center.  On her journey to death she was accompanied by unbearable suffering, pain and distress.

Defendant Corizon's Motion for Summary Judgment should be denied.

DATED this 9th day of November, 2018.

TIM JONES PC

PAULSON COLETTI

    and

HALLMAN LAW OFFICE

By:  _s/ W. Eugene Hallman_____
        W. Eugene Hallman, OSB No. 741237
        Of Attorneys for Plaintiff

W. Eugene Hallman
Hallman Law Office
PO Box 308
Pendleton OR 97801
(541) 276-3857
(541) 276-7620 fax
office@hallman.pro

**Page 37 - Plaintiffs' Response to Motion for Summary Judgment (Corizon Health, Inc.)**

**Certificate of Filing & Service**

I HEREBY CERTIFY that on the 9th day of November, 2018, I filed this original **Plaintiffs'
Response to Motion for Summary Judgment by Corizon Health, Inc.** by Electronic Filing:

Trial Court Administrator
US District Court -    740 US Courthouse
1000 SW Third Avenue
Portland OR 97204-2902

I FURTHER CERTIFY that on the same date a true and correct copy of this document was
served upon the following by Electronic Service (for eFilers) or by US Mail (for those not registered
as eFilers):

Richard K. Hansen
Anne M. Talcott
Schwabe Williamson & Wyatt PC
1211 SW 5th Ave., Suite 1900
Portland, OR 97204

John M. Fitzpatrick
Katherine J. Mercer-Lawson
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver CO 80202

Kenneth P. McDuffie
Nall & Miller, LLP
235 Peachtree Street, NE
North Tower, Suite 1500
Atlanta GA 30303
        Of Attorneys for Defendants Corizon Health, Inc., Joseph McCarthy, M.D., Colin
        Storz, Leslie O'Neil, CJ Buchanan, Louisa Duru, Molly Johnson, and Courtney
        Nyman

Vicki M. Smith
Jamie T. Azevedo
Bodyfelt Mount, LLP
319 SW Washington Street, Suite 1200
Portland OR 97204
        Of Attorneys for Defendants Washington County and Pat Garrett


By:  _s/ Mary Hallman_____
        Mary Hallman
        Assistant to Mr. Hallman