# Deposition Of:
## C.J. Buchanan

August 15, 2017

Russell Pitkin and Mary Pitkin
vs.
Corizon Health, Inc.; et al.

Case No.: 3:16-cv-02235-AA



SYNERGY LEGAL
LITIGATION SUPPORT SERVICES

C.J. Buchanan

```
 1        many patients were sent out due to detox.
 2   Q.   Detox, is that something that was commonly managed within
 3        the jail?
 4   A.   Yes, sir.
 5   Q.   In your time, can you think of -- whether you personally
 6        ever sent someone out to an outside facility who was
 7        suffering from heroin withdrawal?
 8   A.   I don't recall, sir.
 9   Q.   What I want to do is make sure that I'm incorporating in
10        that question your time at Prison Health Services and
11        Corizon.
12   A.   Right.  I do not recall.
13   Q.   I have to ask the court reporter for a bit of assistance
14        here.
15            MR. JONES:  Did I mention heroin withdrawal or drug
16        withdrawal generally?
17            THE REPORTER:  One second, let me go back.  You
18        mentioned heroin withdrawal specifically.
19            MR. JONES:  Okay.
20   BY MR. JONES:
21   Q.   So my next question is:
22            Beyond heroin withdrawal, can you think of your time
23        at Prison Health Services or at Corizon where you
24        referred a patient who was suffering from any kind of
25        drug withdrawal out for hospital services?
```

C.J. Buchanan

```
 1   A.  No, sir, I can't recall any patients I've sent out for drug
 2       or alcohol withdrawal.
 3   Q.  The same question:
 4           Can you -- did you ever see anybody else send anyone
 5           out for -- who was suffering from heroin withdrawal or
 6           drug withdrawal generally speaking, heroin specifically?
 7   A.  I don't know.  I don't know.
 8   Q.  Would it be fair to say that as you sit here today, you
 9       can't think of a single instance of a co-worker sending
10       someone -- a patient out for hospital treatment for drug
11       withdrawal, specifically heroin withdrawal, in your time at
12       PHS and Corizon?
13           Would that be an accurate statement?
14   A.  It could be because -- actually, nurses on the other two
15       shifts that I didn't work on could have sent someone out.
16       I maybe wouldn't be aware of it.
17   Q.  Here's -- and here's what I don't want you to do,
18       Ms. Buchanan:
19           You don't have to guess today and you don't have to
20           speculate.  In fact, I don't want you to.  Okay?
21   A.  Yes, sir.
22   Q.  And so I'm just asking based upon your experience, did you
23       become aware of, see, or hear about any other co-worker
24       sending a patient out for hospital treatment for drug
25       withdrawal, specifically heroin withdrawal, in your time
```

C.J. Buchanan

```
 1      with PHS and Corizon?
 2   A. Not that I recall.
 3   Q. Do you recall what you would have seen in your years with
 4      Corizon what you would characterize as "severe withdrawal
 5      syndromes" present in any patient you took care of?
 6           MS. TALCOTT:  Object to the form.
 7           THE WITNESS:  Yes, I've seen people in severe
 8      withdrawal.  Not all the patients present as the same.
 9  BY MR. JONES:
10   Q. Yeah.  In those cases of severe withdrawal syndromes, was
11      it your training and your instruction through Corizon that
12      it was appropriate to treat those patients there at the
13      jail?
14   A. Yes, we did treat them at the jail.
15   Q. Have you -- in your time with Corizon, did you ever see a
16      withdrawal from drugs that you deemed to be
17      life-threatening to the patient?
18           MS. TALCOTT:  And are you talking about heroin,
19      specifically?
20           MR. JONES:  I'm talking about just drugs generally.
21           MS. TALCOTT:  Okay.  And you're including alcohol with
22      that?
23           MR. JONES:  I'll just -- I'm not -- I'm not going to
24      include alcohol in that.
25           MS. TALCOTT:  So -- I'm sorry, Tim, but opiates
```

```
 1   BY MR. JONES:
 2    Q.  In your experience and your training, Ms. Buchanan, can
 3        heroin withdrawal result in the death of a patient if not
 4        appropriately treated?
 5            MS. TALCOTT:  Object to the form.
 6            Go ahead.
 7            THE WITNESS:  I'm -- I'm not sure if it could result
 8        in the death of a patient or not.  Every -- every patient
 9        reacts to the treatment from detoxing differently.
10   BY MR. JONES:
11    Q.  Before I move on, I just want to make sure I give you every
12        answer -- or every opportunity to answer that question.
13            Is there a segment of -- of the patient population in
14            your experience that if not treated appropriately,
15            can die from heroin withdrawal?
16    A.  I don't know.  You know, if a patient could be detoxing and
17        die, I don't think I have the knowledge to say whether that
18        person died from drugs or opiate withdrawal.
19    Q.  Fair enough.  Were you ever aware of any incentive program
20        put in place through Corizon to discourage the referral of
21        patients to the emergency room locally?
22    A.  No, sir, I wasn't aware of any such program.
23    Q.  I'm -- we have some exhibits from previous depositions, one
24        of which is Exhibit 3 on page Bates stamp 1307, and there
25        is an offer of employment to Colin Storz of March 14, 2014.
```

