# Deposition Of:
## Colin Storz, PA

April 26, 2017

Russell Pitkin and Mary Pitkin
vs.
Corizon Health, Inc.; et al.

Case No.: 3:16-cv-02235-AA



S Y N E R G Y

L E G A L

LITIGATION SUPPORT SERVICES

Colin Storz, PA

```
 1   for Ms. Pitkin.
 2       Q.   Is that, traditionally, part of the chart?
 3       A.   Typically, yes.
 4       Q.   In flipping through the chart, do you see it
 5   located in the chart anywhere?  Do you see it at the
 6   end, there, perhaps?
 7       A.   It looks -- that looks like it.  It's cut
 8   off, but.
 9       Q.   How is that to be used?
10       A.   This --
11       Q.   Yes.
12       A.   So the medications are -- well, the point of
13   a MAR is to show what orders have been placed in a
14   patient's chart, so that a nurse passing medications
15   can know which medication and which dose to provide to
16   the patient at what time.
17       Q.   Can you tell me about your education,
18   training and experience?
19       A.   I'm a physician assistant.  I was trained
20   at -- for my Master's degree, at a place called South
21   College, in Tennessee, Knoxville.  My undergrad is in
22   sociology, through the University of Oregon.  And I'm
23   a physician assistant.  I'm licensed to practice
24   medicine in the state of Oregon.
25       Q.   All right.  And what is a physician
```

Colin Storz, PA

1  **assistant?**

2      A.   It's someone who, under the purview of a

3  doctor's license, can practice.  What that means, I

4  guess, in brief, is that I can prescribe medications,

5  diagnosis, treat illnesses, order labs, perform

6  certain procedures.

7      **Q.   And what does it mean to be under the purview**

8  **of a doctor's license?**

9      A.   A physician assistant is a unique form of

10 medical licensure to practice medicine, whereby I have

11 to -- in order to practice medicine, I have to be

12 under the license of a practicing physician.

13     **Q.   And what does that mean, "to be under the**

14 **license"?**

15     A.   There's a specific physician and physician

16 assistant practice agreement that's submitted to the

17 board, that you can enter into, willingly, with a

18 physician, and then they are, sort of, over you, to

19 provide some oversight, while you practice medicine.

20     **Q.   And how does that -- how is that licensure**

21 **terminated?  Under which circumstances would you no**

22 **longer be under a doctor's license to practice**

23 **medicine?**

24     A.   Well, if the two parties, there, in the

25 practice agreement decide to cancel it.  Typically, if

Colin Storz, PA

1    someone moves on to a different job, or leaves the
2    job, or if, I guess, one person no longer practiced
3    medicine.
4        Q.   So if the physician's position at the job is
5    terminated, you are no longer under his license;
6    correct?
7        A.   That is correct.
8        Q.   If a physician is transferred from the job
9    site, no longer working there, you are no longer under
10   their license; correct?
11       A.   That's not necessarily true.  So if a
12   physician works at the site, but also works at other
13   sites, it's still possible for them to satisfy the
14   practice agreement, and I can still practice medicine.
15   There's a lot of specifics to it.
16       Q.   Sure.  But in terms of the licensure
17   agreement, isn't it accurate that the State of Oregon
18   wants you to be able to be specifically supervised by
19   that physician, while operating under their license?
20       A.   Correct.
21       Q.   If they are no longer working at a job site
22   and have no intention of returning to that job site,
23   isn't it accurate that you are no longer working under
24   their licensure?
25       A.   That is correct.

Colin Storz, PA

1      Q.   And it's illegal to do so; correct?

2      A.   Correct.

3      Q.   Who was your -- who was the physician that

4  you were licensed under, on April 24th, 2014?

5      A.   No one -- or -- 24th -- so that was --

6      Q.   The date that Ms. Pitkin died.

7      A.   That was no one.

8      Q.   Were you working at the facility that day?

9      A.   I was.

10      Q.   And you were working without a licensed

11  physician; correct?

12      A.   Well, so, in terms of working, I mean, I was

13  still a contracted employee, so I showed up to my

14  place of employment, but I wasn't able to practice

15  medicine.

