# Deposition Of:
## Ivor Garlick, M.D.

December 8, 2017

Russell Pitkin and Mary Pitkin
vs.
Corizon Health, Inc.; et al.

Case No.: 3:16-cv-02235-AA



SYNERGY

LEGAL

LITIGATION SUPPORT SERVICES

Ivor Garlick, M.D.

```
 1                        APPEARANCES
 2   APPEARING ON BEHALF OF THE PLAINTIFFS:
 3   TIM JONES, ESQ.
 4   Tim Jones, P.C.
 5   888 SW 5th Avenue, Suite 1100
 6   Portland, Oregon  97204
 7   Phone:  503-374-1414
 8   Email:  tim@timjonespc.com
 9
10   APPEARING ON BEHALF OF THE DEFENDANTS, WASHINGTON
11   COUNTY and PAT GARRETT:
12   JAMIE AZEVEDO, ESQ.
13   Bodyfelt Mount
14   The Spalding Building
15   319 SW Washington Street, Suite 1200
16   Portland, Oregon  97204
17   Phone:  503-595-7827
18   Email:  azevedo@bodyfeltmount.com
19
20
21
22
23
24
25
```

Ivor Garlick, M.D.

1    A.    I did hear about it, yes.

2    Q.    Do you know whether that had anything to do with

3    Corizon losing the contract in Lane County?

4    A.    No.

5    Q.    What about Washington County, do you know why

6    Corizon lost its contract in Washington County?

7    A.    There were a lot of staffing issues at Washington

8    County, and it was difficult to get staff, nursing staff.

9    But I -- the specifics of why they decided to not renew our

10   contract, I do not know.  I'm not privy to that.

11   Q.    Do you know whether it had anything to do with the

12   death of Madaline Pitkin?

13         MS. AZEVEDO:  Object to form.

14   A.    I do not know that.

15   Q.    (By Mr. Jones)  What currently is your role in

16   utilization management, Doctor?

17   A.    I obtain all the consults that are requested by

18   the site medical directors and nurse practitioners, PAs, at

19   our sites and I review them to -- for utilization for

20   off-site services.

21         So if someone needs to see a cardiologist, they

22   will ask me if -- they will give me the reasons why they

23   need to see the cardiologist and I will allow it or not

24   allow it.

25         The reason I don't allow it is I don't have enough

Ivor Garlick, M.D.

1    the jail?

2        A.    I was familiar with parts of that contract.

3        Q.    In that contract, Doctor, you may recall that

4    there were provisions, one of which was that monitoring

5    shall include, at a minimum, documented vital signs and a

6    determination of levels of consciousness every two hours in

7    severe cases of detoxification for drugs and/or alcohol.

8    That's the kind of thing that I'm talking about, Doctor.

9            To the extent that a contract called for specifics

10   on medical care, how was it the staff was trained on that

11   issue?

12           MR. HANSEN:  Object to the form.

13       A.   May I see that?

14       Q.   (By Mr. Jones)  Yeah.

15           Let me refer to something, Doctor.  This is

16   Exhibit 21, Bates stamped page WC001100.

17       A.   It's the first time I've seen this.

18       Q.   Okay.  But you are aware, I'm assuming, Doctor,

19   that the contracts between -- let's just say the contract --

20   were you aware that the contract between Washington County

21   and Corizon had medical specifics within it, like what I --

22   like the provision I just showed you?

23       A.   I was -- I cannot recall knowing that there was so

24   many specifics, that there were medical specifics, as you

25   said.

Ivor Garlick, M.D.

1      Q.   But is that unusual, though, in your contracts?

2           MR. HANSEN:   Object to the form.

3      A.   I -- I haven't seen it in any contract.  But then

4   I -- I may not have seen that part of the contract.

5      Q.   (By Mr. Jones)  And here is what I'm trying to

6   figure out, Doctor.  If the contract calls for Corizon to

7   monitor severe cases of withdrawal every two hours, for

8   instance, how is it that the staff hears about that?

9           MR. HANSEN:   Object to the form.

10      A.   That -- that's a very vague statement in my

11   opinion, because what is a severe case and how is that

12   determined, which is not in that paragraph, and I, you know,

13   don't usually monitor people every two hours.

14           It depends on their condition, it depends on what

15   is happening with them, depends on, you know, many factors.

16   And for a blanket every two hours, I know of no such policy

17   that we have in any of our jails.

18      Q.   (By Mr. Jones)  I guess maybe a way to -- do you

19   know, Doctor, whether -- because you did quite a bit of

20   training and inservice for the health professionals at the

21   Washington County Jail, did you not?

22      A.   Yes.

23      Q.   Did you ever train them on that particular

24   contractual provision we just reviewed?

