# Deposition Of:
## **Mandy Forsmann**

January 23, 2018

Russell Pitkin and Mary Pitkin
vs.
Corizon Health, Inc.; et al.

Case No.: 3:16-cv-02235-AA



S Y N E R G Y

L E G A L

LITIGATION SUPPORT SERVICES

Mandy Forsmann

```
 1        A.    Yes.
 2        Q.    Was that specifically as a result of Miss
 3   Pitkin's death, to your understanding?
 4        A.    Yes.
 5        Q.    We know Miss Buchanan was disciplined,
 6   correct?
 7        A.    Yes.
 8        Q.    And, in fact, you are aware that Corizon
 9   reported Miss Buchanan to the nursing board?
10        A.    Yes.
11        Q.    Were you part of that?
12        A.    Yes.
13        Q.    What was your involvement with that?
14        A.    I was told by Corizon because I held a
15   license in Oregon, I had to be the reporter of the
16   incident.
17        Q.    Okay.  So you were the reporter?
18        A.    Yes.
19        Q.    Did Corizon tell you what to say?
20        A.    Yes.
21        Q.    And who at Corizon told you what to say to
22   the nursing board?
23        A.    Debbie Fye.
24        Q.    Did Miss Fye ever accept any responsibility
25   for what happened at Washington County during Miss
```

Mandy Forsmann

```
 1   Pitkin's death?
 2          MS. TALCOTT:  Object to the form.
 3      Q.   Go ahead.
 4      A.   I don't remember.
 5      Q.   All right.  First of all, so we got Miss
 6   Buchanan.  Was Miss Johnson disciplined?
 7      A.   Yes.
 8      Q.   And did you report her to the nursing board
 9   as well?
10      A.   Yes.
11      Q.   And that was at the direction of Debbie Fye,
12   correct?
13          MS. TALCOTT:  Object to the form.
14      A.   Yes.
15      Q.   And why did they tell you they wanted you to
16   report those two nurses to the nursing board?
17          MS. TALCOTT:  Object to the form.  Are you
18   asking why Debbie Fye told her?
19      Q.   Debbie Fye, anyone at Corizon.
20      A.   I don't remember.
21      Q.   Did you agree that they should be reported to
22   the nursing board?
23      A.   No.
24      Q.   Why did you think they shouldn't be reported
25   to the nursing board?
```

Mandy Forsmann

```
 1        Q.   Have you ever seen a policy, procedure or
 2   protocol requiring Corizon employees to perform vital
 3   checks every two hours with severe cases of
 4   withdrawal?
 5             MS. TALCOTT:   Object to the form.
 6        A.   No.
 7        Q.   Have you ever seen a policy, procedure or
 8   protocol requiring Corizon employees, when there is a
 9   concern for dehydration, to perform vital checks every
10   four hours?
11             MS. TALCOTT:   Object to the form.
12        A.   No.
13        Q.   Have you seen any policies, procedures or
14   protocols at Corizon or Corizon entities regarding how
15   frequently to perform vital checks with patients going
16   through protocol?
17             MS. TALCOTT:   Object to the form.
18        A.   Yes.
19        Q.   And how frequently by protocol, to your
20   knowledge, are Corizon employees required to check
21   vitals on patients going through withdrawal?
22             MS. TALCOTT:   Object to the form.
23        A.   Every eight hours.
24        Q.   And that's regardless of the severity,
25   correct?
```

**Mandy Forsmann**

```
 1    that call or was it physical findings?
 2              MS. TALCOTT:  Object to the form.
 3        A.    It was both.
 4        Q.    What physical findings necessitated
 5    contacting the provider?
 6              MS. TALCOTT:  Object to the form.
 7        A.    Persistent nausea, vomiting, not being able
 8    to keep fluids down, a blood pressure that wasn't
 9    within normal limits, skin turgor, goose flesh,
10    diarrhea.
11        Q.    All of those symptoms -- well, while you were
12    director of nursing at Corizon, you trained all staff
13    members to contact the provider when they were dealing
14    with a patient with those symptoms, correct?
15        A.    Yes.
16        Q.    And it was the provider's decision as to
17    whether to send them to the ER?
18              MS. TALCOTT:  Object to the form.
19        A.    Yes.
20        Q.    Were you aware of -- well, back again to my
21    question.  Specifically as it relates to patients with
22    opioid withdrawals, are you aware of any cases in
23    which Corizon sent a patient to the emergency room?
24              MS. TALCOTT:  Object to the form.
25        A.    I don't remember.
```

Mandy Forsmann

```
 1        Q.   Did Corizon have the ability to provide I.V.
 2   fluids at the Washington County Jail?
 3        A.   Yes.
 4        Q.   Is that something you would have expected any
 5   nurses you trained to know?
 6             MS. TALCOTT:  Object to the form.
 7        A.   Yes.
 8        Q.   Had you, yourself, ever specifically trained
 9   nurses that Washington County Jail had the ability to
10   provide I.V. fluids?
11        A.   Yes.
12        Q.   And under what circumstances did you train
13   nurses to provide I.V. fluids?
14        A.   At the order of a prescriber.
15        Q.   And once again, is that something you trained
16   staff to confer with the providers?
17        A.   Yes.
18        Q.   And would you -- did you train staff to
19   consult with providers when they were concerned that a
20   patient may have dehydration?
21        A.   Yes.
22        Q.   Did you train Nurse Buchanan?
23        A.   No.
24        Q.   Was she there before you became the director
25   of nursing?
```

Mandy Forsmann

```
1       A.   Leslie O'Neil.
2       Q.   Did you train Leslie O'Neil regarding her
3   responsibilities as the director of nursing?
4       A.   Yes.
5       Q.   And did you provide any specific training to
6   Miss O'Neil regarding the protocols for withdrawal?
7       A.   Yes.
8       Q.   Does Corizon have a specific policy for
9   dehydration?
10           MS. TALCOTT:  Object to the form.
11      A.   I don't know.
12      Q.   If they do, you've never seen one?
13           MS. TALCOTT:  Object to the form.
14      A.   No.
15      Q.   Is that correct?
16           MS. TALCOTT:  Object to the form.
17      A.   Yes, correct.
18      Q.   I apologize if I bounce around.  It's my
19   wandering mind at work.
20           MR. HOOD:  If it gets too far afield, maybe
21   we can help.
22           MR. COLETTI:  I'm sure.
23           MS. TALCOTT:  It's a big challenge.
24      Q.   (Continuing by Mr. Coletti):  Let's talk
25   generally.  You left in December, sorry, September
```

Mandy Forsmann

```
 1   2014?
 2        A.   Yes.
 3        Q.   Were you involved in the hiring of
 4   Dr. McCarthy?
 5        A.   No, I was not.
 6        Q.   When was Dr. McCarthy first brought on, to
 7   your recollection?
 8        A.   I honestly do not remember.
 9        Q.   What did you think of Dr. McCarthy?
10             MS. TALCOTT:  Object to the form.
11        A.   Can I talk to Drake?  Can we take a time-out?
12             MR. HOOD:  Actually, I was just going to ask
13   you, can you put a time frame on it, John?
14        Q.   At anytime.
15        A.   It was -- there was the impression that he
16   might have been documenting on patients that he didn't
17   actually see.
18        Q.   And did that cause you concern?
19        A.   Yes.
20        Q.   And when do you remember that first becoming
21   a concern for you?
22        A.   When I was the director of nursing.
23        Q.   And do you remember how long Dr. McCarthy
24   actually worked for Corizon?
25        A.   I do not.
```

Mandy Forsmann

1     Q.   And do you remember when you began to have

2  these concerns as the director of nursing?

