# Deposition Of:
## Cristin Rettler

May 14, 2018

Russell Pitkin and Mary Pitkin
vs.
Corizon Health, Inc.; et al.

Case No.: 3:16-cv-02235-AA



S Y N E R G Y

L E G A L

LITIGATION SUPPORT SERVICES

Cristin Rettler

```
 1   time.  Right now, I'm working there full time,
 2   probably for about six years.  I -- I think I started
 3   there just after I left the ER at Tuality.
 4       Q.   All right.  Can you just tell me about your
 5   educational background.
 6       A.   I graduated from Pacific University in
 7   Forest Grove.
 8       Q.   What year did you graduate?
 9       A.   '02.
10       Q.   And what did you do after graduating?
11       A.   I worked in primary care for a while.  Then
12   I worked in urgent care.  I -- I was working in the ER
13   at Tuality when I started at the jail.
14            And then after I left there, I went back to
15   working full time at -- at -- at Tuality Hospital.
16   And then at Tuality Physicians.
17       Q.   All right.  How long did you work for
18   Corizon?
19       A.   That's a good question.  I think it was just
20   under two years.  I -- I -- that's my best
21   guesstimate.
22       Q.   Gotcha.  And let's just look at these
23   records.  They're in the 2013 time frame.
24            Do you know what year you started working
25   for Corizon?
```

Cristin Rettler

```
 1        A.   Like I said, I feel like it was just another
 2   two years.  So I think this was at the end of my
 3   employment.  So maybe back up 18 months.
 4        Q.   All right.  And how did you get the job
 5   there?
 6        A.   How did I get the job?
 7        Q.   Yeah.
 8        A.   I applied.
 9        Q.   I mean, what made you decide go to work for
10   Corizon?
11        A.   Okay.  So I was working at Tuality in the
12   ER, and we would -- they would bring patients in
13   sometimes from the jail, or before they went to the
14   jail, they would bring patients in.
15             And then I heard that they had an opening,
16   and I applied.  I did not realize at that time that I
17   would not be working for the County --
18        Q.   Okay.
19        A.   -- that I -- that I'd be working for a
20   subcontractor.
21        Q.   All right.
22        A.   And I interviewed with Steven Hyppolite.
23   Stevens Hyppolite, which is now in prison.
24        Q.   Yeah.  We've taken his deposition.
25        A.   Okay.
```

Cristin Rettler

```
1        Q.    And --
2        A.    He's easy to find.
3        Q.    Yeah.  Why did you leave Corizon?
4        A.    Because I had serious concerns about the
5    level of care that was being offered to the patients
6    there, and I was concerned for my medical license.
7        Q.    Can you tell me about your concerns?
8        A.    The nursing -- the nurses were often hired
9    right out of LPN school, and so they -- while I had
10   the utmost respect for them, I found them to be very
11   hardworking, very empathetic group.  Just were really
12   out of their depths, I thought, for the level of care
13   that was needed.
14          It's a very sick population at the jail. And
15   they -- the staffing matrix was not followed.  So
16   there were numerous times that I was -- near-misses,
17   where I thought someone could have had a very bad
18   outcome and it was just by luck that they didn't. Like
19   I overheard a conversation and I said, wait, what
20   happened, you know, that kind of thing.
21          And so I talked to my supervising physician
22   about it, Joe McCarthy, who I have tremendous respect,
23   and he is very, also, hardworking and empathetic.
24          And I spoke to someone from Corizon who
25   came, whose name I actually don't recall.  He -- it
```

Cristin Rettler

1  wasn't Garlick.  Garlick was my immediate supervising

2  chain-of-command person --

3       Q.   Does Dr. Orr --

4       A.   -- who I had never met.

5       Q.   Does the name Orr sound familiar?

6       A.   Orr.  Yes.  Harold Orr.  Correct.

7       Q.   So you talked --

8       A.   I -- I spoke to him about his concerns when

9  he came on-site.  And I did e-mail him as well about

10  some specific questions I had about pain management, I

11  believe.

12            And I was -- I was punished when it was

13  known that I was raising concerns.  I was written up.