C.J. Buchanan

1  Q.  Well, what I'm trying to get at, Ms. Buchanan, is do you
2      have an independent recollection of her as you sit here
3      today?
4  A.  What do you mean by "independent recollection"?
5  Q.  Well, my earlier question was, "Do you remember her?"
6          I know you take care of a lot of people and so I guess
7      somebody might say, "No, I don't really remember them."  Or
8      somebody might say, "Yes, I do."
9          And I'm trying to figure out whether -- as you sit
10     here today whether you specifically remember Ms. Pitkin.
11 A.  I feel like I remember her.
12 Q.  So tell me about your interaction with Ms. Pitkin on the
13     23rd.
14 A.  Okay.
15 Q.  And if you're referring to a specific page in Exhibit 10,
16     would you tell me what that is?
17 A.  Okay.  Give me a minute to just glance through here,
18     please.
19 Q.  Certainly.
20         MS. TALCOTT:  Do you need him to repeat the question?
21         THE WITNESS:  Yeah.
22         Could you repeat the question, Mr. Jones?
23         MR. JONES:  I'll have the court reporter read it back.
24                  (Reporter read back.)
25         THE WITNESS:  Okay.  On April 23, 2014, I received a

**C.J. Buchanan**

```
 1        call from Pod 2 wanting to send Ms. Pitkin down to see me.
 2   And the reason I say "see me" is I was working in the
 3   capacity of what they called a MRF nurse.
 4        I was holding a clinic and seeing people that had
 5   medical complaints, so Ms. Pitkin came down during the
 6   morning part of the day about -- I mean, before 12 noon and
 7   -- in a wheelchair.
 8        And it was a -- kind of a -- it was a little
 9   interruption of the clinic because male patients are down
10   there at that time so we had to kind of move all of them
11   out to the lobby and -- so I could see Ms. Pitkin.
12        So I -- I took her into the clinic room in her
13   wheelchair and took a history and attempted to take her
14   blood pressure and it was low, her blood pressure was.
15        So because it was low -- I could hear the doctor in a
16   couple of rooms down the hall so I went and got
17      Dr. McCarthy and I -- the director of nurses happened to be
18   in there too, Leslie Fitzgerald, and I said, "I have a
19   patient that her blood pressure is hard to hear. Would you
20   please come and see her?"
21        So they followed me back to the exam room and
22      attempted to take -- or took Ms. Pitkin's blood pressure.
23   BY MR. JONES:
24   Q. What reading did you get to regarding her blood pressure?
25   A. I -- I don't remember, sir.
```