16      Q.   Did you notify anyone -- first of all, how

17  were you notified that the physician under whose

18  -- whom -- if I can speak today -- the physician,

19  under whom's license you were practicing, was no

20  longer at the facility?

21      A.   On the evening -- it was that Wednesday

22  evening.  So that was the 23rd?

23      Q.   23rd.

24      A.   I was called, at home, that night, and I was

25  informed of the doctor's termination of employment.

Colin Storz, PA

1       Q.   What were you told about the termination?

2       A.   Not much.  I was told that he

3    wasn't -- Dr. McCarthy was laid off, fired.  I don't

4    know.  And then he -- just, sort of, as a, "Here, this

5    is the information for you."

6       Q.   And were you aware of any problems with

7    Dr. McCarthy, beforehand?

8       A.   No, not really.  I mean, you have to

9    understand, I was only working there for a month.

10      Q.   Sure.  We'll get into that.  But in terms

11   of -- was it a surprise to you that you got a phone

12   call that Dr. McCarthy had been fired?

13      A.   Yeah, I would say so.

14      Q.   Did you have any conversations with

15   Dr. McCarthy about operating under his license, or was

16   that arranged through Corizon?

17      A.   I had a conversation with him.

18      Q.   Tell me about that.

19      A.   So when a practice agreement is made, I sat

20   down with him, and we -- it's an online form, and you

21   just fill it out, and there's some checkboxes about,

22   you know, how many charts he'll review per month, what

23   procedures he's comfortable with me doing, that kind

24   of thing.  So in that sense, I discussed how I would

25   be practicing at the jail, under his -- having a

Colin Storz, PA

1  practice agreement with him.

2      Q.   Can you tell me, generally, about that

3  practice agreement?

4      A.   Yeah.  So, in really general terms, I guess

5  what it means is that I'm able to do what they hired

6  me to do.  Which is to say, I can see a patient, I can

7  diagnosis an illness, I can treat that illness.

8      Q.   What are the limitations of your treatment?

9      A.   Well, there are certain procedures that I'm

10 either allowed to or not allowed to do, based on the

11 practice agreement.  So, like, there's some oddball

12 stuff, like, ultrasound joint therapy, for example,

13 could be one of the things listed in the practice

14 agreement.  I don't believe I had been checked off to

15 be able do that.  I can't remember a whole list of

16 everything, but that's, kind of, to give you an idea.

17 There's so many different procedures that can be done.

18 And some of them, if Dr. McCarthy isn't comfortable

19 with me doing them -- or at that site, he would be,

20 like, "No, you shouldn't be doing that here."

21     Q.   As I understand it, there was no infirmary at

22 Washington County jail.

23     A.   Define "infirmary."

24     Q.   Is it a term you are familiar with, as it

25 relates to your job at Corizon, a jail with an

Colin Storz, PA

1  **infirmary, as opposed to one without an infirmary?**

2      A.   It did not have what would typically be

3  considered an infirmary.

4      **Q.   So describe the difference between an**

5  **infirmary and what was present at Washington County.**

6      A.   Well, I guess, an infirmary would be a place

7  where there are a series of hospital beds, monitoring

8  devices, certain level of staffing per patient, I

9  suppose.  And the jail has -- we have what's called

10  the Medical Observation Unit, or MOU.  And it's an

11  area of the jail where people are observed every

12  15 minutes, by a rounding deputy.  But that, you know

13  -- that's the extent of it, I suppose.

14      **Q.   And do we know if the rounding deputy has any**

15  **medical training?**

16      A.   Not necessarily.

17      **Q.   And I take it, the rounding deputy would do**

18  **nothing more than walk by and look through a window?**

19      A.   I don't know if that's true.  I think that,

20  oftentimes, a deputy will ensure the patient is -- the

21  person/inmate/patient -- however you want to say

22  it -- is breathing, or cogent, or not hurting

23  themselves, or, you know, nothing glaringly wrong with

24  them.