25      A.   Not that I can recall.

Ivor Garlick, M.D.

 1  about, Doctor?

 2      A.   I would talk to them about taking care of patients

 3  during detox.

 4      Q.   What specifically --

 5      A.   From mild to severe.

 6      Q.   What specifically would you say to them?

 7      A.   I would go through the evaluation, I would go

 8  through how you get a history from a patient, the COW's,

 9  CIWA, talk about the importance of vital signs, talk about

10  the way in which you monitor the patient, and then we would

11  go through medications and a lot more.

12      Q.   Would you expect your medical director there at

13  that jail, or any jail that you have under your purview, to

14  know what an acute care facility is?

15      A.   Sorry.  Can you ask that again?

16      Q.   Would you expect your medical directors within a

17  jail like Washington County to understand what an acute care

18  facility is?

19      A.   I -- I suppose so.  I'm not sure what you mean.

20      Q.   Do you know what an acute care facility is,

21  Doctor?

22      A.   Such as a hospital.

23      Q.   I'm just reading from the standards published by

24  the NCCHC, Doctor, and it references acute care facility.

25  Do you have a working definition for what that term means?

Ivor Garlick, M.D.

1    A.   Their definition, I do not know how they define

2    it.  I mean, acute care hospital facility is somewhere where

3    they can administer acute care, emergency care for a

4    patient.

5    Q.   When you talked to the staffs, like those at

6    Washington County, about intoxication and withdrawal, what

7    kind of guidance would you provide them in terms of when you

8    refer someone to an acute care facility or hospital setting?

9    A.   My guidelines are if a patient is having more

10   trouble that we can't take care of them, sometimes they are

11   stumbling, you know, alcoholics start going through DTs and

12   they are unsteady on their feet and they are falling, we

13   refer them because alcoholics get very confused, et cetera.

14   I mean, when people are not responding to

15   treatment as we would expect them to.

16   Q.   So --

17   A.   If their medical condition is deteriorating.

18   Q.   Yeah.

19   THE VIDEOGRAPHER:  Excuse me, Counsel, your

20   microphone.

21   Q.   (By Mr. Jones)  What would you tell them

22   specifically about opioid withdrawal, and when -- what kind

23   of guidance would you -- providing that you were training

24   them, when to send those suffering from opioid withdrawal to

25   acute care facilities, hospital settings?

Ivor Garlick, M.D.

1            MR. HANSEN:  Object to the form.

2      A.   Again, same -- the same answer would apply.

3      **Q.   (By Mr. Jones)  Would you agree, Doctor, that**

4   **opioid withdrawal if not properly treated, can be deadly?**

5            MR. HANSEN:  Object to the form.

6      A.   Opioid withdrawal is -- is mostly not deadly.  It

7   is unusual for people to die of opioid withdrawal.

8      **Q.   (By Mr. Jones)  But you would agree --**

9      A.   Most do not.  Alcohol withdrawal, yes.  Benzo

10  withdrawal, yes.  Opioid withdrawal is not usually a deadly

11  condition.

12     **Q.   But it can be, wouldn't you agree, Doctor?**

13     A.   Can rarely be, yes.

14     **Q.   Dehydration, Doctor, if not properly treated, can**

15  **that likewise be deadly?**

16            MR. HANSEN:  Object to the form.

17     A.   People do die of dehydration, yes.

18     **Q.   (By Mr. Jones)  And my question is, if -- would**

19  **you agree with the proposition, Doctor, if not properly**

20  **treated by a healthcare staff, dehydration can be deadly?**

21            MR. HANSEN:  Object to the form.

22     A.   Dehydration can be deadly, yes.

23     **Q.   (By Mr. Jones)  Symptoms associated with opioid**

24  **withdrawal would include diarrhea commonly, Doctor?  Would**

25  **you agree with that?**

Ivor Garlick, M.D.

```
 1        A.   Yes.
 2        Q.   Vomiting?
 3        A.   Yes.
 4        Q.   Coming back to the components of this culture of
 5   patient safety that Corizon was establishing, we've talked
 6   about the importance of well-trained staff.
 7             It is also important, is it not, Doctor, to have a
 8   sufficient number of -- and you write type of staff at any
 9   given facility.  Is that -- is that -- would that be
10   accurate as well?
11             MR. HANSEN:  Object to the form.
12        A.   Our goal is to have the right number of staff,
13   yes.
14        Q.   (By Mr. Jones)  If you don't have the right number
15   of staff, it renders your institution less safe, doesn't it,
16   Doctor?
17             MR. HANSEN:  Object to the form.
18        A.   Staff have to work harder who are -- who are
19   there.
20        Q.   (By Mr. Jones)  Let me ask it this way, Doctor.
21   Would you agree that if the staff is not properly trained,
22   you run the risk of rendering the facility less safe for
23   your patients?  Would that be an accurate statement?
24             MR. HANSEN:  Object to the form.
25        A.   Well, I think it -- anywhere if staff is not
```

Ivor Garlick, M.D.