3     A.   Are you asking for dates?

4     Q.   Just generally.

5     A.   I don't remember.

6     Q.   You seem like the type of person that would

7  have reported your concerns.

8          MS. TALCOTT:   Object to the form.

9     A.   Yes.

10    Q.   And you did report them, correct?

11    A.   Yes.

12    Q.   Who did you report them to?

13    A.   The health service administrator at the time.

14    Q.   And who was that health service

15 administrator?

16    A.   Vicki Thomas.

17    Q.   What, if anything, to your knowledge, did

18 Vicki Thomas do in response to your concerns that

19 Dr. McCarthy might be documenting visits that didn't

20 occur with patients?

21    A.   That there were conversations with Corizon

22 leadership.

23    Q.   And did Miss Thomas tell you that happened?

24    A.   Yes.

25    Q.   Did she tell you with whom she spoke?

Mandy Forsmann

```
 1        A.   I don't remember.
 2        Q.   What did she tell you?
 3        A.   That she had expressed concerns of, you know,
 4   what we were concerned with, that he was documenting
 5   on people that he didn't see, and -- that's all I
 6   remember.
 7        Q.   And when you say documenting on people,
 8   patients he didn't see, so he was creating charts
 9   without actually performing any examination?
10             MS. TALCOTT:  Object to the form.
11        A.   Yes.
12        Q.   And what were your safety concerns about
13   that?
14             MS. TALCOTT:  Object to the form.
15        A.   That there were patients that were ill that
16   were not getting care that they needed.
17        Q.   And you recognized how dangerous that was,
18   correct?
19             MS. TALCOTT:  Object to the form.
20        A.   Yes.
21        Q.   And you reported it to Miss Thomas; she said
22   she reported it to Corizon management, correct?
23        A.   Yes.
24        Q.   And what, if anything, occurred, to your
25   knowledge, in response to your concerns?
```

Mandy Forsmann

1  A.   I don't know.

2  **Q.   Do you know if anything happened?**

3  A.   I don't know.

4      MS. TALCOTT:  Object to the form.

5  **Q.   To your knowledge, did anything change with**

6  **Dr. McCarthy?**

7  A.   No.

8  **Q.   Did you continue to have those concerns as an**

9  **HSA?**

10  A.   Yes, I did.

11  **Q.   Did you, yourself, report those concerns to**

12  **management?**

13  A.   Yes, I did.

14  **Q.   And who did you report those concerns to?**

15  A.   Debbie Fye and Dr. Garlick.

16  **Q.   And what, if anything, did they do in**

17  **response to that?**

18  A.   It was decided that he would be terminated.

19  **Q.   And did they explain to you why they were**

20  **going to terminate him?**

21  A.   Not that I remember.

22  **Q.   Did anyone ever tell you that they were going**

23  **to terminate him because of your concerns about him**

24  **creating charts that didn't exist?**

25      MS. TALCOTT:  Object to the form.

Mandy Forsmann

1    and they had not been.

2        Q.   All right.  Did you ever see Dr. McCarthy

3    send a patient to the emergency room for withdrawals?

4        A.   I don't remember.

5        Q.   Did you ever see Dr. McCarthy order an I.V.

6    bolus at Washington County Jail for patients with

7    dehydration?

8        A.   No.

9        Q.   Did you ever see anyone order an I.V. bolus

10   for a patient in Washington County Jail with concerns

11   for dehydration?

12       A.   Yes.

13       Q.   And where was the I.V. administered?

14       A.   Back -- you mean on the body or the location?

15       Q.   Location, sorry.

16       A.   Back in medical.

17       Q.   And so the clinic?

18       A.   Yes.

19       Q.   And those I.V. boluses were administered

20   before Dr. McCarthy's time, I take it?

21       A.   I believe so.

22       Q.   Did you see any administered after

23   Dr. McCarthy was terminated?

24       A.   No.

25       Q.   Were there concerns other -- did you have

Mandy Forsmann

```
 1   told you to contact Clackamas County or anyone else if
 2   the nursing staff had medical questions, correct?
 3           MS. TALCOTT:  Object to the form.
 4     A.    I don't remember.
 5     Q.    And there was no documentation, to your
 6   knowledge, as to who nursing staff should contact with
 7   Dr. McCarthy being fired should they have any concerns
 8   about patients, correct?
 9           MS. TALCOTT:  Object to the form.
10     A.    I don't remember.
11     Q.    And Dr. McCarthy never said anything to
12   either of you about the fact he had a patient that he
13   had just put into the Medical Observation Unit because
14   he was concerned about her, correct?
15           MS. TALCOTT:  Object to the form.
16     A.    I don't remember.
17     Q.    And is it accurate to state you never met
18   Madaline Pitkin?
19     A.    Yes.
20     Q.    Is it accurate to state nobody ever told you
21   about Madaline Pitkin prior to her death?
22     A.    Yes.
23     Q.    As the HSA, did anyone tell you that on April
24   23rd, that they were able to come up with a valid
25   blood pressure for Madaline Pitkin?
```

Mandy Forsmann

```
1    patient with a blood pressure of 40 over UA, what does
2    that mean?
3              MS. TALCOTT:  Object to the form.
4         A.   I'm not sure.
5         Q.   Had you ever heard of such a term?
6              MS. TALCOTT:  Object to the form.
7         A.   No.
8         Q.   If you had a patient with a history of
9    vomiting, nausea, and diarrhea with a blood pressure
10   that you were unable to obtain, were you trained as a
11   nurse and as a director of nursing that that is a
12   potential medical emergency?
13        A.   Yes.
14        Q.   Is that a patient that needs to be taken to
15   an emergency room?
16             MS. TALCOTT:  Object to the form.
17        A.   Yes.
18        Q.   No doubt in your mind, correct?
19             MS. TALCOTT:  Object to the form.
20        A.   Correct.
21        Q.   Did you ever read any of the medical request
22   forms that Miss Pitkin filed?
23        A.   Yes.
24        Q.   And what was your reaction when you read
25   them?
```