14  And then I decided that I needed to leave Corizon.

15            And I -- I told the sheriff that I wanted to

16  talk to him.  I spoke to the sheriff on two separate

17  occasions.  Early when I was there, when I had -- when

18  I had some concerns.  And then after I decided to

19  leave, I -- I believe I had maybe already put in my

20  resignation when I decided I wanted to have, like, an

21  exit interview with him, and he was very receptive to

22  that.

23            And I expressed my concerns about Corizon,

24  and their -- I thought their goals of reducing costs

25  were in direct conflict with the goal of caring for

Cristin Rettler

 1  our patients.  And --
 2       Q.   Did it appear to you that Corizon was
 3  placing profit over patient safety?
 4       A.   That was absolutely --
 5            MS. TALCOTT:  Object to the form.  You have
 6  to give me a chance to object.
 7  BY MR. COLETTI:
 8       Q.   Go ahead.  And did you communicate your
 9  safety concerns to Dr. Orr as well?
10            MS. TALCOTT:  Object to the form.
11            MS. SMITH:  Join.
12  BY MR. COLETTI:
13       Q.   Go ahead.  Go ahead.  Just tell me what you
14  told Dr. Orr.
15       A.   When -- when Dr. Orr came, I talked to him
16  about the staffing matrix; that I had concerns that
17  the nurses were undertrained and that there were not
18  enough of them to meet the demands of the jail.  That
19  was one thing that I talked to him about.
20            And the other thing that I talked to him
21  about was this issue of pain management; that I was --
22  I had tremendous pressure to never prescribe any pain
23  medications.  And so Dr. -- let me back up and go to
24  Dr. Garlick.
25            I had weekly meetings by phone with

Cristin Rettler

1 Dr. Garlick, and I would have to go over all of the
2 patients that I sent to the ER.  Now, I work at that
3 ER and I work at the jail, so I know exactly what -- I
4 feel no one is more aware of what we can handle at the
5 jail versus what we can handle in the ER.  And if
6 there was, you know, any sort of, you know, safety
7 concerns, then I made the executive decision to send
8 them.  And if Dr. McCarthy was there, I would talk to
9 him about it.  He was only there ten hours a week,
10 so -- and I was there -- I was the only full-time
11 medical professional there.
12         So Dr. Garlick would go through each case
13 with me and tell me why it was not appropriate to send
14 that person, regardless of what the situation was.
15 And every time -- my mom's an attorney and, you know,
16 she was worried for me, too.  And every time she said,
17 you need to get him to put that in writing because
18 something is going to happen, and that's going to be
19 your medical license.  Because I can't just say, oh,
20 Dr. Garlick won't let me send these people.
21         But no matter what the situation was, he --
22 he gave me pushback about it.
23     Q.  Did -- did he ever put any -- any of this in
24 writing?
25     A.  No.  And I said that at every weekly call.

Cristin Rettler

```
 1   I left.
 2        Q.   All right.  So is it fair to say there were
 3   no changes?
 4             MS. TALCOTT:  Object to the form.
 5        A.   No, there were no changes.
 6   BY MR. COLETTI:
 7        Q.   And you spoke with Dr. McCarthy as well
 8   about your concerns?
 9        A.   On a constant basis, yeah.
10        Q.   And what did he say?
11        A.   Well, he was concerned as well.
12        Q.   Did you -- did you and he discuss your
13   concern about the staffing, the limited staffing?
14        A.   We did.
15        Q.   Did you discuss your concerns regarding the
16   training of the nurses?
17             MS. TALCOTT:  Object to the form.
18   BY MR. COLETTI:
19        Q.   Or the experience, rather, of the nurses?
20        A.   Yeah, it's -- it was more the experience.
21   Caring for that sick of a population, I mean, you --
22   you need -- you don't know what you don't know.  And
23   that -- that was usually what -- it wasn't that the
24   nurses didn't care.  I never -- I never felt that way.
25   I felt that they just didn't know what needed to be
```

Cristin Rettler

1    brought to me because of lack of experience and

2    because they were just so overwhelmed.

3          Sometimes they'd be running calls all day,

4    call -- like backup calls when they -- like, you know,

5    someone would have chest pain or have -- there would

6    be a fight or something.  And so then they'd be so far

7    behind with their regular duties of dispensing seizure

8    medications, you know, things like this.  It was -- it

9    was very important work that they were doing, and they

10   were just so, so over- -- understaffed and

11   overwhelmed.