C.J. Buchanan

1   Q.  Did you document it, the blood pressure that you obtained?
2   A.  You mean, an actual number?
3   Q.  Yes.
4   A.  No, sir.
5   Q.  You're required to do that, aren't you?
6   A.  Yes, sir.
7   Q.  Why did you not record the blood pressure?
8   A.  I don't know why.
9   Q.  Was it 40 over unavailable?
10          MS. TALCOTT:  Object to the form.
11          THE WITNESS:  I don't know, sir.
12  BY MR. JONES:
13  Q.  Can you tell me whether it was more or less than 40 over
14      unavailable?
15          MS. TALCOTT:  Object to the form.
16          THE WITNESS:  Can I tell you -- would you repeat that,
17   please?
18          MR. JONES:  Yeah.
19  BY MR. JONES:
20  Q.  Can you tell me whether it was more or less than 40 over
21      unavailable?
22          MS. TALCOTT:  Object to the form.
23          THE WITNESS:  I don't know, sir.
24  BY MR. JONES:
25  Q.  If that was recorded on a COWS assessment that same

**C.J. Buchanan**

```
 1          you referenced?
 2     A.   I believe I called her Fitzgerald.
 3     Q.   And she was the director of nursing?
 4     A.   Yes.
 5     Q.   And when they came into the room, did they make attempts to
 6          record a blood pressure?
 7               MS. TALCOTT:  Object to the form.
 8               Go ahead.
 9               THE WITNESS:  They took blood pressures, each of them.
10     BY MR. JONES:
11     Q.   In your review of the chart, did you note what they
12          recorded, either Ms. Fitzgerald, the director of nursing,
13          or Dr. McCarthy?
14     A.   I don't know what results they obtained.
15     Q.   And did you see those anywhere in the chart when you
16          reviewed the chart?
17     A.   No, sir.
18     Q.   Did you see the blood pressure being recorded from -- by
19          Mr. Wertz?
20     A.   Only the 40 over UA on the COWS check.
21     Q.   And was that -- is that Mr. Wertz's signature at the bottom
22          of page 1934 of Exhibit 10?
23               MS. TALCOTT:  If you know.
24               THE WITNESS:  It appears to be his signature.
25     BY MR. JONES:
```

C.J. Buchanan

```
 1    Q.  Okay.  Other than Ms. Fitzgerald, Dr. McCarthy, Mr. Wertz,
 2        and yourself, did anybody else on the 23rd attempt to
 3        record a blood pressure?
 4    A.  Attempt to take a blood pressure on Ms. Pitkin?
 5    Q.  Yes.
 6    A.  Not that I know of.
 7    Q.  Did -- did you -- was your attempt done manually?
 8    A.  I attempted to take her blood pressure manually and with an
 9        electronic cuff also.
10    Q.  With a machine?
11    A.  Yes, a machine.
12    Q.  And you couldn't get -- you couldn't get a blood pressure
13        either time?
14            MS. TALCOTT:  Object to the form.
15            MR. JONES:  Well, yeah, that's a good objection.  I
16        agree with that.
17    BY MR. JONES:
18    Q.  Did -- did you get a -- did you get a recording with the
19        machine?
20    A.  I -- I don't remember what I got with the machine.
21    Q.  So did you -- you tried both ways then, one manually and
22        one with a machine?
23    A.  Correct.
24    Q.  How many times did you try to get one?
25    A.  I don't remember how many times I tried.
```

C.J. Buchanan

1  Q.  Was it more than two?
2  A.  Possibly.
3  Q.  Can you give me an estimate of how much time you spent
4      trying to get a blood pressure?
5  A.  I -- I can't give you a time in minutes.  I -- I know I
6      tried using both instruments and then I just went and got
7      Dr. McCarthy.
8  Q.  The trouble that you had was it was so faint, is that why
9      you were having a difficult time obtaining a blood
10     pressure?
11 A.  I -- I don't know why I couldn't get it.  I didn't know if
12     I just couldn't hear it or -- you know, or what.  Or maybe
13     -- you know, maybe the electronic machine was in error.
14 Q.  Do you know what kind of machine was in place that you
15     used?
16 A.  No, I don't recall the name of the machine.
17 Q.  Did you recall that in your attempts to get the blood
18     pressure you determined it was, "Very low, it was very hard
19     to hear"?
20          Is that -- is that what you experienced in attempting
21     to obtain a blood pressure from Ms. Pitkin on the 23rd?
22          MS. TALCOTT:  Object to the form.
23          Go ahead.  You can answer.
24          THE WITNESS:  Ms. Pitkin's -- I don't remember the
25     number, I remember thinking it was low.  Ms. Pitkin was a