25      **Q.   Let's talk about that.  There's a requirement**

Colin Storz, PA

```
 1      Q.   When we speak to the deputies, they are going
 2   to be telling us, to your knowledge, that they look at
 3   the patient patients in the MOU every 15 minutes?
 4      A.   Yes.
 5      Q.   How are they going to describe they do that,
 6   do you think?
 7           MR. HANSEN:  I going to object.  How can he
 8   know what they are going to say --
 9           MR. COLETTI:  Are you objecting to form,
10   Dick?
11           MR. HANSEN:  I am, generally, objecting to
12   the form, yes.
13   BY MR. COLETTI:
14      Q.   Based on your understanding of how things
15   work, how do they do it?  What do they do to check on
16   your patients?
17      A.   Well, my understanding is that they will look
18   at the patient, or inmate, and establish, like I said
19   before, if there's something glaringly wrong with
20   them, oftentimes, make sure that they are breathing or
21   awake, not engaging in self harm.
22      Q.   When you say, "look at the patient," will
23   they actually go -- as I understand, the MOUs, they
24   are still cells; correct?
25      A.   Correct.
```

Colin Storz, PA

 1    licensed on the 24th, because your doctor wasn't

 2    working there anymore; correct?

 3        A.    Correct.

 4        Q.    You were the person that rendered care to her

 5    while she was on the floor and you rendered CPR, did

 6    you not?

 7        A.    I did.

 8        Q.    You were the person that was closest to being

 9    licensed at Corizon, on the date of her death;

10    correct?

11        A.    Closest to being licensed --

12        Q.    Meaning, there was no licensed physician for

13    you to work under; correct?

14        A.    Correct.

15        Q.    And you, likely, had the most authority, as a

16    medical personnel, in terms of treatment and care, at

17    the facility, on the date of her death; correct?

18        A.    Not without an active license.

19        Q.    Could you do anything?

20        A.    Well, so I am BLS trained, which is basic

21    life support.  So that's, like, a certification you

22    get, on the weekend, at Red Cross.  You know, I can

23    administer BLS algorithm, CPR, that kind of thing.

24        Q.    Sure.  In the infirmary -- I guess you don't

25    have an infirmary -- in the Medical Observation Unit,

Colin Storz, PA

1   what type of monitoring devices did you have, back in

2   April of 2014?

3       A.   "Monitoring devices," you mean equipment?

4       Q.   Yes.

5       A.   Well, we have -- we are able to take blood

6   pressure, pulse, standard set of vitals.

7       Q.   Were you able to administer IVs?

8       A.   Yes.

9       Q.   Where were the IV bags kept?

10      A.   I don't recall, exactly, at the time.

11      Q.   But you did have access to IVs, in April of

12  2014; correct?

13      A.   Yes.

14      Q.   And you could have administered an IV, had

15  someone made -- either you or Dr. McCarthy, before his

16  departure, made the decision that an IV was necessary

17  for Ms. Pitkin, that could have been ordered; correct?

18      A.   If it was deemed necessary to give an IV,

19  then, yes, one could be administered.

20      Q.   How about intermuscular injections?

21      A.   Yes.

22      Q.   How about rectal administration of

23  medication?

24      A.   Yes.

25      Q.   What did you do, on April 23rd, after finding

Colin Storz, PA

1   **out that you could no longer do your job as a**

2   **physician assistant, until there was a licensed**

3   **physician back?**

4   A.   Well, I don't normally work on Wednesdays, so

5   I actually wasn't at work the day that he was fired or

6   let go.  So I was called late that evening, and I

7   explained to my manager, at the time, that I couldn't

8   practice, but that I'm still coming to work, because I

9   was scheduled.  I mean, if I don't come to work, I get

10  an absence.  So I came to work.

11      **Q.   What were you planning on doing at work, just**

12  **basic life support?**

13      A.   Well, I mean, ironically, I told myself, "At

14  least I'm there in case an emergency happens."

15      **Q.   It is ironic.**

16           **What days did you normally work?**

17      A.   Monday, Tuesday, Thursday, Friday.

18      **Q.   Did you have any discussion with**

19  **Dr. McCarthy, on the 23rd of April, that Wednesday?**

20      A.   No.

21      **Q.   So you had no idea what was happening with**

22  **Ms. Pitkin?**

23      A.   Other than that she could be an opiate

24  withdrawal, no.