1    wrong with this statement, it's quotations from an article

2    and it's a very general statement and it -- it -- there's

3    another aspect to what this person is saying here, because

4    it talks about, there's personal failure so much as

5    limitations and effectiveness of the treatment.  There's

6    also -- there's a whole gap here because they don't mention

7    the motivation of a patient to actually accept treatment.

8            So I agree with the statement but it -- it's not a

9    complete statement.

10       **Q.   Okay.  Does Corizon use Suboxone in its**

11   **correctional -- in its settings to treat withdrawals?**

12       A.   We use Suboxone at a few of our facilities, very

13   few.

14       **Q.   Why is it limited to just a few, Doctor?**

15       A.   Because it is something that doctors need to be

16   specially trained for, they have to get a waiver to be a

17   Suboxone licensed physician, and it's not an essential part

18   of our treatment withdrawal protocols but it's a good added

19   treatment.

20       **Q.   Are you licensed to supervise the use of Suboxone?**

21       A.   I am.

22       **Q.   What does Suboxone do, Doctor?**

23       A.   Suboxone is a -- it's a partial agonist, partial

24   antagonist opioid, and it helps people maintain a state of

25   functionality even though they're receiving an opioid.

Ivor Garlick, M.D.

1    Q.   You see it as an effective treatment?

2    A.   Extremely.

3    Q.   Do you -- do you have any other drug that rivals

4    Suboxone within your tool kit there at Corizon to treat

5    withdrawals?

6         MR. HANSEN:   I'm going to object to the form.

7    A.   Suboxone is a good way to treat.  You asked me

8    before if it is an effective treatment.  It's an effective

9    treatment for maintenance treatment.  It's also an effective

10   detox medication.  But the medical protocol we have is a

11   very good treatment program too.

12   Q.   (By Mr. Jones)  Has there ever been anyone that

13   was licensed to utilize Suboxone at the Washington County

14   Jail based upon your knowledge?

15   A.   No.  Not at the time I was there.

16   Q.   Do you have to have somebody on site with that

17   kind of licensure or can it be somebody like a regional

18   person --

19   A.   You -- no, you should have somebody on site to --

20   to administer it.

21   Q.   In other words, your medical director should be

22   qualified to administer Suboxone before it is done.

23   A.   Some medical directors are.  Some are not.  It's

24   not an absolute requirement.

25   Q.   Yeah.  Have you ever been on a health safety

Ivor Garlick, M.D.

```
 1   can't hear, seeing lights, hearing voices, please help me.
 2              MR. HANSEN:  Object to the form.
 3         Q.   (By Mr. Jones)  Did Dr. McCarthy ever mention that
 4   patient to you?
 5              MR. HANSEN:  Object to the form.
 6         A.   I don't think we talked about any patient.  I
 7   can't remember that we did.
 8         Q.   (By Mr. Jones)  Did you ask him, Doctor, if he was
 9   concerned about any patient out on the ward -- out in the
10   jail?
11         A.   I didn't ask him but I asked Mandy.
12         Q.   What did Mandy tell you?
13         A.   Mandy said that there was no problems there that
14   she wanted me to talk about -- or that she needed to talk to
15   me about.  Paraphrased.
16         Q.   Dr. McCarthy was the only medical doctor at that
17   jail, wasn't he, Doctor?
18         A.   Yes.
19         Q.   And as you fired him that day, did you ask him
20   were there -- something to the effect of, is there anything
21   I ought to know about with regard to any of the patients out
22   there?
23         A.   I don't recall that I asked him that.
24         Q.   Did you ask him whether he was concerned about any
25   of the patients out there?
```

Ivor Garlick, M.D.

```
 1         A.   I can't remember that I did ask him that.

 2         Q.   And, yet, it's your recollection he did not

 3    volunteer to tell you whether he had concerns about any

 4    patient out in the jail; is that correct?

 5         A.   Correct.

 6         Q.   When did you have any discussion with Mandy

 7    Forsmann about patients out in the jail?  Is it before the

 8    meeting or after the meeting?

 9         A.   After the meeting, I had some time before my

10    flight left to come back to Denver and I said to her, is

11    there anything you need me for, any problems?  I was just

12    biding some time, I thought if there was something I could

13    help with while I was there, I would be happy to do that.

14         Q.   Did it come to your attention at that time or in

15    the days that followed that Ms. Forsmann was aware of

16    Ms. Pitkin's plight at the time of your visit on the 23rd of

17    April?

18         A.   I have no idea what she was aware of.

19         Q.   If she was aware, you would have expected her to

20    tell you that, wouldn't you, Doctor?

21              MR. HANSEN:  Object to the form.

22         A.   Depends on her -- I just asked an open-ended

23    question, did you need anything.  If she said no, I trusted

24    that she didn't feel anything was necessary to tell me

25    about.
```