Mandy Forsmann

```
 1        A.   I was shocked.
 2        Q.   And you were shocked because no treatment was
 3   provided to her, correct?
 4             MS. TALCOTT:  Object to the form.
 5        A.   I don't know.
 6        Q.   Why were you shocked?
 7        A.   I was shocked because of the language that
 8   she used and how she wrote her concerns on the kite,
 9   but I'm not sure if she was seen or not, I don't know.
10        Q.   Well, you're aware that nurses have admitted
11   -- actually, I think you completed the paperwork to
12   the Department of Nursing wherein you stated that
13   nobody responded to the medical request forms,
14   correct?
15             MS. TALCOTT:  Object to the form.  Misstates
16   the evidence.
17        A.   I don't know.
18        Q.   Do you remember writing documentation to the
19   nursing board, criticizing Nurse Johnson for not
20   responding to medical request form requests?
21             MS. TALCOTT:  Object to the form.
22        A.   I don't specifically remember that.
23        Q.   Do you remember after learning -- first of
24   all, when did you first become aware of Miss Pitkin's
25   medical request forms?
```

Mandy Forsmann

1  instructed to do so?

2      A.   Yes.

3           MR. COLETTI:   We will mark this as Exhibit

4  87.

5      Q.   Do you remember completing the paperwork

6  regarding -- before we get into that, do you know who

7  Matt Northrop is?

8      A.   Yes.

9      Q.   Who is Matt Northrop?

10     A.   He was an RN that worked at Washington

11 County.

12     Q.   Did you ever speak with Mr. Northrop about

13 his involvement with Madaline Pitkin?

14     A.   I don't remember.

15     Q.   Do you remember -- well, did Mr. Northrop

16 ever complete any chart note as it related to Madaline

17 Pitkin that you are aware of?

18          MS. TALCOTT:   Object to the form.

19     A.   Not that I remember.

20     Q.   Do you remember seeing any documentation that

21 Mr. Northrop was able to obtain any blood pressures

22 from Madaline Pitkin?

23     A.   I don't remember.

24     Q.   So back to Exhibit 87.  I will just read

25 these to you and then show them to you.  It appears

Mandy Forsmann

```
 1   withdrawal were intended to prevent deaths caused by
 2   I.V. drug use?
 3              MS. TALCOTT:  Object to the form.
 4       A.   Yes.
 5       Q.   And that includes dehydration, correct?
 6              MS. TALCOTT:  Object to the form.
 7       A.   Correct.
 8       Q.   It includes malnutrition, correct?
 9              MS. TALCOTT:  Object to the form.
10       A.   I don't know.
11       Q.   Sure.  Well, were you trained that vomiting,
12   chronic vomiting and diarrhea causes dehydration?
13       A.   Yes.
14       Q.   Were you trained that dehydration can be
15   fatal if not treated properly?
16       A.   Yes.
17       Q.   Were you trained that dehydration is a
18   medical emergency?
19              MS. TALCOTT:  Object to the form.
20       A.   Yes.
21       Q.   Then moving on to Miss Johnson, again,
22   reference to the Board of Nursing materials, again,
23   this is a Recommendation For Termination for Molly
24   Johnson.  It's Bates number CORIZON009408.  It says,
25   "Policies concerning documentation, response to MRF,
```

Mandy Forsmann

```
 1    I'm going to show you what's been marked as Exhibit
 2    74, a Corizon document, at the top the title is
 3    "Dehydration" and another is "Nursing Judgment."  Have
 4    you ever seen this document before?
 5              MS. TALCOTT:  Which exhibit is that?
 6              MR. COLETTI:  Seventy-four.
 7       A.   I don't remember this specific document, no.
 8       Q.   So you've never seen that before?
 9       A.   I don't remember it.
10       Q.   All right.  Why don't you just look through
11    it and do you see -- look at the next page, first of
12    all.  Do you remember ever receiving that document?
13       A.   I don't remember.
14       Q.   All right.  Is it accurate to state that
15    while a Corizon employee, you do not recall a specific
16    protocol relating to dehydration, correct?
17              MS. TALCOTT:  Object to the form.
18       A.   Specifically to dehydration?
19       Q.   Yes.
20       A.   No, I do not.
21       Q.   And were you ever trained or did you train
22    staff at Corizon to monitor the input and output with
23    patients with dehydration?
24       A.   Yes.
25       Q.   And do you know if that was part of any
```

Mandy Forsmann

1  formal protocols or training?

2      A.   I do not remember.

3      Q.   And why would you train staff and employees

4  to monitor input and output with patients undergoing

5  or with dehydration?

6          MS. TALCOTT:  Object to the form.

7      A.   Are you asking what I would do specifically?

8      Q.   Why were you trained to do so?

9      A.   It was part of my nursing training.

10     Q.   And what's your understanding as to why?

11     A.   Because it's critical to know how much a

12  patient is ingesting versus how much they're putting

13  out.

14     Q.   And at anytime in looking -- first, why is it

15  critical to know that?

16     A.   It can show that there's kidney failure,

17  organ failure.

18     Q.   And it can show that they're not actually

19  consuming anything, correct?

20     A.   Correct.

21     Q.   Because if there's no output, then there's

22  likely no input, correct?

23          MS. TALCOTT:  Object to the form.

24          MR. HOOD:  Object to the form.

25     A.   I'm not an expert.  I don't know.

Mandy Forsmann

```
 1          MS. TALCOTT:  Object to the form.  Compound
 2    question.  You asked her three different questions
 3    about three different types of training in one
 4    question.
 5          MR. COLETTI:  I think I'll figure it out by
 6    trial.
 7      A.    I don't recall this document.
 8      Q.    All right.  You don't remember ever seeing
 9    that?
10      A.    Uh-huh.
11      Q.    I take it you have seen Corizon's General
12    Health Services Policy and Procedure Manual?
13      A.    Yes.
14      Q.    And I take it you've seen the Nursing
15    Encounter Tools 2013 at Corizon?
16      A.    Yes.
17      Q.    Do you know who created the staffing plan at
18    the jail?
19      A.    I do not.
20      Q.    Do you know if that was in fact created by
21    Corizon or Prison Health Systems?
22          MS. TALCOTT:  Object to the form.
23      A.    I don't know.
24      Q.    Do you remember complaints about the lack of
25    staffing at the Washington County Jail?
```