12        Q.   All right.  Did -- when you said the patient

13   population was very sick, what do you mean by that?

14        A.   So a lot of these people have very serious

15   mental health issues.  A lot of these people have

16   chronic illnesses, like -- that was another issue --

17   like COPD, that there's a -- there's a formulary.

18   This is something I specifically spoke with

19   Dr. Garlick and Dr. Orr about.

20          There's a formulary of inhaler medications

21   that are paid for.  And so these people would come in,

22   and they couldn't breathe.  They were poorly

23   controlled on the medications on this formulary.

24   Multnomah County doesn't do this.  Multnomah County

25   keeps them on their medications.  And they would --

Cristin Rettler

```
 1  Corizon would change their medications to these cheap
 2  meds.  And they -- they were in their cells, and they
 3  could not breathe.  And I witnessed this.
 4          And so, you know, I would say, we need to
 5  make an exception for these -- for these few patients,
 6  and they wouldn't.  They would say, you know, well,
 7  they're -- they're -- they're about to get kicked.
 8  That's what they -- that was a common response I got.
 9  They're about to get kicked, meaning they're about to
10  leave.  So, you know, like then they're not our
11  problem, once they leave.
12      Q.   All right.  I'm going to read to you -- this
13  is from another case involving Corizon, and these were
14  actually summaries of what the witnesses were going to
15  say at trial.  And just to find out if you had similar
16  experiences with your time with the Washington County
17  jail with Corizon.
18          And their first is of a Dr. Charles Pugh, P-
19  U-G-H.  It says that he will testify that as the
20  Corizon site medical director, he was required by
21  Corizon to submit all physician consults and for the
22  last six months of his employment, emergency room
23  transfer requests to the Corizon regional medical
24  director; and he was under constant pressure from his
25  superior in Corizon to minimize emergency room
```

Cristin Rettler

 1  **referrals, as well as referrals to outside physicians**

 2  **for specialized consultations in order to save Corizon**

 3  **money.**

 4      A.   Absolutely, that was my experience.

 5      **Q.   It says he was under constant pressure to**

 6  **avoid hospitalizations, to monitor all**

 7  **hospitalizations, to do whatever he could to have**

 8  **hospitalized patients discharged from the hospital and**

 9  **returned to the jail to minimize hospital stays.**

10          MS. TALCOTT:  Is there a question?

11  BY MR. COLETTI:

12      **Q.   Yes.  Did you have a similar experience?**

13          MS. TALCOTT:  Object to the form.

14      A.   We -- they would procrastinate as long as

15  they could on referrals, on getting -- because you had

16  to get an approval for a referral.  So any sort of

17  specialty care.  Because, again, they were hoping that

18  they would get kicked.  And they specifically told me

19  that; that, like they were hoping that the patient

20  would leave before they had to get this referral.

21          And I was under weekly pressure from these

22  meetings.  Tuesday morning I had to report to

23  Dr. Garlick and tell him any time that I sent --

24  any -- they would have the list -- they would have the

25  chart sitting next to the phone for me, and I would

Cristin Rettler

```
 1   have to go over each patient and justify why I sent
 2   them.
 3           And it was brutal.  I mean, he -- I don't
 4   think he ever thought I -- I appropriately sent
 5   someone to the ER.  And these are people -- just
 6   ridiculous.  No medical doctor -- I mean, I couldn't
 7   believe that he was a medical doctor and he would say
 8   that to me.
 9   BY MR. COLETTI:
10       Q.   All right.  Did they tell you that they were
11   trying to save money?
12       A.   Yes.  Yes.  That costs us money.  That --
13   that's -- that was his reasoning.  That costs us
14   money.
15       Q.   It says, Dr. Pugh will explain that
16   Corizon's constant efforts to reduce costs interfered
17   with his ability and the ability of his jail medical
18   and nursing staff to provide appropriate levels of
19   care to inmates.  Was that your experience as well?
20           MS. TALCOTT:  Object to the form.
21       A.   That was absolutely my experience.  That's
22   the reason I left.
23   BY MR. COLETTI:
24       Q.   It says that at -- on August 26th, 2014,
25   Dr. Pugh, along with two Corizon nurses, met with the
```