**C.J. Buchanan**

```
 1    Q.  Your note was 11:00, is that -- is that what your note
 2        says?
 3    A.  Yes, sir, but that could have been when I wrote it.  I
 4        could have already seen her.
 5    Q.  Oh, so you could have seen her earlier, like at 10:00?
 6    A.  Yes, sir, or 10:30, yeah.
 7    Q.  But 9:00 is when Mr. Wertz would have given you the call?
 8    A.  Yes, sir, I think so.
 9    Q.  Was there any discussion about her inability to keep food
10        down?
11            MS. TALCOTT:  Are you asking about the discussion
12        between Ms. Buchanan and --
13            MR. JONES:  Yeah.
14            MS. TALCOTT: -- Ms. Pitkin?
15   BY MR. JONES:
16    Q.  Between you and Ms. Pitkin, was there any discussion of her
17        inability to keep food down?
18    A.  I don't recall but like I told you, I gave her ice.  I
19        wanted to see if she was sick -- or couldn't keep something
20        down.
21    Q.  Did you have IVs available to you at the jail?
22    A.  I have seen IV fluids in the past.
23    Q.  Did you, as a part of your work there at the jail, ever use
24        IVs?
25    A.  Yes.
```

C.J. Buchanan

1  Q.  How often would you use those?
2  A.  Not -- not very often.
3  Q.  Would it be rare?
4  A.  Very rare.
5  Q.  A few times a year?
6  A.  I believe that's an accurate accounting.
7  Q.  And under what circumstances would you typically use IVs a
8      few times a year?
9  A.  As best as I can recall, IVs that we occasionally used were
10     on inmates that were discharged to the jail from the
11     hospital.
12         So they were in place in the hospital and they were
13     probably receiving IV antibiotics maybe for two or three
14     more days so they had to leave the IV in place.
15 Q.  Other than a hospital initiating an IV, can you ever recall
16     initiating one yourself there at the Washington County
17     Jail?
18 A.  No, sir.
19 Q.  Okay.  Ever see anybody else at the jail -- any other
20     health care professional administer an IV at the jail
21     during your time there?
22 A.  I have seen IVs going, but I don't know if these were
23     hospital returnees or not but -- very seldom.
24 Q.  It would be fair to say then you've never as a nurse while
25     working at the Washington County Jail administered an IV to

```
 1        treat someone for dehydration brought on by detoxification
 2        of heroin.
 3              Is that a correct statement?
 4   A.   I don't know.  I just -- I don't remember such a case.
 5   Q.   Withdrawal from any drug, have you ever administered an IV
 6        at the Washington County Jail to treat dehydration brought
 7        on by drug withdrawal while working at the Washington
 8        County Jail?
 9   A.   I don't believe so, sir.
10   Q.   So you've testified that you recall this meeting that you
11        had with Ms. Pitkin that could have happened at 10:00 or
12        10:30 or maybe 11:00 on the 24th -- or 23rd -- excuse me --
13        of 2014.
14              Was there any discussion about her inability to keep
15        food, liquids, and medicine down in the previous six days
16        that you can recall?
17   A.   Not that I can recall, sir.
18   Q.   When you hear a report like that, what is the significance
19        of it?
20             MS. TALCOTT:  Object to the form.
21             THE WITNESS:  Could you clarify that?
22   BY MR. JONES:
23   Q.   What is the significance of someone telling you that they
24        can't keep their food, their liquid, or their medicine down
25        over a period of six days and they're feeling near death?
```