25      **Q.   But you didn't -- when you say -- did you**

Colin Storz, PA

```
 1   discuss her treatment, at all, or was that just

 2   because you dealt with her on the 18th?

 3       A.   With Dr. McCarthy?

 4       Q.   Yes.

 5       A.   No.  It was simply because I signed an order

 6   on her.

 7       Q.   That was on the 18th; correct?

 8       A.   I want to say, yes.

 9       Q.   Page 16 of your chart.

10       A.   The 18th, yes.

11       Q.   Did you, at any time, examine Ms. Pitkin?

12       A.   No.

13       Q.   Did you, at any time, take her vitals?A.

14   No.

15       Q.   Did you issue any orders, in terms of how

16   frequently her vitals should be taken?

17       A.   No.

18       Q.   Is there a spot for you to request vitals be

19   taken on a consistent basis or regular basis?

20       A.   Yes, there is.

21       Q.   Where is that?  Are we looking at

22   Exhibit 16 --

23            MR. HANSEN:  Page 16, Exhibit 1.

24   BY MR. COLETTI:

25       Q.   Excuse me.  Page 16, Exhibit 1.
```

Colin Storz, PA

1    A.   There was a vitals q shift, times 7 days, but

2   by the same person is placed on COWS protocol, so

3   there is inherent vitals being taken with that.

4        **Q.   Wait a minute.  So where are the vitals q**

5   **shift, by seven days?**

6        A.   So if you take a look at -- well, it's No. 7,

7   on this page 16.

8        **Q.   Is that the section that's not completed, at**

9   **all?**

10       A.   That is the section that is -- no checked

11   boxes, no.

12        **Q.   Is that a -- in looking at page 16 of**

13   **Exhibit 1, is this a completed chart, in your opinion?**

14       A.   Well, I mean, I think that it shows what

15   monitoring they want, in terms of they want the COWS

16   protocol.

17        **Q.   Let's talk items 1 through 12.  Are any of**

18   **those completed?**

19       A.   No.

20        **Q.   Are those required to be completed?**

21       A.   I would assume, yes.

22        **Q.   Under 7, "vitals," who's responsible for**

23   **determining how frequently vitals are conducted?**

24       A.   Well, technically, I suppose it's up to the

25   protocol, or whoever signs off on the protocol.

Colin Storz, PA

1        Q.   Did you sign off on the protocol?

2        A.   Yes.

3        Q.   Without seeing the patient; correct?

4        A.   Correct.

5        Q.   Outside -- have you ever practiced outside of

6   a prison setting?

7        A.   Yes.

8        Q.   Are you required to perform a history,

9   yourself, before prescribing medication?

10       A.   Typically, yeah.

11       Q.   Are you required to perform a physical,

12   yourself, before prescribing medication?

13       A.   Depends on, you know, case by case, you know,

14   but sometimes can you prescribe based on history

15   alone.

16       Q.   But you at least have to take the history

17   from the patient; right?

18       A.   You typically would, yes.

19       Q.   Is it a violation of the standard of care if

20   you don't?

21       A.   I don't know that.

22       Q.   You don't know if you are committing

23   malpractice if you prescribe medication without seeing

24   or talking to a patient?

25            MR. HANSEN:   Object to form.

Colin Storz, PA

```
 1              MR. COLETTI:  Go ahead.
 2     THE WITNESS:  I would say it's standard practice
 3     to see a patient and listen to history, before
 4     you prescribe a treatment plan.
 5     BY MR. COLETTI:
 6         Q.   And that's standard care; correct?
 7         A.   Sure, yes.
 8         Q.   And violation of standard care is
 9     malpractice; correct?
10         A.   I suppose.
11         Q.   Do you have any understanding why, in a
12     prison setting, you are able to do that, but you can't
13     do it outside of prison?
14         A.   Well, if I had to guess --
15              MR. HANSEN:  We're not guessing here.
16              THE WITNESS:  I'm not guessing.
17     BY MR. COLETTI:
18         Q.   Did it ever -- did you have any objection to
19     doing something you knew that, if you did in the
20     public sector, would be malpractice?
21         A.   Well, no.  That seemed to be the way they did
22     things.
23         Q.   So it was okay with you?
24         A.   Yes.
25         Q.   Did you ever ask to be able to examine a
```