Ivor Garlick, M.D.

```
 1    according to what's in the kite.
 2         Q.   But this is a --
 3         A.   So that's the value of actually talking to the
 4    patient and assessing the patient yourself from the kite.
 5    It's not we don't trust this.  It's just we want to see what
 6    the patient is talking about.
 7         Q.   So this -- this patient is experiencing constant
 8    vomiting and diarrhea, can't keep her medicines down and she
 9    feels near death, what else do you need to know before you
10    would contact a physician?
11         A.   You need to talk to her, you need -- this is what
12    she wrote.  It's like when you go to the doctor, you tell
13    the doctor what's wrong, but then he's going to ask other
14    questions or she and examine you and then make a decision
15    and then decide what to do.  You don't just say I have
16    appendicitis and send you to the doctor for an appendix to
17    be taken out.
18              So -- so the evaluation needs to be elaborated on
19    by the nursing assessment and then she can decide whether
20    she calls the doctor or not.
21         Q.   Does this appear to be a progression based -- from
22    the previous notation, the previous healthcare request?
23         A.   Pretty much it looks like it.
24         Q.   Can't sleep.  Is that a symptom of opioid
25    withdrawal?
```

Ivor Garlick, M.D.

1    A.    Yes.

2    **Q.    Why does that happen, Doctor?**

3    A.    There's a -- when the opioids are -- when the

4  opioid is absent, the opioid receptors are activated.  The

5  part of the brain that gets activated is -- it is part of

6  the brain where if it's activated, you can't sleep.  It's

7  very specific nucleolus.

8         And so part of the Clonidine works in that area so

9  it helps people sleep.  There's limitations to giving the

10  Clonidine but it's because of the activation of that area in

11  the brain.

12    **Q.    Muscle cramping and twitching.  Is that also a**

13  **symptom of opioid withdrawal?**

14    A.    Yes.

15    **Q.    Dehydration?**

16    A.    Dehydration is a complication.

17    **Q.    Is -- is -- is -- is muscle cramping and twitching**

18  **a manifestation of dehydration?**

19    A.    It could be.

20    **Q.    Everything hurts.  Is that a manifestation of**

21  **opioid withdrawal?**

22    A.    Yes.

23    **Q.    Can that also be a symptom of dehydration?**

24    A.    I don't think so, really.

25    **Q.    Weakness to the point where she felt she couldn't**

Ivor Garlick, M.D.

1    **stand.  Is that also a manifestation of opioid withdrawal?**

2         A.   They are restless, they feel weak, they feel

3    tired, they're not sleeping.

4              (Interruption.)

5              MR. JONES:  Let's go off the record.

6              THE VIDEOGRAPHER:  We're going off the record at

7    11:40.

8              (Recess from 11:40 a.m. to 11:44 a.m.)

9              THE VIDEOGRAPHER:  We're back on the record.  The

10   time is 11:44.

11             MR. JONES:  We took a break there.  What was my

12   last question?  If you can read that back.

13             (The requested portion was read back by the

14   reporter.)

15        **Q.   (By Mr. Jones)  So that is a manifestation of**

16   **withdrawal from opioids?**

17        A.   Can be, yes.

18        **Q.   Fainting.  Is that a manifestation of opioid**

19   **withdrawal?**

20        A.   Not usually.

21        **Q.   Is it occasionally?**

22        A.   Well, it's usually a complication of something.

23        **Q.   Yeah.  Like what, Doctor?**

24        A.   Like volume loss.

25        **Q.   Is the fainting a symptom associated with**

Ivor Garlick, M.D.

1    dehydration?

2        A.   It can be.

3        Q.   Is that what you meant by volume loss?

4        A.   Yes.

5        Q.   Volume is important to perfuse the organs?

6        A.   Correct.  Blood volume.

7        Q.   Under these circumstances with the constant

8    vomiting and diarrhea, there can be an electrolyte imbalance

9    occur?

10       A.   It's possible, yes.

11       Q.   What's the important -- what does an electrolyte

12   imbalance mean to you?

13       A.   Electrolyte imbalance implies that there's a

14   disruption in the sodium level, the potassium level, the

15   chloride level, and the way in which the water in the

16   body -- in the vascular system is retained.  And other side

17   effects.

18       Q.   What's the danger of something like that occurring

19   in this situation?