Mandy Forsmann

```
 1              MS. TALCOTT:  Object to the form.
 2     A.   Yes.
 3     Q.   What do you remember about the complaints of
 4   the lack of staffing at Washington County Jail?
 5     A.   I remember some nurses felt that the patient
 6   load was heavy.
 7     Q.   And did those nurses include Leslie O'Neil?
 8     A.   I don't remember.
 9     Q.   Do you remember an email, and we will make
10   this part of Exhibit 86, Bates number 006471, is an
11   email dated Thursday, May 1st, 2014, from Leslie
12   O'Neil to Miss Fye.  I will not read the whole thing,
13   but goes down to the bottom, "On another note:  My RNs
14   are overwhelmed right now and I only have one RN per
15   shift.  Are there any plans to re-negotiate our
16   contract to add staffing hours?  As a nurse, I really
17   think we need two RNs and an LPN, at an absolute
18   minimum, per shift.  It has been a long while since
19   our staffing matrix has been revised and our patient
20   population has increased along with their acuity
21   levels, etc., and patient safety is an obvious
22   concern.  On swing shift and night shift, having only
23   two nurses scheduled seems concerning."
24              Do you remember seeing that document?
25     A.   I don't remember.
```

Mandy Forsmann

```
 1        Q.    Do you remember nursing staff not being
 2   allowed access to the MOU to perform assessments on
 3   patients?
 4             MS. TALCOTT:  Object to the form.
 5             MS. AZEVEDO:  I'll join.
 6        A.    No.
 7        Q.    Did you discuss your concerns with Miss Fye
 8   or Miss O'Neil's concerns with Miss Fye?
 9             MS. TALCOTT:  Object to the form.
10        A.    I expressed concerns to Miss Fye about my
11   concerns, yes.
12        Q.    What were your concerns?
13        A.    That my nursing staff felt like they were
14   understaffed and that the patient acuity was high.
15        Q.    And that was prior to Miss Pitkin's death,
16   correct?
17        A.    Yes.
18             MS. TALCOTT:  Object to form.
19             MS. AZEVEDO:  I'll join.
20        Q.    And what, if anything, did Corizon do in
21   response to that?
22        A.    I don't remember.
23        Q.    Did Miss Fye share in your concerns?
24             MS. AZEVEDO:  Object to form.
25             MS. TALCOTT:  Join.
```

Mandy Forsmann

```
 1      A.   I don't remember.
 2      Q.   Do you remember her sending any
 3 correspondence to Washington County, stating that the
 4 staffing plan needed to change in order to protect
 5 patient safety?
 6           MS. AZEVEDO:  Object to the form.
 7           MS. TALCOTT:  Join.
 8      A.   I don't remember.
 9      Q.   Did you have concerns regarding patient
10 safety due to the understaffing?
11           MS. TALCOTT:  Object to the form.
12      A.   Yes.
13      Q.   And did you -- were you concerned at some
14 point -- well, what were your concerns?
15      A.   That the expectations of the care that we
16 needed to provide we couldn't always provide with the
17 staffing that we had.
18      Q.   All right.  And that was communicated by you
19 to Miss Fye, correct?
20      A.   Yes.
21           MS. TALCOTT:  Object to the form.
22      Q.   Prior to Miss Pitkin's death, correct?
23      A.   Yes.
24      Q.   There was a requirement, was there not, that
25 registered nurses do the intake?
```

Mandy Forsmann

```
 1   believed that there was a delay in having some of the
 2   intake exams done, correct?
 3          MS. TALCOTT:  Object to the form.
 4      A.   I don't know.
 5      Q.   Is that your understanding?
 6      A.   Can you ask me the question again.
 7      Q.   Sure.  Well, it says of the -- they did some
 8   audits and, "Unfortunately, we have found that between
 9   April 25, 2014, and May 7, 2014, 156 out of 311 intake
10   medical screens were over the two hour requirement.
11   Of these, 58 screens were in excess of four hours and
12   several were in excess of eight hours.  We also found
13   that during this time frame, a licensed practical
14   nurse performed the initial intake 93 times in lieu of
15   the required registered nurse."
16          MS. TALCOTT:  Is there a question?
17      Q.   Do you remember that?  The question was
18   before I read that.
19      A.    I remember it being in that letter.
20      Q.   Do you remember responding to the letter
21   yourself about your concerns about having licensed
22   practical nurses performing examinations on your most
23   critically ill patients as opposed to a registered
24   nurse?
25          MS. TALCOTT:  Object to the form.
```

Mandy Forsmann

1          MR. HOOD:  Object to the form.

2    A.    I don't remember.

3    Q.    This has been marked as Exhibit 82.  Please

4    go ahead and read that, if you would, out loud and

5    tell me if that's an email you sent.

6    A.    "Hello.  Leslie and I spoke after your

7    conversation yesterday.  I just want you both to know

8    that I totally understand where you're coming from and

9    you're right, there has been holes recently in

10    intake."

11          Do you want me to read the whole thing?

12    Q.    Please do, and what's the date of this?

13    A.    This is Thursday, May 8th, 2014.

14    Q.    And who is the letter -- who is your email

15    addressed to?

16    A.    Mike Lenahan and Kim Phillips.

17    Q.    Okay.  And just go ahead and continue,

18    please.

19    A.    "Per the Nurse Practice Act, LPNs are able to

20    gather data and do focused assessments, which is what

21    intake is.  I do realize that the contract specifies

22    that there will be an RN out there, but we feel we

23    need the most credentialed staff in the MOU taking

24    care of our sickest patients.  Would it be okay to

25    have the LPN out there either for the shift or to

Mandy Forsmann

1  cover booking vacancies while the RN goes to the MOU?
2  I understand your concerns and I am really trying to
3  make this work for everyone.  Have you heard any more
4  about additional custody staff for the MOU?"
5      Q.  All right.  And so your concern was the
6  contract required the RNs to be out doing intake while
7  the LPNs were back dealing with the patients that were
8  in the medical units, correct?
9      A.  Correct.
10          MS. TALCOTT:  Object to the form.
11     Q.  And you had safety concerns about that, did
12  you not?
13          MS. TALCOTT:  Object to the form.
14          MS. AZEVEDO:  I'll join.
15     A.  Yes.
16     Q.  Because you had your least credentialed
17  nursing staff dealing with the sickest of the
18  patients, correct?
19          MS. TALCOTT:  Object to the form.
20          MS. AZEVEDO:  I'll Join.
21     A.  Yes.
22     Q.  And you recognized that that was dangerous,
23  did you not?
24          MS. TALCOTT:  Object to the form.
25          MS. AZEVEDO:  I'll Join.

Mandy Forsmann

1     A.   Yes.

2     Q.   Where you referenced the need for additional

3  custodial staff, the requirement at Washington County

4  Jail, before they allowed you into the cells to

5  perform examinations, was that they have two deputies

6  there, correct?

7     A.   Yes.

8     Q.   And at Corizon you recognized that you were

9  unable to perform assessments because frequently there

10 were not enough deputies to do so, correct?