Cristin Rettler

1   **Chatham County sheriff and chief deputy.  At that**

2   **meeting, Dr. Pugh and the nurses expressed their**

3   **concerns about patient safety issues and the poor**

4   **quality of care being provided to the inmates.**

5           **Sounds like a similar meeting that you had,**

6   **correct?**

7       A.   Yes.

8            MS. TALCOTT:   Object to the form.

9       A.   Yes.

10  BY MR. COLETTI:

11      **Q.   And you had that meeting both with the**

12  **sheriff and with Dr. Gar- -- or Dr. Orr and**

13  **Dr. Garlick?**

14           MS. TALCOTT:   Object to the form.

15           MS. SMITH:   Object to the form.

16  BY MR. COLETTI:

17      **Q.   Go ahead.**

18      A.   Yes.

19      **Q.   And you communicated the same information to**

20  **Latham Stack, correct?**

21      A.   I did.

22           MS. TALCOTT:   Object to the form.

23           MS. SMITH:   Object to the form.

24  BY MR. COLETTI:

25      **Q.   And did you also speak with John Hutzler?**

Cristin Rettler

```
 1        A.   I never spoke with him.
 2        Q.   All right.
 3        A.   I made myself available to speak to him.
 4        Q.   All right.  And did he ever -- he never
 5   contacted you?
 6        A.   No.  He's the one that forwarded me these
 7   e-mails.  But before then, I hadn't read anything from
 8   him.
 9        Q.   All right.
10        A.   I did give Latham Leslie O'Neil's
11   information as well, and she also spoke with either
12   Latham or his supervisor.  I don't know which one.
13        Q.   Okay.  And did you -- did Ms. O'Neil voice
14   her concerns to you?
15        A.   Yes.  We talked about it regularly.
16        Q.   And did she also have concerns about the
17   safety of the patient care?
18        A.   She did.
19             MS. TALCOTT:  Object to the form.  You have
20   to give me time to object.
21             MS. SMITH:  Join.
22   BY MR. COLETTI:
23        Q.   All right.  And how many times do you think
24   you and Ms. O'Neil talked about your concerns?
25             MS. TALCOTT:  Object to the form.
```

Cristin Rettler

```
 1              MS. SMITH:  Join.
 2         A.   I would say probably on a weekly basis for
 3    the last many months that I worked there.  I
 4    mean . . .
 5    BY MR. COLETTI:
 6         Q.   All right.  And you said -- so you reported
 7    directly to Dr. Garlick.  And it sounds like
 8    Ms. O'Neil was there.
 9              Who was -- do you remember who the HSA was
10    while you were there?
11         A.   Mandy Forsmann.
12         Q.   Mandy Forsmann.  Did you communicate your
13    concerns to Ms. Forsmann?
14         A.   I did.
15         Q.   And what did she say?
16         A.   That I should voice my concerns to
17    Dr. Garlick.
18         Q.   And you said you were written up when you
19    started to --
20         A.   That was --
21         Q.   -- to complain, correct?
22         A.   Right.  So that was with the next -- the
23    person that took over for Hyppolite.  Vickie.  Uh-huh.
24         Q.   All right.  And what did -- can you tell me
25    what she did?
```

Cristin Rettler

1      A.   She wrote me up for having salad dressing in

2   the refrigerator because that's glass, and they're not

3   allowed to bring glass in the jail.

4           And she wrote me up another time, directly

5   after I complained.  I had a PA student that I was

6   supervising.  And as part of my obligation for -- in

7   his supervising capacity, I review his charts.  And if

8   there's a correction that needs to be made, you put a

9   line through it and you put your initials.

10          I did that, and she said that I was

11  falsifying a medical document when I did -- which

12  is -- I mean, she knows that that's -- it was clear

13  that she was sending me a message.

14      Q.   All right.  Because of your complaints?

15      A.   Because I was complaining.

16          MS. TALCOTT:  Object to the form.

17  BY MR. COLETTI:

18      Q.   And -- sorry.  I'm just going to keep going

19  on Dr. Pugh's statement.