C.J. Buchanan

```
 1    A.   Maybe -- maybe a little more than that, but not -- not
 2         many.  It wasn't a routine procedure to give shots.
 3    Q.   Is there any other way -- if someone is suffering from
 4         diarrhea and vomiting and can't keep their medication down,
 5         other than continuing to give them oral medications or
 6         administering them IM, is there any other way that you
 7         would deliver the drugs into their system?
 8    A.   Are you asking me is there any other way besides IM
 9         injections or pills by mouth?
10    Q.   Yes.
11             MS. TALCOTT:  And you mean for the drugs that they
12         give detoxing patients?
13             MR. JONES:  Yes.
14             THE WITNESS:  Well, there's -- there's IV, of course,
15         that's the only one left.  But I -- I don't know if even
16         these drugs are in that form, you know, to be placed in an
17         IV bag.
18    BY MR. JONES:
19    Q.   You certainly have never administered or seen administered
20         these drugs to treat people who are suffering from
21         detoxification IV is that -- by IV solution --
22    A.   That is correct.
23    Q.   -- is that correct?
24    A.   That's correct.
25    Q.   Let's move back one page to 1946.
```

C.J. Buchanan

```
 1   Q.   What does that signify to you based on your training and
 2        background?
 3   A.   People that have acute vomiting, then they -- they vomit up
 4        their fluids and electrolytes.  The -- I don't know how to
 5        put it.
 6             Anyway, they vomit up so much fluid their body gets
 7        out of kilter.
 8   Q.   What is the impact of an electrolyte imbalance on the
 9        heart?
10             MS. TALCOTT:  Object to the form.
11             THE WITNESS:  I'm not really sure.
12   BY MR. JONES:
13   Q.   Can it stop the heart from beating?
14             MS. TALCOTT:  Object to the form.
15             THE WITNESS:     I don't know, sir.
16   BY MR. JONES:
17   Q.   And the way one develops electrolyte imbalance -- at least
18        one way based upon your background and training is by
19        constantly vomiting?
20             That is capable anyway in your -- in your mind of
21        producing an electrolyte imbalance within the body of
22        someone?
23             MS. TALCOTT:  Object to the form.
24        THE WITNESS:  I didn't catch the last phrase you --
25        you said.
```

C.J. Buchanan

```
 1   BY MR. JONES:
 2   Q.  Based on your training and background, vomiting -- constant
 3       vomiting can potentially cause an electrolyte imbalance
 4       within one's body.  Would that be an accurate statement?
 5           MS. TALCOTT:  Object to the form.
 6           THE WITNESS:  I think that would depend on the
 7       patient.
 8   BY MR. JONES:
 9   Q.  But can it?
10           MS. TALCOTT:  Same objection.
11   BY MR. JONES:
12   Q.  Cause an electrolyte imbalance in a person's body?
13           MS. TALCOTT:  Same objection.
14           THE WITNESS:  Well, I suppose it could but it -- it
15       still would depend on the patient.
16   BY MR. JONES:
17   Q.  And I want to make sure I understand.
18           Do you know based upon your training and background,
19       whether an electrolyte imbalance has any impact upon the
20       function of the heart?
21           MS. TALCOTT:  Object to the form.
22           THE WITNESS:  I don't know.
23   BY MR. JONES:
24   Q.  Did you ever develop a concern regarding Ms. Pitkin that
25       she may have been suffering from an electrolyte imbalance
```

```
                         C E R T I F I C A T E
 1
 2   STATE OF WASHINGTON   )
                           ) ss.
 3   COUNTY OF SPOKANE     )

 4

 5        This is to certify that I, Leigh Delmond, Certified
 6   Court Reporter in and for the State of Washington, residing in
 7   Pullman, reported the within and foregoing deposition; said
 8   deposition being taken before me on the date herein set forth;
 9   that pursuant to RCW 5.28.010 the witness was first by me duly
10   sworn; that said examination was taken by me in shorthand and
11   thereafter under my supervision transcribed, and that same is a
12   full, true, and correct record of the testimony of said witness,
13   including all questions, answers, and objections, if any, of
14   counsel.
15        I further certify that I am not a relative or employee
16   or attorney or counsel of any of the parties, nor am I
17   financially interested in the outcome of the cause.
18        IN WITNESS WHEREOF I have set my hand this 29th
19   day of August, 2017.
```

_Leigh Delmond_
LEIGH DELMOND, CCR
CCR NO. 3332

[Notary Public seal: LEIGH DELMOND, NOTARY PUBLIC, STATE OF IDAHO]