Colin Storz, PA

```
 1    patient or, at least, obtain a history, prior to
 2    prescribing medication?
 3        A.    Did I -- in this case?
 4        Q.    At any time in the Corizon setting, did you
 5    ask to actually, physically, speak to a patient or
 6    examine a patient before prescribing medication?
 7        A.    Yes.
 8        Q.    Why did you do that?
 9        A.    To get an accurate history and determine what
10    needed to be treated.
11        Q.    Did you think it was important?
12        A.    Yes.
13        Q.    Did you think it was in the patient's best
14    interest?
15        A.    Yes.
16        Q.    So you wanted to be thorough and accurate;
17    correct?
18        A.    Correct.
19        Q.    Because you realized if you weren't, it could
20    be dangerous; correct?
21        A.    Correct.
22        Q.    If we were to -- to your
23    knowledge -- actually, let's go back.
24            You mentioned that with a COWS protocol,
25    there's going to be -- did you say, a routine
```

Colin Storz, PA

```
 1        Q.   What does 40-over-U.A. mean to you?

 2        A.   Are you referring to a specific part in here?

 3        Q.   Well, you were looking at the 23rd, where

 4   they attempted to take vital signs.  Are you looking

 5   at the actual --

 6             MR. HANSEN:  I think he's looking at page 17.

 7             THE WITNESS:  Let me read this.

 8   BY MR. COLETTI:

 9        Q.   I can direct you to page 13, as well.

10        A.   Okay.  Apparently, the systolic was

11   40-over-unable, I would assume that's what the UA

12   means.

13        Q.   Is that good or bad?

14        A.   That would be bad.

15        Q.   That would be a medical emergency, wouldn't

16   it?

17        A.   Yes.

18        Q.   Medical emergency necessitating immediate

19   treatment; correct?

20        A.   Yes.

21        Q.   And not just ice cubes and Gatorade; correct?

22        A.   I would think it would need a more proactive

23   intervention.

24        Q.   Like an emergency room; correct?

25        A.   It's possible.
```

Colin Storz, PA

```
 1          Q.   Well, don't you think that would be the
 2     safest thing to do with a patient that you are unable
 3     to obtain a blood pressure from, to take them to an
 4     emergency room?
 5          A.   That's one avenue you could take.
 6          Q.   Wouldn't that be the preferable avenue?
 7          A.   Yes.
 8          Q.   You wouldn't stick them in the cell and not
 9     check their vitals again for 24 hours, would you?
10          A.   I would not do that.
11          Q.   Because you are potentially risking a
12     patient's life; correct?
13          A.   Could be.
14          Q.   What is the purpose of the medication given
15     in the withdrawal protocol?
16          A.   To help with their symptoms during
17     withdrawal.
18          Q.   So you can't treat withdrawal, you can just
19     treat the symptoms; correct?
20          A.   Well, sure.  Okay.  Yes.
21          Q.   Meaning, there's no pill that's going to fix
22     withdrawal.  It's just something their body has to go
23     through, but in doing so, they vomit --
24          A.   Correct.
25          Q.   -- they have diarrhea?
```

Colin Storz, PA

1    morning.

2        Q.   Given a history reflected in Exhibit 12 (sic)

3    that the patient has provided, I think you already

4    told me that patient needs to go to an emergency room;

5    correct?

6            MR. HANSEN:   Point of clarification, you

7    said, "Exhibit 12" you are talking about page 12, in

8    Exhibit 1.

9    BY MR. COLETTI:

10       Q.   Page 12, Exhibit 1.

11       A.   One more time.  You are saying --

12       Q.   I believe you've already testified that

13   patient needs to go to an emergency room.

14       A.   Based on the blood pressure alone?

15       Q.   Well, blood pressure and history.

16       A.   I'd say that would be one of the avenues of

17   care you can proceed down.

18       Q.   I believe you said the most preferable;

19   correct?

20       A.   Yes.

21       Q.   If we're creating a, quote/unquote, culture

22   of safety, then patient safety comes first; correct?

23       A.   I would think that someone with a blood

24   pressure of systolic 40-over-unable-to-find, would be

25   someone sent to the emergency room, yes.