20           MR. HANSEN:  Object to the form.

21       A.   The danger of electrolyte imbalance is that it can

22   cause other medical problems, hyponitremia, hypokalemia, it

23   can all cause their own effects.

24       Q.   (By Mr. Jones)  Can it cause a cardiac arrhythmia?

25       A.   It can.

Ivor Garlick, M.D.

 1          Q.   Which can be fatal, can't it, Doctor?

 2          A.   Yes.

 3          Q.   Is it sufficient under these circumstances here,

 4     what we see on April 21, for an LPN to be the decisionmaker

 5     on what ought to occur next?

 6          A.   Well, an LPN often evaluates the medical request

 7     and some LPNs are outstanding and they know what they're

 8     doing, they do a good job.  And I have no idea who this

 9     person is or actually what she did, but an LPN can do this,

10     yes.

11          Q.   Go to the -- back to where we started, Doctor,

12     with the healthcare request form from April 23 of 2014.

13     It's Bates stamped 1947, Exhibit 10.  Should be just the

14     next page, I think, Doctor, in there.

15               Your version may be a bit faint, and I apologize

16     for that.

17               Coming back to this, this is the third or fourth

18     call for help.  I haven't been able to keep food, liquids,

19     meds down in six days.  What's the concern that gets raised

20     if meds aren't able to -- if a patient can't keep the meds

21     down?

22          A.   Well, if -- we're concerned if people can't keep

23     their meds down, they are not getting their meds, so they

24     are not being effective.

25          Q.   Well, you're prescribing something to treat

Ivor Garlick, M.D.

1  going on and everyone thought -- well, whoever the provider

2  was or the nurse felt this is the reality, that is -- I

3  agree that it's a life-threatening situation.

4      Q.   (By Mr. Jones)  In addition to the LPN that made

5  the finding over -- 40 over UA, the director of nursing was

6  interviewed by the police in the aftermath, Doctor, and

7  Leslie O'Neil said -- O'Neil told me that UA meant they were

8  not able to get an accurate blood pressure on Pitkin.

9  O'Neil told us she tried to get a blood pressure reading on

10  Pitkin and that she had a difficult time getting a reading

11  on her.

12          So if you have 40 over UA and you have a director

13  of nursing having a difficult time getting a blood pressure

14  reading, isn't that someone that needs to go to the

15  hospital, Doctor?

16          MR. HANSEN:  Object to the form.

17      A.   Did she say why she had a difficult time?

18      Q.   (By Mr. Jones)  Is that important?

19      A.   Well, if the cuff wasn't working, if the cuff was

20  too large or too small.  You know, if that was her blood

21  pressure that she just -- she absolutely tried her best with

22  the best available equipment and she couldn't get a blood

23  pressure, yes, that's life-threatening.

24      Q.   You will see, Doctor, there were multiple blood

25  pressures taken throughout her stay at the jail, were there

Ivor Garlick, M.D.

1    not?

2         A.    Yes.

3         Q.    Multiple blood pressures recorded, weren't there?

4         A.    There was several.

5         Q.    Was it significant, then, that now, all of a

6    sudden on the 23rd, we have at least two practitioners that

7    you and I have talked about that have indicated they were

8    having a hard time getting a blood pressure.  That is

9    significant, is it not, Doctor?

10             MR. HANSEN:   Object to the form.

11        A.    So -- so I know we've answered this, but I wasn't

12   there when this was happening.  So if the clinicians at the

13   time who were there, the DON was there, whoever was there,

14   decided this was not life-threatening, I would like to know

15   why and what they were seeing at the time.

16        Q.    (By Mr. Jones)  Okay.  But in the training that

17   you do, Doctor, if you get something like this where you

18   have a difficult time, you can't get blood pressures from

19   someone who is detoxing from opioids, don't you instruct --

20   don't you train your people to get that patient to a

21   hospital setting?

22             MR. HANSEN:   Object to the form.

23        A.    I think I have answered that question many times,

24   yeah.

25        Q.    (By Mr. Jones)  You do?

Ivor Garlick, M.D.

1      A.   I think I've answered that question many times.

2      **Q.   Is the answer yes?**

3      A.   The answer is, find out what the facts are and

4  then make a decision as to whether the patient should go

5  out.  If it's truly 40 over UA, I would send the patient

6  out.

7      **Q.   Okay.  I will move off this, Doctor.  And if it's**

8  **truly that you are having a difficult time, using your best**

9  **efforts to get the reading, that's time to send somebody out**

10 **as well, isn't it?**

11         MR. HANSEN:  Object to the form.

12     A.   If that's the reading you get, yes.

13     **Q.   (By Mr. Jones)  Okay.  O'Neil told us we take the**

14 **average for the patient's prior diastolic readings.  What's**

15 **the -- the diastolic, is that the upper?**

16     A.   The lower one.

17     **Q.   So the UA would be the diastolic reading?**

18     A.   Yes.

19     **Q.   We take the average.  Is that an appropriate thing**

20 **to do, Doctor?**

21     A.   I don't take averages ever.  I would not ever do

22 that.