11          MS. TALCOTT:   Object to the form.

12          MS. AZEVEDO:   Object to the form.

13    A.   Yes.

14    Q.   And there was push back and -- well, first of

15 all, that's something you communicated to Washington

16 County, correct?

17          MS. TALCOTT:   Object to the form.

18          MS. AZEVEDO:   I'll join.

19    A.   I don't remember.

20    Q.   Well, you remember clearly you've asked if

21 they've heard anything about additional custodial

22 staff, correct?

23    A.   Yes.

24    Q.   So you understood somebody had told

25 Washington County that you needed more custodial staff

Mandy Forsmann

1    so you could perform assessments in the MOU, correct?

2         MS. TALCOTT:  Object to the form.

3         MS. AZEVEDO:  Object to the form.

4    A.   Yes.

5    Q.   And what do you remember -- did that ever

6    change, to your knowledge?

7    A.   I don't remember.

8    Q.   Do you remember Washington County saying no?

9         MS. AZEVEDO:  Object to the form.

10   A.   I do not remember that.

11   Q.   Do you remember ever there being a change in

12   terms of custodial staff at the jail --

13        MS. TALCOTT:  Object to the form.

14   Q.   -- in the MOU?

15        MS. AZEVEDO:  I'll join.

16   A.   I don't remember.

17        MR. COLETTI:  Let's take about a five-minute

18   break and I'll try to get things organized so we can

19   get this wrapped up.

20        THE VIDEOGRAPHER:  Going off the record at

21   8:05.

22                         (Recess taken.)

23        THE VIDEOGRAPHER:  Back on the record at

24   8:16.

25   Q.   Do you remember who Kimberly Barnes was?

Mandy Forsmann

```
1      A.   Yes.
2      Q.   Who is Kimberly Barnes?
3      A.   She was administrative assistant.
4      Q.   She was a Corizon employee?
5      A.   Yes.
6      Q.   What were her responsibilities, if you
7   remember?
8      A.   She gathered statistics.  She helped with
9   clinic lists and the call out.  She helped with
10  payroll.  She took minutes at meetings.
11     Q.   All right.  We were discussing the under-
12  staffing, correct?
13          MS. TALCOTT:  Object to the form.
14          MS. AZEVEDO:  Object to the form.
15     A.   Yes.
16     Q.   And the concerns that you and others had at
17  Washington County Jail regarding understaffing,
18  correct?
19          MS. TALCOTT:  Object to the form.
20          MS. AZEVEDO:  I Join.
21     A.   Yes.
22     Q.   And were you concerned that they were
23  understaffed?
24          MS. TALCOTT:  Object to the form.
25     A.   Yes.
```

Mandy Forsmann

```
 1        Q.   All right.  Did you have any discussions with
 2   anyone at Corizon regarding what the contractual
 3   obligations were for staffing?
 4        A.   Yes.
 5        Q.   Who did you have those discussions with?
 6        A.   Debbie Fye.
 7        Q.   And what did she tell you about those
 8   contractual obligations?
 9        A.   I don't really remember.
10        Q.   Do you remember generally what you and she
11   discussed?
12        A.   I do not.
13        Q.   I will show you an exhibit which we will mark
14   as 92.
15             MS. TALCOTT:  You're going to read the Bates.
16        Q.   It's Washington County 002824.  This is a
17   letter dated June 24, 2014, from Debbie Fye to Sheriff
18   Pat Garrett.  It says, "Sheriff Garrett, we have
19   completed our in-depth analysis of the medical
20   services at Washington County Jail.  We have
21   identified several areas in which changes are
22   necessary in order to provide quality care at the
23   facility.  These changes are identified in the
24   accompanying documents:  key deliverables, staffing
25   grid, justification for staffing changes, work flow,
```

Mandy Forsmann

```
 1   and charge nurse duties.
 2           "To ensure we continue to meet the
 3   contractual obligations, patient care standards, and
 4   NCCHC standards, these changes must be implemented
 5   expeditiously."
 6           Do you remember having those discussions with
 7   Miss Fye about the need for changes?
 8           MS. TALCOTT:  Object to the form.
 9           MS. AZEVEDO:  I'll join.
10       A.   Yes.
11       Q.   And did you agree that those changes were
12   necessary to comply with patient safety and NCCHC
13   standards?
14           MS. TALCOTT:  Object to the form.
15           MS. AZEVEDO:  I'll join.
16       A.   Yes.
17       Q.   Did Miss Fye ever tell you that Corizon was
18   not in compliance with the NCCHC standards with the
19   staffing plan that currently existed?
20           MS. TALCOTT:  Object to the form.
21       A.   I don't remember.
22       Q.   Did you ever look to see if in fact you were
23   in compliance with the NCCHC staffing standards?
24       A.   I don't remember.
25       Q.   Do you remember discussing with Miss Fye what
```

Mandy Forsmann

```
 1        A.    I don't know.
 2        Q.    When you left Corizon, was there an exit
 3   interview or anything like that?
 4        A.    No.
 5        Q.    Did you at anytime -- well, let me back up.
 6              During the course of your employment with
 7   Corizon, you had a number of concerns regarding
 8   patient safety, correct?
 9              MS. TALCOTT:  Object to the form.
10              MS. AZEVEDO:  I'll join.
11        A.    Yes.
12        Q.    And that was specifically due to how they
13   were practicing medicine in the jail, correct?
14              MS. TALCOTT:  Object to the form.
15              MS. AZEVEDO:  I'll join.
16        A.    I don't know.
17        Q.    Well, you were concerned that the medical
18   director was falsifying patient records, correct?
19              MS. TALCOTT:  Object to the form.
20        A.    Yes.
21        Q.    You were concerned that there was under-
22   staffing, which was dangerous, correct?
23              MS. TALCOTT:  Object to the form.
24        A.    Yes.
25        Q.    You were concerned that there was not an
```

Mandy Forsmann

```
 1   ability or there was a lack of accessibility to the
 2   Medical Observation Unit, correct?
 3            MS. TALCOTT:  Object to the form.
 4       A.   Yes.
 5       Q.   And the Medical Observation Unit is where you
 6   sent the sickest people, correct?
 7            MS. TALCOTT:  Object to the form.
 8            MS. AZEVEDO:  Join.
 9       A.   Yes.
10       Q.   So did it occur to you that -- did it seem to
11   you that the place where the patients were the
12   sickest is where the nursing staff should have the
13   most access?
14            MS. TALCOTT:  Object to the form.
15       A.   Yes.
16       Q.   With the highest qualified nurses, correct?
17            MS. TALCOTT:  Object to the form.
18            MS. AZEVEDO:  Join.
19       A.   I am sorry?
20       Q.   With the highest qualified nurses, meaning
21   the most credentialed.
22            MS. TALCOTT:  Same objection.
23       A.   Yes.
24       Q.   And you recognized that that was unsafe?
25            MS. TALCOTT:  Object to the form.
```