20          He says, as a site medical director,

21  Dr. Pugh was invited to attend annual meetings with

22  other site medical directors and others in Tennessee,

23  and he attended these meetings both in 2013 and 2014.

24          At the 2014 meetings, there was a

25  presentation one day after lunch by someone from

Cristin Rettler

1  utilization management that lasted approximately an
2  hour and a half and was focused on how to save money.
3          One of the topics that was emphasized was
4  minimizing the number of emergency room referrals of
5  jail inmates.  Did you attend similar meetings?
6          MS. TALCOTT:  Object to the form.
7      A.   I did.
8  BY MR. COLETTI:
9      Q.   And did you -- did -- did Corizon share
10 similar information with you?
11         MS. TALCOTT:  Object to the form.
12     A.   They did.
13 BY MR. COLETTI:
14     Q.   Can you tell me about that?
15         MS. TALCOTT:  Object to the form.
16     A.   I remember the focus of one meeting was how
17 to document -- first of all, I -- I was ashamed at
18 being at that meeting, the things that were presented.
19 And I wish that I could have recorded some of these
20 meetings.
21         I -- I was shocked that these were medical
22 presentations that were given.  You know, it was all
23 doctors and a couple mid-levels.  It seemed more like
24 a Wall Street mogul kind of meeting, like how you
25 would, like, avoid -- how to make money.  That -- that

**Cristin Rettler**

1  seemed the focus of all of the talks.  It was -- it

2  was not about patient care at all.  There was really

3  no discussion of patient care.

4           I thought it was going to be a discussion on

5  how to provide appropriate care within this

6  environment, but that wasn't at all what the lectures

7  were about.  It was how to make Corizon money.  Every

8  single lecture was that.

9           MS. TALCOTT:  Objection.

10 BY MR. COLETTI:

11      **Q.  All right.**

12           MS. TALCOTT:  Objection.  Nonresponsive.

13 BY MR. COLETTI:

14      **Q.  And do you remember, was there anyone else**

15 **with you from Washington County jail?**

16      A.  Yeah.  Hyppolite.  He thought it was great.

17 He was all on board with that --

18           MS. TALCOTT:  Object.

19      A.   -- and so was Vickie.

20           MS. TALCOTT:  Objection.  Nonresponsive.

21 BY MR. COLETTI:

22      **Q.  All right.  Did you ever meet Debbie Fye or**

23 **talk with Debbie Fye?**

24      A.  I don't know if I know who that is.

25      **Q.  That name doesn't ring a bell?**

Cristin Rettler

1       A.   Yes.

2       Q.   **And the same thing with the County?**

3            MS. SMITH:  Object to the form.

4            MS. TALCOTT:  Join.

5       A.   So I -- you know, I had weekly contact with

6  Dr. Garlick.  And I was contact -- I was, for a time,

7  communicating with Dr. Orr, but then I wasn't allowed

8  to anymore.  And I met with the sheriff just those two

9  times to talk to him about it.

10           But I did -- you know, I summarized all of

11 my concerns and, you know, I -- I felt like I was as

12 thorough as, you know, I could have been.  And I

13 feel -- I feel like he left there understanding that I

14 had concerns about patient safety.

15 BY MR. COLETTI:

16      Q.   **All right.  That's in your discussion with**

17 **Dr. -- or with Pat Garrett?**

18      A.   Yes.

19      Q.   **Did you ever send any -- other than the**

20 **e-mails we've got marked as Exhibit 97, did you ever**

21 **send any documentation to Corizon or the County about**

22 **your concerns?**

23           MS. TALCOTT:  Object to the form.  None of

24 these are e-mails to Corizon.

25           MS. SMITH:  Join.

Cristin Rettler

1  BY MR. COLETTI:

2      **Q.   Go ahead.**

3      A.   So Pat Garrett didn't ask for any

4  documentation.

5      **Q.   Uh-huh.**

6      A.   And Corizon wanted to avoid any

7  documentation.  That was clear.  Like -- Dr. Garlick

8  did not want me to send him e-mails.

9      **Q.   Did he specifically --**

10     A.   And he would not -- yes, he specifically

11 told me that; that we can talk about things on the

12 phone.