Colin Storz, PA

1      Q.   Particularly, the history of vomiting and
2  claiming to be near death themselves?
3      A.   I would think so.
4      Q.   Kind of a no-brainer, isn't it?
5      A.   I would think it's a pretty slam dunk, you
6  know.
7      Q.   Sure.  If that came up on a PA's test, you'd
8  probably nail it every time, wouldn't you?
9      A.   Sure, yeah.
10     Q.   You came on shift on the 24th -- excuse
11 me -- yeah -- the 24th, what time?
12     A.   I think -- well, barring any unforeseen thing
13 I'm not remembering about getting in traffic or
14 something, I would usually show up around
15 8:00 o'clock.
16     Q.   And when you got to work, I take it nobody
17 told you that they were holding on to a patient with
18 this kind of history, in a cell?
19     A.   No, I was not told that.
20     Q.   Nobody told you that they had only
21 given -- continued to try to give the patient oral
22 meds, when they clearly weren't working, already;
23 correct?
24     A.   I was not aware of that.
25     Q.   That was something you would want to know

Colin Storz, PA

1      A.   I don't remember anyone, specifically,

2  saying, like, that.  I think that there was a general

3  feeling of, "This was a tragedy.  This was really bad.

4  We need to make sure this doesn't happen again."  But

5  I don't know that that was -- yeah, I mean, that was,

6  really, kind of, the general feeling I got from the

7  upper management.

8      Q.   "Really bad," meaning really poor medical

9  care?

10     A.   I don't know.  It's hard for me to get inside

11 their head on that.  I think that, you know, if I'm

12 looking at a situation, where I don't really know a

13 lot of what's going on with the chart; I don't really

14 know a lot about this patient, leading up to this

15 event; I'm at work the next day; I perform CPR on this

16 person; there's a meeting; some people get fired;

17 people are trying to ask, "What's going on?"  I don't

18 know what's going on.  I think it's -- for me, my

19 assumption, if you are asking that --

20         MR. HANSEN:  No assumptions.

21 BY MR. COLETTI:

22     Q.   Well, what did you believe?  I mean, you were

23 the person whose medical care she was under, from the

24 18th, the 19th, the 20th, the 21st, the 22nd, into the

25 23rd, while she was decompensating, the way we've just

Colin Storz, PA

1   discussed; right?  And nobody told you anything about
2   it; correct?
3       A.   Correct.
4       Q.   Were you angry?
5       A.   Once I found out more details about what
6   happened, yes, I was frustrated.
7       Q.   And frustrated because it was preventible;
8   correct?
9       A.   Based on my knowledge, yes, it could have
10  been prevented.
11      Q.   Sure.  An IV could have prevented it;
12  correct?
13      A.   It's un -- I don't know that I could say, for
14  certain, that's all or a definitive treatment for it
15  or not, you know.
16      Q.   Certainly a good start; correct?
17      A.   It definitely would have been one of the
18  things I would have considered, yes.
19      Q.   Sure.  And once you were able to stabilize
20  her hydration, you could work on nutrition -- you
21  also -- you could give her nutrition through the IV;
22  correct?
23      A.   You can, yes.
24      Q.   So there were a number of ways you could have
25  provided nutrition and hydration, without dealing with

This document (March 14, 2014, Corizon employment offer to Colin Storz) is filed under seal as an attachment to the Supplemental Declaration of John Coletti.



CONFIDENTIAL

CORIZON001307

This document (March 14, 2014, Corizon employment offer to Colin Storz) is filed under seal as an attachment to the Supplemental Declaration of John Coletti.



CONFIDENTIAL

CORIZON001308

Colin Storz, PA

REPORTER'S CERTIFICATE

1

2

3          I, Suzanne Ricardo, a Certified

4   Shorthand Reporter No. 13659, do hereby certify:

5          That the foregoing proceedings were

6   taken before me at the time and place herein set

7   forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was

10  made by me using machine shorthand which was

11  thereafter transcribed under my direction; further,

12  that the foregoing is an accurate transcription

13  thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have hereunto

18  subscribed my name this 30th day of April, 2017.

19

20

21

22

23  _____

24              Suzanne Ricardo

25              CSR No. 13659