23     **Q.   You don't train people to do that, do you?**

24     A.   No.

25         MR. HANSEN:  Time for a lunch break?

Ivor Garlick, M.D.

1    Q.    And that was in 2013?

2    A.    No, that was -- gosh, might have been 2009.

3    **Q.    Did you have a role of some kind in convincing the**

4    **company to use the drug Suboxone, Doctor?**

5    A.    I have advocated for using this drug and it's been

6    on our protocol and it takes time to get doctors licensed

7    and to get them familiar with it.  People are scared of this

8    drug.

9    **Q.    Okay.  How long have you been advocating for the**

10   **use of the drug by Corizon?**

11   A.    Well, I liked how we used it at Doña Ana, it

12   worked really well, and so I've been talking about it for --

13   for -- for -- since that time, since about 2010, '11.

14   **Q.    Are there other addiction medicine specialists in**

15   **Corizon senior to you?**

16   A.    Well --

17   MR. HANSEN:  At what time?

18   **Q.    (By Mr. Jones)  Currently.**

19   A.    The other addiction medicine specialists have the

20   same qualifications as me who do addiction medicine but --

21   so am I senior, by senior, I'm the -- I'm the designated

22   substance abuse doctor for the company.

23   **Q.    You are.  Okay.  And how long have you been the**

24   **designated substance abuse doctor for the company?**

25   A.    Probably around five or six years.

Ivor Garlick, M.D.

1       Q.   So since 2012 or '13?

2       A.   Somewhere around there.  It's kind of been a vague

3  title, so I'm not sure of the actual time.

4       Q.   **Are there actual responsibilities -- what are the**

5  **actual responsibilities that come along with the title,**

6  **Doctor?**

7       A.   Basically it's --

8            MR. HANSEN:  Object to the form.

9       A.   -- it's to help them create protocols, to educate

10  about substance abuse, and to answer any questions from any

11  of the docs about substance abuse they may have.

12      Q.   **(By Mr. Jones)  Is there anybody in the company**

13  **more knowledgeable about addiction medicine, substance abuse**

14  **than you?**

15      A.   There are a lot of good addictionists in the

16  company, yes.  They may know more than me or less than me,

17  but they certainly are well-respected.

18      **Q.   Does Corizon currently have any protocols that**

19  **deal with the use of Suboxone in its facilities?**

20      **A.   We're creating protocols, yes.**

21      **Q.   So back in -- by April of 2014, I just want to**

22  **make sure I understand, there was a pilot program that had**

23  **been run by the program -- by Corizon, in conjunction with**

24  **the Department of Health in New Mexico and there was**

25  **somebody else within your region, I think, that you were**

Ivor Garlick, M.D.

1  supervising that was using Suboxone; is that accurate?

2      A.   No.  The person that I was supervising who was

3  using it would have been late 2014 or early 2015.

4      Q.   So prior to April of 2014, it's your recollection

5  that it -- Suboxone was a drug that was not used outside of

6  the pilot program down in New Mexico by Corizon.

7      A.   Correct.

8      Q.   I believe Dr. McCarthy testified that he,

9  subsequent to his departure, prescribed Suboxone.  Did it

10 ever come to your attention when he had gained that ability

11 to do so?

12     A.   I have no knowledge of him having a license, and I

13 have no knowledge of him using the Suboxone.

14     Q.   In terms of what drugs to use at the jail, did

15 Washington County have any input on which drugs should be

16 used at the jail?

17     A.   Not that I'm aware of.

18     Q.   That was solely within the purview of Corizon?

19     A.   Yes.  As far as I'm aware.

20     Q.   Now, is your move within the company to get all

21 your physicians licensed to prescribe that medication?

22     A.   That is my current move to get physicians at each

23 site to be licensed to use Suboxone.

24     Q.   When you terminated Dr. McCarthy, you knew that he

25 was the only medical doctor on staff there at Washington

Ivor Garlick, M.D.

1    County?

2        A.    Yes.

3        Q.    What was your plan about how the staff would be

4    told about that firing?

5            MR. HANSEN:    Object to the form.

6        Q.    (By Mr. Jones)   If you had one?

7        A.    I had no plan.   This was not in my -- was not one

8    of my -- I had no plan.

9        Q.    It would be important that somebody have a plan,

10   though, right, Doctor?

11           MR. HANSEN:    Object to the form.

12       A.    I guess.

13       Q.    (By Mr. Jones)   Well, the medical director is

14   there for a purpose, is he not?