Mandy Forsmann

```
 1            MS. ALZEVEDO:  I'll join.
 2     A.   Yes.
 3     Q.   And dangerous?
 4            MS. TALCOTT:  Object to the form.
 5     A.   Yes.
 6     Q.   And that's exactly what you communicated to
 7  Corizon during your tenure as the director of nursing
 8  and as an HSA, correct?
 9            MS. TALCOTT:  Object to the form.
10            MR. HOOD:  Object to the form.
11            MS. AZEVEDO:  Join.
12     A.   I don't remember exactly which role I was in.
13     Q.   All right.  But while you were there, there
14  was no change to any of those things other than
15  Dr. McCarthy eventually getting fired, correct?
16            MS. TALCOTT:  Object to the form.
17            MS. AZEVEDO:  Object to the form.
18     A.   I don't remember.
19     Q.   That's all I have.  Thanks for your time.
20     A.   Thank you.
21
22                      EXAMINATION
23  BY MS. AZEVEDO:
24     Q.   Before picking staff, did you ever convey any
25  of your staffing concerns to Washington County?
```

Mandy Forsmann

```
 1   understaffing, correct?
 2           MS. TALCOTT:  Object to the form.
 3       A.    I don't remember.
 4       Q.    And did you ever communicate with anyone --
 5   well, did you feel that if a medical director was not
 6   doing their job appropriately that the medical
 7   director position was understaffed?
 8           MS. TALCOTT:  Object to the form.
 9           MS. AZEVEDO:  Join.
10       A.    I don't understand the question.
11       Q.    Sure.  If the medical director is not doing
12   their job safely, would you agree that that position
13   is understaffed?
14           MS. TALCOTT:  Object to the form.
15           MS. AZEVEDO:  I'll join.
16       A.    Yes.
17       Q.    And did you -- while the HSA, did any of the
18   deputies at Washington County Jail ever communicate
19   any concerns they had to you about Madaline Pitkin?
20       A.    No.
21       Q.    Did you ever learn of anyone at Corizon who
22   had received either verbal or written complaints or
23   concerns from any deputies at Washington County about
24   Madaline Pitkin?
25           MS. AZEVEDO:  Object to the form.
```

This document (Buchanan Narrative for BON) is filed under seal as an attachment to the Supplemental Declaration of John Coletti.



This document (Johnson Narrative for BON) is filed under seal as an attachment to the Supplemental Declaration of John Coletti.





**CORIZON**
Promote a culture of safety

**Nursing Encounter Tool**
*Withdrawal*

| Facility Name | | Location Seen | | Date seen ___/___/___ | Time Seen ○ AM ○ PM |
|---|---|---|---|---|---|

Patient's Name ___ Last ___ First ___ MI ___ ID Number ___ Birth date ___/___/___

Medication Allergies ○ N ○ Y If Yes List:

Chronic Care Clinic(s) ○ N ○ Y                    Last seen in Sick Call: ___/___/___

| ☐ Seizures ___/___ | ☐ Asthma ___/___ | ☐ CAD ___/___ | ☐ Dyslipidemia ___/___ |
|---|---|---|---|
| ☐ DM ___/___ | ☐ COPD ___/___ | ☐ HTN ___/___ | ☐ Other ___/___ |

| Drug/Alcohol | Amount | Frequency of use | Duration of use | Last use |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**S U B J E C T I V E**

| Past withdrawal history ○ N ○ Y | Present withdrawal symptoms ○ N ○ Y |
|---|---|
| (Check all that apply) | (Check all that apply) |

Past withdrawal history:
☐ DTs (delirium tremens)
  # of past withdrawal episodes:_____
☐ Alcohol amnesia (Blackouts)
Hallucinations:   ☐ Visual   ☐ Auditory   ☐ Tactile
☐ Tremors
☐ Nausea/vomiting/diarrhea   ☐ Withdrawal seizures

Present withdrawal symptoms:
☐ Tremors                                    ☐ Diarrhea
☐ Sweats                                     ☐ Headache
Hallucinations:                              ☐ Gooseflesh
☐ Visual   ☐ Auditory   ☐ Tactile           ☐ Bone aches
☐ Anxiety/agitation                          ☐ Yawning
☐ Nausea/vomiting   ☐ Seizures              ☐ Runny nose

c/o Pain and/or injury ○ N ○ Y:  Describe_____
Past medical history:   ☐ Diabetes   ☐ Seizure disorder   ☐ CVD   ☐ HTN   ☐ CVA   ☐ Head injury
History of mental health treatment ○ N ○ Y
History of suicide attempt in last 6 months ○ N ○ Y: (See Emergent/Urgent Interventions, page 2)
☐ Other_____

New medications or change in last 30 days ○ N ○ Y: List_____

**O B J E C T I V E**

Response: AVPU (choose one) ○ Awake ○ Responds to Voice ○ Responds to Pain ○ Unresponsive

General appearance: Acute distress ○ N ○ Y: Describe:_____
Orientation to:          Person ○ Y ○ N          Place ○ Y ○ N          Time ○ Y ○ N
Combative ○ N ○ Y          Yawning ○ N ○ Y
Vital Signs: T_____ P_____ RR_____ BP ___/___ Wt._____ ○ Actual ○ Reported Pulse Ox_____ %

Visible tremor   ○ N ○ Y                    Skin: Cool ○ N ○ Y   Clammy ○ N ○ Y   Sweaty ○ N ○ Y   Pale ○ N ○ Y
Eyes:   Conjunctiva pale ○ N ○ Y          Sclera icteric ○ N ○ Y          Oral mucosa: ○ Moist ○ Dry

Visible injury ○ N ○ Y:Describe_____

☐ CIWA –Ar score:_____          ☐ BWS–C score:_____          ☐ COWS score:_____
(ETOH, barbiturate or multi substance)     (Benzodiazepine)                    (Opioid)

uHCG ○ (+) ○ (-) ○ N/A
Dipstick U/A ○ Normal ○ Abnormal (see labs) ○ Not done: Explain:_____

☐ Additional examination:_____

| Nurse's Signature | Print/Stamp Name | Title |
|---|---|---|
| | | |

©2013 Corizon Health, Inc.
Page 1 of 2

CORIZON007206

06/30/2033  07:04 3036712446        IVOR GARLICK MD_PC          #2190 P.009/018



**CORIZON**
Promote a culture of safety

**Nursing Encounter Tool**
*Withdrawal*

| Patient's Name | Last | | First | | MI | ID Number |
|---|---|---|---|---|---|---|