13         MS. TALCOTT:  Objection.  Nonresponsive.

14 BY MR. COLETTI:

15     **Q.   Go ahead.  So when you -- when you expressed**

16 **an interest in communicating through e-mail to**

17 **document your concerns, Dr. Garlick said he wanted to**

18 **do -- do it by phone?**

19         MS. TALCOTT:  Object to the form.

20     A.   And when I would -- when I would e-mail him,

21 as my mom instructed me to do, specific questions

22 saying, you know, okay, you said this on the phone and

23 I want, you know, to clarify the policy, he would not.

24 And he would -- he became angry about it.

25 BY MR. COLETTI:

Cristin Rettler

```
 1        A.   I was never told that it was appropriate to
 2   send anyone to the ER, by Dr. Garlick.  According to
 3   Dr. Garlick, no matter what was going on, I -- I could
 4   handle it there in the jail.
 5   BY MR. COLETTI:
 6        Q.   So not -- not one time did he ever say it
 7   was -- it was justified to send a patient out?
 8        A.   He gave me pushback on every single patient;
 9   that how I could have handled it differently; that I
10   could have waited; that I -- they -- they were being
11   released; that it wasn't an actual emergency.  He --
12   he never -- he never thought it was appropriate.
13        Q.   Were you familiar with any program at
14   Corizon to actually provide you a bonus financially if
15   you did -- if you avoided sending a patient out?
16        A.   No.
17             MS. TALCOTT:  Object to the form.
18   BY MR. COLETTI:
19        A.   There -- so there's one exception to that,
20   sort of.  And if -- if I -- if there was a laceration
21   and I wasn't working and the nurses called me and
22   said, I think this needs to be sewn up, if I would
23   come in, they would give me -- it wasn't worth
24   anything -- it was, like, $150 or something, or $170.
25   Something like that.
```

Cristin Rettler

1   sentinel events, which is like when someone dies at

2   the jail.

3        **Q.   Yeah.**

4        A.   And there were a few sentinel events that

5   occurred right before I started.  I thought that's how

6   the audit started, but I could be wrong.

7             So I took the MAX every day, and I ended up

8   sitting next to Latham on the MAX and we just struck

9   up a conversation.  And he -- he thought that I had,

10  like, sought him out, but I -- I hadn't.  It was --

11  it's just -- as soon as he said his name, I recognized

12  it, though, because it's an unusual name.  Because I

13  had seen it on the paperwork at those meetings.  And I

14  told him immediately that if he had any questions, I

15  would be willing to talk to him.

16       **Q.   And -- and just walk us through what**

17  **happened then.**

18       A.   I think then it was -- I mean, that's pretty

19  much the e-mail trail.  Then I said, I mean, if you

20  have any questions about how jail medical is actually

21  run, you know, I'd be willing to talk to you.  I -- I

22  think by then I had already maybe had one meeting with

23  the sheriff.  And I had been talking to Dr. McCarthy

24  regularly and some of the nurses about, you know, my

25  concerns.

Cristin Rettler

```
 1          And -- and then he -- I didn't -- I mean,
 2   I -- you know, he -- he says in here about how, you
 3   know, it's wonderful that I'm willing to take these
 4   chances.  And I didn't feel like I really was all that
 5   helpful, actually, at the time.  Because I -- I didn't
 6   have access to all those matrix that they weren't
 7   fulfilling in the jail.  You know, that -- we all
 8   asked for those regularly.
 9          I -- I knew that they weren't fulfilling.
10   There's no way that the County would have agreed to
11   have, you know, like three nurses on, you know, with
12   this sick of a population.  I mean, there's -- there's
13   no way that the County contract, that that would have
14   been approved that that was appropriate.
15          So I -- I assumed that Corizon -- and
16   knowing Corizon's cost-cutting measures, I assumed
17   that was the case.  But I -- you know, Vickie never
18   would have given me access to anything like that.
19          MS. TALCOTT:  Objection.  Nonresponsive.
20          MS. SMITH:  Join.
21   BY MR. COLETTI:
22      Q.  All right.  Do you know if there was -- do
23   you know if there were any conversations between
24   Corizon and the jail about increasing nurses, the
25   number of nurses?
```

Cristin Rettler

1          And I remember what Kate had told me was

2     that she was withdrawing from heroin, and she was in

3     MOU.  And -- I mean, I could talk about MOU, too, if

4     you want.