15       A.    Yes.

16       Q.    And your staff needs someone to consult with from

17   time to time, I take it.   That's part of the role of the

18   medical director, isn't it, Doctor?

19           MR. HANSEN:    Object to the form.

20       A.    Yes.

21       Q.    (By Mr. Jones)   So if you don't have somebody in

22   that position, is it important that the staff know --

23       THE COURT REPORTER:   Sorry.   Repeat that.

24       Q.    (By Mr. Jones) -- who they are supposed to speak

25   with?

Ivor Garlick, M.D.

```
 1            MR. HANSEN:  Object to the form.
 2       A.   I had no knowledge of how they were going to
 3  structure that after I left.
 4       Q.   (By Mr. Jones)  But the understanding -- from a
 5  patient safety standpoint, it was important to have an
 6  acting medical director at that site at all times, wasn't
 7  that true, Doctor?
 8            MR. HANSEN:  Object to the form.
 9       A.   Not necessarily.
10       Q.   (By Mr. Jones)  Did you know who Colin Storz was?
11       A.   Yes.
12       Q.   Physician's assistant there at Washington County
13  Jail?
14       A.   Yes.
15       Q.   He was -- Dr. -- or Colin Storz was asked the
16  question, who was the physician that you were licensed under
17  on April 24, 2014?  And I will remind you, Doctor, that was
18  the day that Madaline Pitkin died.  And his answer was, No
19  one on 24.  That -- so that was -- the question:  The date
20  that Ms. Pitkin died?  Answer:  That was no one.
21            Should someone have told Mr. Storz whether there
22  was an acting director some place?
23            MR. HANSEN:  Object to -- object to the form.
24       Q.   (By Mr. Jones)  Because it impaired his ability to
25  practice medicine, did it not?
```

Ivor Garlick, M.D.

```
 1              MR. HANSEN:  Object to the form.
 2              MS. AZEVEDO:  I will join.
 3         A.   I guess under Oregon law, if he didn't have a
 4    physician to supervise him, again, I -- I -- I -- I don't
 5    know the details of that.
 6         Q.   (By Mr. Jones)  So he was asked the question, Were
 7    you working without a licensed physician?  Correct?  Answer:
 8    Well, in terms of working, I mean, I was still a contracted
 9    employee so I showed up to my place of employment but I was
10    not able to practice medicine.
11              Were you aware that Mr. Storz was not able to
12    practice medicine the day of Ms. Pitkin's death?
13         A.   I can't remember if I was -- if I knew that or not
14    at the time.
15         Q.   If Mr. Storz, the physician's assistant, was
16    unable to practice medicine, you had fired the medical
17    director doctor, and Mr. Storz didn't know who he was going
18    to practice under as of the time of her death, that would be
19    inconsistent with establishing a culture of patient safety
20    at Washington County, wouldn't it, Doctor?
21              MR. HANSEN:  Object to the form.
22         A.   Well, we had nurses, we had doctors in Clackamas
23    and in Lane County who could have been called.  I had a
24    telemedicine license for Oregon.  I could have been called.
25         Q.   (By Mr. Jones)  Who -- did you have an expectation
```

Ivor Garlick, M.D.

1  veins, it's very difficult to do that.

2      Q.   (By Mr. Jones)  Do you know if they were

3  instructed to use IVs at the Washington County Jail to treat

4  dehydration?

5      A.   You know, I -- I just can't say for sure.  I -- I

6  don't know.  I think so, but I can't be a hundred percent

7  sure.  Because some of our sites do and some don't -- do

8  not.

9      Q.   There are some sites that don't use IV,

10 intravenous therapy to treat dehydration?

11     A.   Well, we don't use intravenous fluids unless it's

12 a real emergency but then we'd get them out.

13     Q.   Get them out to a hospital?

14     A.   Some of them -- I think all of them can but there

15 may be some that do not.

16     Q.   When you say "get them out" --

17     A.   Not all jails can give IV.

18     Q.   All jails can provide IV --

19     A.   Not all jails.

20     Q.   Do you know whether Washington County could

21 provide IVs?

22     A.   I -- I -- I can't remember.

23     Q.   When you say "get them out," what did you mean by

24 that?