---

○ **Emergent intervention not required.**

Notify practitioner after EMS activation for:
Ineffective intervention with continuing or sudden acute deterioration of patient condition with:
☐ CIWA-Ar score 20-67    ☐ BWS-C score 41-80    ☐ COWS score 25-48

○ **Emergent Intervention required due to:**

EMS process activated      Time:_____ ○ AM ○ PM
EMS arrival                Time:_____ ○ AM ○ PM
EMS Transport              Time:_____ ○ AM ○ PM
Consider:    ☐ O₂    ☐ AED    ☐ CPR

☐ Other:_____

☐ Other:_____    Time:_____ ○ AM ○ PM
Practitioner notified:
☐ Suicide watch initiated and Mental Health practitioner notified    ☐ Mental health referral completed
☐ Mental Health practitioner notified    Name:_____                  Time:_____ ○ AM ○ PM

---

○ **Urgent intervention not required.**

Practitioner contact required for: (check all that apply)
☐ Vital signs:
☐ CIWA-Ar score >7          ☐ Altered mental status
☐ BWS-C score 21-40         ☐ Unable to take PO
☐ COWS score 11-24          ☐ Abnormal dipstick U/A
☐ Benzo use > 4 weeks       ☐ Hyperglycemia
☐ Xanax (alprazolam) use    ☐ Vomiting/diarrhea x12 hrs
☐ + uHCG                    ☐ Diabetes
☐ CVD                       ☐ Gross tremor or twitching
☐ History of withdrawal     ☐ Recurrent complaint
☐ Notify practitioner of rising score
☐ Other:_____
○ Seen by practitioner        ○ Contacted practitioner

Name:_____

Time:_____ ○ AM ○ PM
☐ History of suicide attempt in last 6 months (suicide watch initiated)

○ **Urgent intervention required due to:**

☐ See physicians orders for medical withdrawal of:
○ Alcohol  ○ Opioids  ○ Barbiturates  ○ Benzodiazepines

☐ See physicians orders (other)
☐ Same day practitioner visit/consult
Mental health referral completed for:
☐ CIWA-Ar score 10-67
☐ BWS-C score 21-80
☐ COWS score 11-48
☐ History of mental health treatment
☐ Treat per routine intervention

Transport via:_____    to:_____

Time:_____ ○ AM ○ PM

☐ Mental health referral completed

---

○ **Routine intervention**

**Disposition:**
In the absence of acute findings (any listed in the sections above), initiate routine interventions for patients who report a history of substance use.
Notify practitioner of new or worsening signs / symptoms.

☐ Medication review
Mental health referral completed for:
☐ History of mental health treatment

**Interventions:** (the following actions are required)
1.  Aggressive PO hydration
2.  Initiate withdrawal observation: Complete
    ☐ CIWA-Ar scale    ☐ BWS-C scale    ☐ COWS scale
    q-shift x 3 days
3.  Initiate withdrawal flowsheet
OTC medication given per guidelines          ○ N    ○ Y
☐ Medication:_____    ☐ KOP
☐ Other:_____

---

Contact practitioner or nursing supervisor if you have any concerns about the status of the patient.

| **Patient Education** | **Follow up / Follow through** |
|---|---|
| ☐ Patient educated to contact medical if symptoms develop or worsen | Nurse follow up scheduled          ○ N  ○ Y |
| ☐ Written information provided | Custody notified of special needs  ○ N  ○ Y |
| ☐ The patient demonstrates an understanding of self-care, symptoms | ☐  Lower bunk, lower tier |
| to report and when to return for follow-up care. | ☐  Other:_____ |

| Nurse's Signature | Print/Stamp Name | Title |
|---|---|---|

©2013 Corizon Health, Inc.
Page 2 of 2

NA6281
Issued 1/15/2013



CORIZON007232

## Responsibility

- Every employee must know policies and protocols

- Every nurse must exercise nursing judgment
  - Every situation without fail

**C⊘RIZON**

2

CORIZON007233

# Topics to be covered

- Withdrawal protocols
- Available tools
- Dehydration
- Nursing judgment
- Kites/Medical requests
- Sick call protocols – NET / PIFS
- Care of patient in medical unit/infirmary
- When/How to escalate
- Complacency



3

CORIZON007234

# Topics to be covered

- Basic Nursing skills/decision making
- Priming
- Sentinel event
  - Your responsibilities
  - What to do
  - What not to do
  - Case study presentation
- Media policy
- Questions/Answers

**CORIZON**

4

CORIZON007235

# Withdrawal

- We assess for and treat every day
- Must know all policies/procedures/protocols/forms
- Extremely important
- COWS/CIWA are completed **EVERY** shift during acute phase
- Patients can die from severe alcohol withdrawal and dehydration occurring in any withdrawal if not treated



5

CORIZON007236

## Available tools

- Available tools
  - Policy – J-G-06.00
  - COWS/CIWA/BWSC score form
  - COWS/CIWA practitioner order form
  - NET – Withdrawal
  - PIF Substance Abuse Withdrawal
  - Decision Support – quick reference guide
  - Detoxification Program
  - Clinical Pathway – substance abuse
  - Correctional Officer Briefing – Substance abuse withdrawal



**C♦RIZON**

6

CORIZON007237

# Kites/Medical requests

- RN should triage request
- Every pt MUST be seen no exceptions
- Immediate, 24-48 hours MAX
- NET usage for visit
- Assess thoroughly
- Repeated request – why – look at more closely
- PIFS as indicated and document education provided



9

CORIZON007240

## Care of pt in medical unit

- Nurses can move pt into medical
- Must be seen EVERY shift
- Focused assessment and documented
- Review of COWS/CIWA scores and assessment
- Shift report – every pt
- Complete NETs as indicated by assessment
- Take VS and document
- Only provider can order out of medical
- Complete assessment before transfer - handout



**C⬛RIZON™**

10

CORIZON007241

## When/How to escalate

- Review all documentation
- Speak to staff – obtain their observations, assessment and recommendations
- You must communicate concerns to provider
- Offer suggestions
- Can you help me understand - _____
- I am not comfortable with this decision and will be calling SMD, RMD, VP, ect
- Make the call – escalate up the chain
- You should NEVER feel bad about going to next level
- Documentation



11

CORIZON007242

# Complacency

- Withdrawal cannot become routine
- Be alert for priming – huddle if needed
- Most withdrawals are without complications
- Must always be alert for those with complications
- Need to take immediate action



**C✦RIZON**

12

CORIZON007243

## Basic Nursing skills/decision making

- Must always follow the nursing process
- Critical VS, symptoms, labs must be addressed
- Most critical pts needs to be seen by HSA/DON
- Ordering nursing measures as indicated is key
- NETS/PIFS – guides
- Listen to gut feelings – escalate as needed
- Documentation