5          **Q.   Sure.**

6          A.   So in some ways, I felt that patients who

7     were in withdrawal were better off in the general

8     population because of the critical nursing shortage

9     issue there.  So other inmates would look out for them

10    when they were in the general population.

11         If they were in MOU, they were sometimes put

12    in a cell by themself or with one other person that

13    was in a similar situation.  And the jail police

14    officers, while I thought they cared, I didn't find

15    they were callous or anything like that, they had no

16    level of training whatsoever.  They -- they didn't

17    know the most basic things.

18         And so if there was problems in other units,

19    as I described, and the nurses were distracted and not

20    able to attend to the MOU, well, that's a dangerous

21    situation because they're in there by themselves.

22         **Q.   All right.**

23         A.   And they have cameras.  But, you know, if

24    the people are laying down or if they're in distress,

25    I mean, it looks the same on the camera.  And it looks

**Cristin Rettler**

1    the same to an untrained police officer.

2        **Q.    And are those concerns you expressed to**

3    **Corizon?**

4        A.    Of course.

5            MS. TALCOTT:    Object to the form.

6    BY MR. COLETTI:

7        **Q.    And did anyone address your concerns?**

8        A.    No.    That was what -- you know, one of the

9    things I was speaking to with the critical nursing

10    shortage.    That's -- that's what nursing shortage

11    --that's what happens when you're understaffed with

12    nurses.

13        **Q.    Sure.**

14            MS. TALCOTT:    Object to the form.

15    Nonresponsive.

16    BY MR. COLETTI:

17        **Q.    Did Dr. -- or did Sheriff Garrett ever tell**

18    **you whether or not they had authorized the nursing**

19    **staffing matrix that was being used?**

20            MS. SMITH:    Object to the form.

21            MS. TALCOTT:    Join.

22        A.    Well, my understanding was that there was

23    this nursing matrix, and then that's what the County

24    was paying for.    And so when I was speaking to him,

25    you know, his concern was that basically that, you

Cristin Rettler

1   know, they weren't getting what they were paying for.

2   That was part of it, you know.  Because the reason

3   they converted to a private organization is to save

4   money and, you know, if they weren't getting what they

5   were paying for, you know, that was a concern.

6           And then, you know, the other concern was,

7   you know, of course, the ethical piece.  But -- and I

8   did think that the sheriff cared about that; that the

9   patients were not being cared for.

10  BY MR. COLETTI:

11      Q.   All right.  But there was no change in

12  nursing in terms of staffing?

13          MS. TALCOTT:  Object to the form.

14          MS. SMITH:  Join.

15      A.   Not that I could see, no.

16  BY MR. COLETTI:

17      Q.   All right.

18      A.   There was not.

19      Q.   All right.  Well, let's --

20      A.   And another thing that Vickie used to say a

21  lot is that, well, we -- we can't find anyone.  And, I

22  mean, I don't -- I assumed that was because they were

23  paying so much less than anywhere else.  And so that

24  may have been true.

25      Q.   Do you -- do you --

Cristin Rettler

```
 1                      CERTIFICATE

 2

 3      I, Marcel N. Johnson, Certified Shorthand Reporter

 4   for Oregon and Washington, and a Registered

 5   Professional Reporter, do hereby certify that CRISTIN

 6   RETTLER personally appeared before me at the time and

 7   place set forth herein; that at said time and place I

 8   reported in stenotype all testimony adduced and other

 9   oral proceedings had in the foregoing matter; that

10   thereafter my notes were transcribed using

11   computer-aided transcription under my direction; and

12   the foregoing transcript constitutes a full, true and

13   accurate record of such testimony adduced and oral

14   proceedings had and of the whole thereof.

15      Witness my hand and stamp at Portland, Oregon, this

16   18th day of May, 2018.

17

18

19

20   _____

21   Marcel N. Johnson

22   Oregon Certified Shorthand

23   Reporter No. 02-0380

24   Washington Certified Court

25   Reporter No. 0002947
```