25     A.   Get them out, send them to the hospital.

Ivor Garlick, M.D.

```
 1          Q.   And what would prompt that?
 2          A.   Well, if they need an IV and they need fluids and
 3     we can't give them, then we need to send them to the
 4     hospital to get them...
 5          Q.   The administration of IV fluids within a jail, is
 6     that, likewise, a statistic that would be tracked in some
 7     fashion?
 8          A.   Well, I'm not so sure it's a statistic but we can
 9     find out from each facility whether they are able to give it
10     or not.
11          Q.   What I mean is, are those numbers available some
12     place, Doctor, if you wanted to look for them?
13          A.   I don't know.
14          Q.   The same nurse that I mentioned there, also
15     testified that she had never administered an IV for
16     dehydration brought on by drug withdrawal at the Washington
17     County Jail.  Was she instructed not to do something like
18     that?
19               MR. HANSEN:  Object to the form.
20          A.   You would have to ask her.
21          Q.   (By Mr. Jones)  Let's put it this way.  Would that
22     be consistent with her training by Corizon?
23          A.   Unless they did not permit IV therapy to be given
24     in the jail, it's not something we teach.
25          Q.   What don't you teach?  You don't teach IV therapy?
```

Ivor Garlick, M.D.

1          Q.   Okay.  In this note on May 1, 2014, Ms. O'Neil

2     says, My RNs are overwhelmed right now, and I only have one

3     RN per shift.  There are -- are there any plans to

4     renegotiate our contract and add staffing hours.  As a

5     nurse, I really think we need two RNs and an LPN at an

6     absolute minimum per shift.

7               Did this ever come to your attention, Doctor?

8          A.   Well, I probably knew about it.  I mean, I can't

9     recall the details, but I knew they had some staffing

10    problems.

11         Q.   Did you know the director of nursing felt like she

12    needed more people, and particularly more RNs, on staff at

13    the jail?

14         A.   I -- same answer.

15         Q.   Do you know whether Dr. Orr had been made aware of

16    this?

17         A.   I don't know.  I don't know.

18         Q.   She says that it has long -- it has been a long

19    while since our staffing matrix has been revised and our

20    patient population has increased along with their acuity

21    levels, et cetera, and patient safety is an obvious concern.

22              So the director of nursing was concerned about

23    patient safety, she was concerned about staffing.  Did that

24    come to your attention in May of 2014 when you came back as

25    regional director?

Ivor Garlick, M.D.

```
 1          MR. HANSEN:  Object to the form.
 2     A.   Well, in general I did know about this but the
 3 specifics I do not remember knowing anything about.  But
 4 I -- I might have been told it.  I did -- we did talk about
 5 this.
 6     Q.   (By Mr. Jones)  What do you recall generally was
 7 the concern regarding staffing at the jail, Doctor?
 8     A.   That we had staffing problems, that there weren't
 9 enough staff and we needed to increase our staff.
10     Q.   Do you know how long those had been issues at the
11 jail when you came back as regional director in May of 2014?
12     A.   No.
13     Q.   But suffice it to say, those were -- those were
14 real issues when you took over on May 1 of 2014.  Would that
15 be accurate?
16     A.   Yes.
17     Q.   On swing shift and night shift, having only two
18 nurses scheduled seems concerning.  Did anyone tell you -- I
19 suppose it's the same thing, Doctor.  Did anyone tell -- did
20 anyone tell you about that concern from the director of
21 nursing?
22     A.   I think I've answered that.
23     Q.   Okay.  Do you know if that staffing concern was
24 eventually addressed there at Washington County?
25     A.   It was addressed, yes, by staffing.
```

Ivor Garlick, M.D.

1  there, your medical providers at Corizon, that with regard

2  to opioid withdrawal, that those who are experiencing severe

3  opioid withdrawal may or may not need an ER transfer?

4      A.    Do I train them?  Do I tell them?  Yes.

5      Q.    Discuss with the site physician?

6      A.    Yes.

7      Q.    So under certain circumstances, those experiencing

8  severe opioid withdrawal may not need to go to the ER

9  pursuant to the policies and procedures of Corizon.

10     A.    Correct.  Again, it depends on what they are

11 presenting with.

12     Q.    The physician on site should always be notified of

13 patients experiencing moderate or severe withdrawal

14 symptoms.  Would you agree with that, Doctor?

15     A.    Yes.  Yes.

16     Q.    And that's -- that's a part of the policies and

17 procedures there at Corizon, is it not?

18         MR. HANSEN:  Object to the form.

19     A.    I'm not sure if it's written down like that in the

20 policies and procedures, but it's something we would

21 recommend.

22     Q.    (By Mr. Jones)  Okay.  Here, Doctor, let me give

23 you one other exhibit, number 8.

24         MR. HANSEN:  Tell me what it is.

25         MR. JONES:  4766.

## CERTIFICATE OF COURT REPORTER

I, DEANNA BAYSINGER, a Registered Professional Reporter and Notary Public within and for the State of Colorado, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

My commission expires:  November 8, 2018.

DEANNA BAYSINGER
Notary Public
State of Colorado
Notary ID 19944018346
My Commission Expires Nov 8, 2018

DEANNA BAYSINGER
Registered Professional Reporter
Notary Public, State of Colorado