**CORIZON**

13

CORIZON007244

# Sentinel event

- Your responsibilities
  - Notify HSA/DON
  - Sequester chart
  - Initiate paperwork
  - Copy chart – RMD, sentinel event committee, Legal
  - HSA/DON - Notify VP, Britt Herron – legal, RMD
  - Do NOT talk about incident among yourselves
  - Begin thorough investigation
  - Root cause analysis
  - CAP
  - Case study presentation



14

CORIZON007245

# Media Policy

- Media policy should posted
- All staff must know
- Do Not Speak to any press



**C&RIZON**

15

CORIZON007246

# HSA/DON

- Education of staff
- Audits
- Protocols written
- Policy/Procedure Book current



16

CORIZON007247

## Responsibility

- Every employee must know policies and protocols

- Every nurse must exercise nursing judgment
  - Every situation without fail



17

CORIZON007248



- Questions/Comments

CORIZON007249

| General Health Services<br><br>Policy & Procedure | C**Ꙅ**RIZON™<br><br>Date of Issue: 10/29/2012 |
|---|---|
| Site Name: Dona Ana County Detention Center | Revision Dates: 3/1/13 |
| Title: Intoxication and Withdrawal | No: J-G-06.00 |

**POLICY:**

Specific protocols exist for patients under the influence of alcohol or other drugs or those undergoing withdrawal. The Corizon protocols are located in the Substance Abuse Withdrawal Program.

**PROCEDURE STATEMENTS:**

**NCCHC/ACA**

1. Inmates are evaluated for the use of and/or dependence on alcohol or other drugs during the receiving screening process.

2. Established guidelines are followed for the treatment and observation of individuals manifesting symptoms of intoxication or withdrawal.

3. These guidelines are approved by the Medical Director, are current, and are consistent with nationally accepted guidelines.

4. Detoxification is done under physician supervision in accordance with local, state, and federal laws.

5. Inmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are transferred, under appropriate security conditions, to a licensed, acute care facility.

6. Individuals at risk for progression to more severe levels of intoxication or withdrawal are kept under constant observation by qualified health care professionals or health trained correctional staff and whenever severe withdrawal symptoms are observed, a physician is consulted promptly.

7. Patients with alcohol or other drug problems are assessed and properly managed by a physician or, where permitted by law, other qualified health care professionals.

8. When a pregnant female is admitted to the facility with a history of opiate use, the Medical Director is contacted so that the opiate dependence can be assessed and treated appropriately.

**REFERENCES**

NCCHC: Standards for Health Services in Jails, 2008 , J-G-06
NCCHC: Standards for Mental Health Services in Correctional Facilities 2008, MH-G-05
ACA: Standards for Adult Local Detention Facilities, 4th Edition, 4-ADLF-4C-36
ACA: 2012 Standards Supplement – no revisions

CORIZON007324

May 8, 2014

ATTN: Nursing Staff

RE:    Changes made to Procedures involving Medical Observation Unit and Medical request Forms/Clinic

Please NOTE:    The following alterations to our Policies and Procedures over-ride our current Policy and Procedure manual.

## MOU Changes

- ✓ RN's responsible for MOU – This is not yet officially in that we need assistance from corrections and they need some time to make the necessary staff adjustments. We will keep you updated on when we will be starting Q Shift Vital Signs and Focused Assessments. Until then, we will do our best to retain RN's in the Medical Observation Unit; however, due to our own staffing, LPN's may be asked to fill-in. NOTE: LPN's and RN's are both qualified for performing ANY detox assessment including Detox Flow Sheet and Vital Signs and administering associated medications.

## Medical Records Form (MRF) Changes

- ✓ RN's responsible for triaging MRF's Q Shift
- ✓ Triage EACH MRF with the Date stamp, document the time of triage and include the initials of who triaged the form.
- ✓ Triage via #1 - #2 - #3
    - o Triage #1 –TO BE SEEN IMMEDIATELY- Airway, Breathing, Circulation, Chest Pain, Detox reports (despite if already on protocol), symptoms reported such as nausea, vomiting, diarrhea.
    - o Triage #2 – General discomforts, medication time changes, etc.
    - o Triage #3 – Requests for 2nd Mattresses/TB Results, general questions for medical, etc.

## MRF Clinic

- ✓ Every person reporting to clinic related to a MRF must have a NET completed
- ✓ Fill-in ALL blanks on NET Form or place an "N/A" if question is "Not Applicable"
- ✓ Patients MUST be seen within 72 hours of triage. Utilize time management and effective communication to ensure this happens. Notify Mandy or Leslie if MRF's are beyond the 72-hour window.

## DETOX Clarifications:

- ✓ If and when starting Taper Orders related to BENZO Detox; it is NOT necessary to continue with Flow Sheet and Vital Signs Q Shift. Start Taper Medications. Okay to remain in General Population.
- ✓ Any patient reporting a potential for Opiate Detox will start COWS checks immediately and will continue Q SHIFT for 3 DAYS.Not long enough. Review the SAW information. Someone on methadone wouldn't even start withdrawing. Needs to be based on symptoms, drug sued (half life)
- ✓ Opiate Detox with minimum symptoms; ex: only diarrhea – move to pods, continue COWS checks Q Shift....until medication treatment is complete – Medications to be distributed via AM-PM-HS Medication Pass.
- ✓ Full Detox – scoring 11 I would recommend 8 and above need to be moved to MOU and started on Protocol.
- ✓ If patient refuses meds/detox checks; have them sign a *Release of Clinical Services Form* and get order from Provider to D/C detox protocol checks and medications. Move them out of the MOU. I think we need to continue to ask the pt to check them, need a refusal form with risks and benefits completed for each refusal Needs to stay in MOU until through withdrawal,

CORIZON007446

CERTIFICATE

REPORTER'S CERTIFICATE

1

2

3        I, Kim Otis, a Certified Court Reporter in and

4    for the State of Washington, residing at Olympia,

5    authorized to administer oaths and affirmations

6    pursuant to RCW 5.28.010, do hereby certify;

7        That the foregoing Deposition Upon Oral

8    Examination of MANDY FORSMANN was reported by me and

9    thereafter reduced to a typed format under my

10   direction; that said transcript is a full, true and

11   correct transcript of my shorthand notes of

12   proceedings heard on the 23rd day of January, 2018, at

13   Lacey, Washington;

14       That the above-named witness before examination

15   was by me duly sworn or affirmed to tell the truth,

16   the whole truth and nothing but the truth; that I am

17   not a relative or employee of counsel or either of the

18   parties therein or otherwise interested in said

19   proceedings.

20       WITNESS MY HAND on this 28th day of January,

21   2018.

22

23                              Kim Otis, CCR No. 2342

24

25

Page 148